UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

THE BUHRKE FAMILY REVOCABLE        :    Civil Action No. 1:22-cv-09174
TRUST, on Behalf of Itself and All Others   :
Similarly Situated,                :    <u>CLASS ACTION</u>
                                   :
                  Plaintiff,       :    **AMENDED COMPLAINT FOR**
                                   :    **VIOLATIONS OF THE FEDERAL**
        vs.                        :    **SECURITIES LAWS**
                                   :
U.S. BANCORP, ANDREW CECERE,       :
TERRY DOLAN, JODI RICHARD and      :
KATHERINE QUINN,                   :
                                   :
                  Defendants.      :    <u>DEMAND FOR JURY TRIAL</u>

———————————————————— x

**TABLE OF CONTENTS**

Page

I.    NATURE OF THE ACTION .................................................1

II.   JURISDICTION AND VENUE .............................................5

III.  PARTIES ..........................................................................6

IV.  SUBSTANTIVE ALLEGATIONS OF FRAUD..................................8

      A.    Background .................................................................8

      B.    USB Promotes Its Trustworthiness, Reputation and Ethicality to Investors as Competitive Advantages that Help Bolster the Bank's Bottom Line ...........................................9

      C.    USB Promotes Its "Best in Class" Risk Management Systems as Foundational to the Bank's Success ...................................11

      D.    The CFPB Issues a Consent Order Detailing that for More than a Decade USB Incentivized a Host of Unlawful Practices to Artificially Inflate Results...........................................11

      E.    Following the Wells Fargo Fake Accounts Scandal, Defendants Knew that USB's Business Conduct Was Illegal ..........................14

      F.    In the Wake of the Wells Fargo Scandal, Defendant Cecere Faces Pressure to Improve USB's Growth Results and Cement its Industry-Leading Brand and Reputation.................................17

      G.    In Response to Congress's Probe of USB's Unlawful Conduct, the Bank's CEO Admits Responsibility but Misleadingly Attempts to Downplay Its Significance .......................................19

      H.    Defendants Failed to Adequately Disclose USB's Illegal Business Practices or the CFPB Investigation to Investors ......................21

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD .........................23

      A.    Defendants' Misleading Statements and Material Omissions Regarding USB's Trust, Ethics and Brand ...............................23

           1.    USB's September 12, 2019 Investor Day Conference..................23

           2.    2019 and 2020 Annual Reports....................................30

**Page**

3.      March 10, 2020 Proxy Statement..................................................33

4.      September 15, 2020, September 21, 2021 and December 8, 2021 Conferences..................................................34

5.      "Most Ethical Company" Statements ...........................................36

6.      USB's "Ethics" Website Statement ..............................................41

B.      Defendants' Misleading Statements and Material Omissions Regarding USB's Risk Environment and Risk Management ...................43

C.      Defendants' False and Misleading Statements and Omissions Regarding the CFPB Investigation ..........................................52

D.      Defendants' False and Misleading Statements and Omissions Regarding USB's Ethics Code..................................................54

VI.     THE TRUTH BEGINS TO BE REVEALED ...................................................57

VII.    ADDITIONAL SCIENTER ALLEGATIONS..................................................58

1.      The Individual Defendants Were Directly Involved in Overseeing the Business Operations Associated with the Improper Conduct at Issue ..........................................59

2.      The Consent Order Attributed Knowledge of the Improper Conduct to Defendants, Who Were Also Aware of the Reputational Damage to USB Resulting from an Enforcement Action or Settlement..................................................62

3.      Defendants' Public Comments Contribute to a Compelling Inference of Scienter ..........................................64

4.      USB's Sales Practices at Issue Were Critical to Its Core Operations ..........................................65

5.      The Individual Defendants Reaped over $26 Million in Insider Trading ..........................................65

6.      USB Acted with Corporate Scienter ..............................................67

VIII.   LOSS CAUSATION AND ECONOMIC LOSS..................................................67

IX.     PRESUMPTION OF RELIANCE ..................................................69

**Page**

X.     NO SAFE HARBOR ............................................................................71

XI.    CLASS ACTION ALLEGATIONS ..............................................................72

COUNT I ..............................................................................................74

For Violation of §10(B) of the Exchange Act and SEC Rule 10b-5  Against
USB and the Individual Defendants ..................................................74

COUNT II .............................................................................................77

For Violation of §20(a) of the Exchange Act  Against the Individual Defendants ........77

PRAYER FOR RELIEF .................................................................................77

DEMAND FOR TRIAL BY JURY ....................................................................78

Lead Plaintiffs, Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by U.S. Bancorp ("USB," the "Bank" or the "Company"); Company press releases and earnings call transcripts; public information regarding USB, including information posted on the Company website; analyst and media reports about the Company and the industry; and regulatory proceedings against USB, including the Consumer Financial Protection Bureau ("CFPB") enforcement action against the Bank (*Bureau of Consumer Financial Protection v. U.S. Bank Nat'l Ass'n.*, No. 2022-CFPB-0006). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities fraud class action brought on behalf of purchasers of USB securities between August 1, 2019 and July 28, 2022, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder against USB and several of its senior executives ("Defendants").

2.    This case arises out of Defendants' misrepresentations and omissions that misled the investing public about USB's illicit conduct in accessing credit reports and opening lines of credit, credit cards and checking and savings accounts without customers' permission. In the wake of the massive scandal at Wells Fargo & Co. ("Wells Fargo"), which triggered extensive criminal and civil investigations stemming from a widespread practice of improperly opening millions of unauthorized

accounts, Defendants here sought to promote USB's "ethical" culture and reputation as the "most trusted choice" among U.S. banks as competitive advantages – *i.e.*, key assets that generate greater value for shareholders. Little did unsuspecting customers and investors know, however, that USB employed a strikingly similar scheme to Wells Fargo's that incentivized and encouraged USB employees to open unauthorized accounts to increase the Bank's sales and revenues.

3.   Throughout the Class Period, for example, Defendants reassured investors and the public that USB's "***culture, brand and reputation are sources of competitive advantage***" and "***differentiate [the Bank] from [it's] peers***."[1]  Indeed, the Bank emphasized that this "advantage" incorporated core values such as "ethics," "trust," "honesty" and "customer transparency."  For example, USB's Chairman, President and Chief Executive Officer ("CEO"), Andrew Cecere, underscored to investors that the Bank's "***reputation***" and "***risk discipline***" were "***differentiators,***" and that it's "strong reputation rooted in trust and engagement" and "[b]est-in-class . . . risk management" were "advantages" that set USB apart from its competitors.  The Bank's Chief Administrative Office, Katherine Quinn, even described ethics and consumer trust during an investor conference as the "secret sauce" of USB, explaining that "***[t]rust will remain a competitive advantage***" for the Bank and "is going to be a foundational driver, top driver of business in our industry."  Accordingly, Defendants proclaimed that "[c]ustomers and employees remain at the center of everything we do – past, present and future," and repeatedly touted that USB "do[es] the right thing."

4.   Likewise,  Defendants heavily promoted USB's annual designation as one of the "World's Most Ethical Companies" in its annual reports to shareholders, at investor conferences, on its website, in SEC filings and in virtually every press release the Company issued during the Class

---

[1]       Emphasis containing bold typeface and italics in quoted material is added.

Period. These were not generic statements merely buried in the back of the Bank's code of conduct. The designation was highlighted, for example, ***three separate times*** on the ***very first page*** of USB's 2019 Annual Report as part of a calculated and strategic marketing effort to increase the Company's brand value and trustworthiness, and to distinguish it from competitors like Wells Fargo, which was tainted by its own fake accounts scandal. Indeed, executives even highlighted to investors USB's rapid growth in brand value in the three years following the Wells Fargo fiasco, marked by a strengthening of the Company's "Most Trusted Choice positioning" and "'Excellent Reputation'" score.

5. In reality, however, these and similar representations were antithetical to the Bank's actual practices, which included abusive, predatory and deceptive conduct designed to artificially inflate USB's financial and operational results. Specifically, the Bank encouraged its employees to implement a variety of illicit practices to increase sales and profits, including: (a) creating sales pressure on employees that encouraged them to open lines of credit, credit cards and deposit accounts without consumers' knowledge and consent; (b) exploiting personal data without authorization; and (c) failing to provide legally required consumer disclosures. Likewise, USB failed to properly monitor its employees from engaging in such unlawful conduct, detect and stop the misconduct, identify and remediate harmed consumers and implement appropriate risk management measures that would have prevented the misconduct.

6. These illegal business practices, however, were the predictable and known result of USB's employee compensation and/or incentive structure, which conditioned employee performance ratings, and ultimately continued employment, on meeting frequently unattainable sales goals. This structure used an incentive-compensation program that rewarded managers and their subordinate employees for encouraging customers to purchase new products, often in the form of unauthorized

lines of credit attached to consumer checking accounts improperly sold to consumers as overdraft protection. USB's conduct violated a host of Banking laws and regulations, including the Consumer Financial Protection Act of 2010 ("CFPA"), the Truth in Lending Act ("TILA"), Truth in Savings Act ("TISA") and Fair Credit Reporting Act ("FCRA"), presenting an acute risk that the Bank would be subjected to severe reputational, legal and financial harm if the truth regarding the Bank's activities were ever publicly disclosed.

7.     That moment occurred on July 28, 2022, when the CFPB issued a Consent Order in an administrative proceeding with USB's banking subsidiary, U.S. Bank National Association ("U.S. Bank"), that included a $37.5 million fine for "*illegally* accessing its customers' credit reports and opening checking and savings accounts, credit cards, and lines of credit without customers' permission." CFPB Director Rohit Chopra declared in a press release announcing the news that "'[f]or over a decade, *U.S. Bank knew its employees were taking advantage of its customers by* misappropriating consumer data to create fictitious accounts.'" Additionally, the CFPB investigation found "*specific evidence that revealed that U.S. Bank was aware that sales pressure was leading employees to open accounts without authorization*, and the bank had inadequate procedures to prevent and detect these accounts." The $37.5 million penalty is notable in comparison to the $100 million penalty that Wells Fargo paid to the CFPB to resolve its fake accounts scandal given that USB is only 29% of the size of Wells Fargo (by annual revenue) but paid a proportionally larger penalty to the CFPB than Wells Fargo when considering company size.

8.     A week later, the United States Senate Committee on Banking, Housing, and Urban Affairs (the "Senate Banking Committee") sent a letter to defendant Cecere about the Bank's "concerning" misconduct, particularly in light of the Wells Fargo fake accounts scandal. The Committee highlighted the CFPB's findings that U.S. Bank utilized an incentive-compensation

program to pressure employees to "engage[] in ***unlawful activity*** by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit," which "accrued fees and increased profits" and which the CFPB found "violated federal consumer laws and violated individual consumers' control over their data privacy." The Committee requested detailed information from the Bank regarding the misconduct and implied that the Committee would further scrutinize Cecere at the Annual Wall Street Oversight Hearing in September 2022. When Cecere appeared before Congress the following month, rather than continue to deny any wrongdoing as the Bank had done in connection with the Consent Order, he explicitly ***admitted*** to the unlawful conduct: "***I take full responsibility that we did open up unauthorized bank accounts***. It was going back to 2010. ***It's unacceptable***. ***It's inconsistent with our principles and procedures as well as our ethics***."

9.     Following publication of the Consent Order, the price of USB stock declined 4% to close at $46.12 on July 28, 2022. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein arise under §10(b) and §20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

12.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act 15 U.S.C. §78a(a) and 28 U.S.C. §1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District. Pursuant to USB's

2Q 2022 Form 10-Q, filed on August 4, 2022, there were 1,485,784,028 shares of USB's common stock outstanding as of July 31, 2022. USB's common stock trades on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in USB's common stock located within the U.S., some of whom undoubtedly reside in this judicial district.

13.    In connection with the acts alleged in this complaint, USB, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

### III.    PARTIES

14.    Plaintiffs Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund were appointed as lead plaintiffs on February 10, 2023. ECF No. 28. As set forth in their earlier-filed certifications and incorporated herein by reference, Plaintiffs purchased significant amounts of USB securities during the Class Period and have been damaged thereby.

15.    Defendant U.S. Bancorp is a Delaware publicly traded corporation with its principal place of business at 800 Nicollet Mall, Minneapolis, Minnesota 55402. USB is the publicly traded parent company of U.S. Bank and its shares trade on the NYSE under the ticker symbol "USB."

16.    Defendant Andrew Cecere is the Chairman, President and Chief Executive Officer of USB. He has served as President of USB since January 2016, Chief Executive Officer since April 2017 and Chairman since April 2018. Cecere also served as Vice Chairman and Chief Operating Officer from January 2015 to January 2016, and was USB's Vice Chairman and Chief Financial Officer from February 2007 until January 2015. Additionally, Cecere served on the Executive Committee and Risk Management Committee of USB at all relevant times. Defendant Cecere certified the Company's Forms 10-Q and signed and certified the Forms 10-K filed with the SEC as discussed in further detail below.

17.     Defendant Terry Dolan is Vice Chair and Chief Financial Officer of USB and has held that role since December 2016.  Defendant Dolan certified the Company's Forms 10-Q and signed and certified the Forms 10-K filed with the SEC as discussed in further detail below.

18.     Defendant Jodi Richard is a Vice Chair and has held the role of Chief Risk Officer of USB since October 2018.  Defendant Richard also served on the Company's Executive Risk Committee.

19.     Defendant Katherine Quinn is Vice Chair and Chief Administrative Officer of USB since April 2017.  Quinn also served in various roles at USB, including as Executive Vice President and Chief Strategy, Marketing and/or Reputation Officer, from September 2013 to April 2017, and has served on the Managing Committee since 2015.

20.     Defendants Cecere, Dolan, Richard and Quinn are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants, together with USB, are sometimes referred to herein as the "Defendants."

21.     The Individual Defendants possessed the authority to control the contents of statements made by USB in its reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of USB's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Due to their positions with USB, and their access to USB's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

IV.    **SUBSTANTIVE ALLEGATIONS OF FRAUD**

A.    **Background**

22.    Founded in 1863, USB is a Delaware company headquartered in Minneapolis, Minnesota. With nearly 77,000 employees and $675 billion in assets, USB is the fifth largest bank in the U.S. It operates more than 2,000 banking branches across the country, and offers and provides an array of financial products and services to consumers, including lending and depository services, cash management, capital markets and trust and investment management services. It also engages in credit card services, merchant and ATM processing, mortgage banking, insurance, brokerage and leasing. The Company trades on the NYSE under the ticker "USB." USB is the publicly traded parent company of U.S. Bank, which is engaged in the general banking business, principally in domestic markets. Consumer and business banking is the Bank's largest business unit – generating 40% of the Company's net revenue, the vast majority of which is derived specifically from consumer banking.

23.    While USB had historically been one of the industry's best performers – including by weathering the financial crisis better than most of its competitors – the Bank was "far from a universally recognized brand" to consumers, as noted in an October 3, 2017 *American Banker* article. In fact, defendant Cecere had once referred to USB as "the best bank no one's heard of," according to the article. But in 2013, the Bank hired defendant Quinn to run the Company's strategy, marketing, reputation and branding efforts, and was tasked with "build[ing] the brand from the ground up." According to one report, when a recruiter first told Quinn about the job opportunity at the Bank, she responded that she too had "never heard of U.S. Bank," to which the recruiter responded, "[t]hat's exactly why they need you." Over the ensuing years, under the leadership of Cecere and Quinn, among others, and in response to USB's "efforts to build brand awareness and strategically market [itself]," the Company's "brand value — the financial significance a brand

carries — grew by 55%" from 2017 to 2019.  A crucial part of those efforts included seeking and obtaining an annual designation by Ethisphere Institute as one of the world's "Most Ethical Companies," an honor the Company heavily promotes to investors.  As recognized by USB, Quinn has "advanced the company strategically and reputationally," and has "built U.S. Bank into a national brand, including . . . the positioning of U.S. Bank as one of the world's most ethical companies."

> **B.      USB Promotes Its Trustworthiness, Reputation and Ethicality to Investors as Competitive Advantages that Help Bolster the Bank's Bottom Line**

24.      Essential to USB's success is the success of its consumer banking operations and its ability to garner the trust of customers.  As defendant Cecere – USB's Chairman, President and CEO – highlighted in a "Strategic Overview" presentation at a September 12, 2019 Investor Day conference (the "2019 Investor Conference"), one of the Company's key "*[a]dvantages*" is a "*strong reputation rooted in trust.*"  In the same presentation, Cecere remarked that USB's "*reputation*" is a "*differentiator*[]," and that "[c]ustomers and employees remain at the center of everything we do – past, present and future."  Quinn, then the Company's Chief Administrative Officer, echoed these sentiments in her presentation at the 2019 Investor Conference, stating that USB's "brand and culture" – including "*trust*," "*ethics*" and "*customer transparency*" – were a "*source of competitive advantage*," and that "Trust and Reputation are Foundational to All Constituencies."  Indeed, she emphasized in her slide deck that USB's brand "directly impacts every major constituency," including employees, customers communities and *shareholders*.  She also stated that USB experienced 55% "[g]rowth in brand value since 2016" – the same year that the Wells Fargo scandal erupted publicly.  The Bank later explained that its brand value growth was in direct "response to [the Bank's] efforts to build brand awareness and strategically market ourselves."  Quinn continued in her comments accompanying the slide presentation:

We were at a leadership off-site this past summer and we asked our top 200 leaders what is the *secret sauce* of U.S. Bank, and this is the word cloud that emerged from that. So for those of us who live and breathe it every day, it's no surprise that *ethics, trust and collaboration rose to the top*.

*          *          *

*Ethics and trust rises to the #1 spot* for all customer segments, both consumers and businesses.

*          *          *

*Trust will remain a competitive advantage for us*.  It is not going anywhere.  It is going to be a foundational driver, top driver of business in our industry.

25.     USB touted these same fundamental attributes and distinguishing characteristics in the Company's 2019 Annual Report, which again highlighted USB's "strong reputation" and growth in brand value alongside a declaration that "[o]ur culture, brand and reputations are sources of *competitive advantage* for U.S. Bank and *differentiate* us from our peers."

26.     Trust and reputation are so important to USB that its executives have repeatedly promoted the Company's selection as one of the "*World's Most Ethical Companies*" on its website, at investor conferences, and in its annual reports, press releases, SEC filings and USB's Code of Ethics and Business Conduct (the "Ethics Code").  When the Company announced the honor for the sixth consecutive year in February 2020, defendant Cecere stated that, "*Our commitment to doing the right thing is at the heart of everything we do* . . .  I'm proud of the work our employees do every day to earn and keep the trust of our customers."  Indeed – unlike the other major banks implicated in fraudulent account scandals, at the end of nearly every press release the Company issued during the Class Period, under the heading "About U.S. Bancorp,"  USB highlighted that it was named one of the "World's Most Ethical Companies," cementing its "statistically leading" reputation among the Bank's peers.  And USB's 2019 Annual Report highlighted its designation as one of the "World's Most Ethical Companies" not once, but *three times* on the *very first page* of the

report.  Thus, the Bank ensured that its ethicality, reputational assets and ability to maintain consumer trust and confidence were of paramount importance and a centerpiece of the Bank's business, financial prospects and its value proposition for USB investors.

### C.    USB Promotes Its "Best in Class" Risk Management Systems as Foundational to the Bank's Success

27.    Defendants also promoted USB's risk management systems – built to manage operational risk embedded in the Bank's business activities through a system of controls and oversight designed to safeguard financial and other customer data – as a critical component of USB's success.  For example, at the 2019 Investor Conference, defendant Cecere described the Company's "[b]est-in-class . . . risk management" as one of the Bank's key "***advantages***," and proclaimed that USB's "risk and financial discipline," along with its "business mix" and "culture," is "what made us great."  He also stated in a slide during the presentation that the Bank's "risk discipline" is a "***differentiator***[]."  Another executive touted USB's "[b]est in class risk discipline" at the conference as a "***competitive advantage***," while yet another executive emphasized that "[a] strong risk culture is embedded in our corporate strategy and will continue to be foundational to our long-term success."  The marketplace agreed with USB's assessment.  For example, Wells Fargo opined in an analyst report at the end of the Class Period that "USB has, in our view, one of the stronger reputations in banking in terms of risk management and oversight."

### D.    The CFPB Issues a Consent Order Detailing that for More than a Decade USB Incentivized a Host of Unlawful Practices to Artificially Inflate Results

28.    Explicitly and directly repudiating the Bank's repeated proclamation of ethicality and trustworthiness, and that it maintained "best-in-class . . . risk management" systems, on July 28, 2022, the CFPB issued a Consent Order fining the bank $37.5 million for "***Illegally Exploiting***

Personal Data to Open Sham Accounts for Unsuspecting Customers."  In the press release issued

that day, the CFPB explained that U.S. Bank:

> ***illegally*** access[ed] its customers' credit reports and open[ed] checking and savings
> accounts, credit cards, and lines of credit without customers' permission.  U.S. Bank
> pressured and incentivized its employees to sell multiple products and services to its
> customers, including imposing sales goals as part of their employees' job
> requirements.  In response, U.S. Bank employees unlawfully accessed customers'
> credit reports and sensitive personal data to apply for and open unauthorized
> accounts.  U.S. Bank must make harmed customers whole and pay a $37.5 million
> penalty.

29.     CFPB Director Rohit Chopra stated that "'[f]or over a decade, ***U.S. Bank knew its***

***employees were taking advantage of its customers by misappropriating consumer data to create***

***fictitious accounts.***'"  The CFPB further described its findings as follows:

> The CFPB's investigation found ***specific evidence*** that revealed that U.S. Bank was
> ***aware*** that sales pressure was leading employees to open accounts without
> authorization, and the bank had inadequate procedures to prevent and detect these
> accounts.  Specifically, U.S. Bank imposed sales goals on bank employees as part of
> their job requirements.  U.S. Bank also implemented sales campaigns and an
> incentive-compensation program that financially rewarded employees for selling
> bank products.
>
> U.S. Bank's conduct harmed its customers in the form of unwanted accounts,
> negative effects on their credit profiles, and the loss of control over personally
> identifiable information.  Customers also had to waste time and energy closing
> unauthorized accounts and resolving consequences stemming from them, including
> seeking refunds for improperly charged fees.
>
> The CFPB found that ***U.S. Bank violated the Consumer Financial Protection Act,***
> ***the Fair Credit Reporting Act, the Truth in Lending Act, and the Truth in Savings***
> ***Act***.  Specifically, U.S. Bank was:
>
> - **Exploiting personal data without authorization**: The Fair Credit Reporting Act,
>   among other things, defines the permissible uses of credit reports, and users of credit
>   reports may only request them if they have a permissible purpose.  U.S. Bank used
>   customers' credit reports without a permissible purpose, and without its customers'
>   permission, to facilitate opening unauthorized credit cards and lines of credit.
>
> - **Opening accounts without consumer permission**: U.S. Bank opened deposit
>   accounts, credit cards, and lines of credit without permission.  This included opening
>   Reserve and Premier lines of credit, which carry high interest rates and expensive

fees.  This behavior violated the Consumer Financial Protection Act and the Truth in Lending Act.

- **Failing to provide legally required consumer disclosures**: The Truth in Savings Act requires banks to provide certain disclosures when opening new deposit accounts.  U.S. Bank violated the law when its employees opened consumer deposit accounts without permission and, in the process of doing so, failed to provide the required disclosures.

30.     The Consent Order itself explained that in order to increase sales of consumer financial products or services, U.S. Bank "imposed sales goals on bank employees as a factor in evaluating employee performance and implemented an incentive-compensation program that financially rewarded employees for selling" such products and services.  The sales goals "included a point-based system, with different point values assigned to different products . . . primarily based on the revenue that each product generated for the bank."  Bank employees were pressured "to sell more products" because, according to the Consent Order, doings so was in U.S. Bank's interest – namely increasing sales and related revenue associated with increased sales.  In direct "response to sales pressure or to obtain incentive awards," bank employees opened accounts, submitted applications for and issued credits cards and opened lines of credit linked to deposit accounts "*without consumers' knowledge and consent*."  The Consent Order also determined that these improper practices had "generated associated fees from products opened without consumers' knowledge and consent."

31.     Significantly, the Consent Order explained that from January 1, 2010 through December 31, 2020 (the "Findings Period"), the processes that U.S. Bank utilized "were not reasonably designed to determine the full scope of Improper Sales Acts or Practices."  This is because prior to 2016, U.S. Bank "primarily relied on consumers to self-identify or on consumers or employees to allege improper activity."  According to the Consent Order, U.S. Bank "[*o*]*nly recorded or investigated the allegations if the allegation was escalated above the bank-branch level,*" and "*was aware that many allegations were not escalated or recorded*."  In other words, the

- 13 -

Bank did not track or investigate instances of unauthorized accounts opened at all because it failed to maintain a system of controls designed to detect improper sales activity until, at the earliest, 2016, when U.S. Bank first "began enhancing its processes for detecting and investigating sales misconduct."

32.    U.S. Bank's improper and unlawful sales activity harmed consumers through "fees charged on unauthorized accounts; negative impacts to consumer credit profiles; the loss of control over personal identifying information; and the expenditure of consumer time and effort investigating the facts, seeking closure of unwanted accounts, and monitoring and mitigating harm going forward." The Consent Order required U.S. Bank to pay a $37.5 million penalty to the CFPB to be deposited into a victims relief fund to provide compensation to consumers harmed by violations of federal consumer financial protection law. The order also required U.S. Bank to forfeit and return all unlawfully charged fees and costs to harmed customers, including by developing a plan to remediate harmed consumers by returning all unlawfully charged fees and costs, plus interest.

### E.    Following the Wells Fargo Fake Accounts Scandal, Defendants Knew that USB's Business Conduct Was Illegal

33.    The CFPB investigation into USB's unauthorized accounts occurred in the wake of the scandal that engulfed Wells Fargo. Referred to by former SEC Chairman Arthur Levitt as a "scandal of almost unimaginable proportions," the revelation that Wells Fargo employees had opened unauthorized accounts on behalf of customers resulted in the collapse of the price of Wells Fargo securities, a host of lawsuits, settlements and fines and the forced exit of several senior Wells Fargo executives, including its former CEO and Chairman John Stumpf. The Wells Fargo scandal would have been top-of-mind for Defendants when they made their misleading statements and omissions during the Class Period, knowing as they did that USB had also used a similar unauthorized-accounts scheme to illegally increase consumer sales and engagement for years and

that the Bank was in extreme legal and regulatory peril as the target of a sweeping CFPB investigation.

34.    On September 8, 2016, the CFPB published an enforcement action and Consent Order against Wells Fargo.  The CFPB, joined by other regulators, sought to punish Wells Fargo for its "*illegal* practice of secretly opening unauthorized deposit and credit card accounts."  The CFPB's announcement of the enforcement action noted that the underlying facts were known to Wells Fargo prior to the CFPB probe and that an internal investigation had revealed fraudulent practices. Specifically, the CFPB found that Wells Fargo had: (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts without the customers' knowledge or consent; (2) submitted applications for credit cards in customers' names without the customers' knowledge or consent; (3) enrolled customers in online banking services they did not request; and (4) ordered and activated debit cards using customers' information without their knowledge or consent.

35.    The CFPB's announcement also noted that Wells Fargo had "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking," and that "Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets."  CFPB Director Richard Cordray remarked, "'*Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences*.'"  As senior executives in the banking industry, this "notice" was directed at defendants Cecere, Dolan, Quinn and Richard, among other banking executives.

36.     Confirming the material risk posed by such illicit business practices to financial institutions like USB, as a result of the CFPB action the price of Wells Fargo stock dropped $1.18 per share on Friday, September 9, 2016, from $49.90 to $48.72, and then continued dropping the following week.

37.     Following the filing of the CFPB action, a September 16, 2016 *Reuters* article reported that, "A phantom account scandal at Wells Fargo & Co. has put the U.S. bank's disclosure policies under a harsh spotlight."  Under the heading "Material Or Not?" the *Reuters* article noted that, "The tactics deployed in its branches were not a surprise for Wells."  The bank had been looking into them since 2011, but "[n]o mention is made of the bank's internal probe, or authorities' probes in the 'legal actions' section of [Wells Fargo's] latest quarterly or annual securities filings. . . . ***Experts said Wells Fargo would have been wise to at least flag the issue earlier.***"  The article also quoted former SEC Chairman Arthur Levitt saying, "It is a scandal of almost unimaginable proportions" and "'[y]ou cannot hold management immune from its consequences.'"

38.     Later in September 2016, Wells Fargo's CEO and Chairman, Stumpf, testified under oath before the Senate Banking Committee.  During his testimony, Stumpf admitted that he and bank executives had been aware of unethical practices in the retail banking segment of Wells Fargo for several years prior to September 2016, as well as regulatory investigations into those unethical practices.  But Stumpf tried to downplay the fake accounts scandal, claiming it "was not a material event" and that the bank just "had some indication that we had one percent of our people who were doing the wrong thing."  But in response to Pennsylvania Senator Pat Toomey's question, "When did you begin to disclose in SEC filings that you had this potentially material adverse set of circumstances that could certainly have huge damage to your reputational value?," Stumpf said, "I do not know."  Senator Toomey continued: "Well, we haven't been able to discover a disclosure, and

*the SEC very clearly requires disclosure of material adverse circumstances. And I do not know how this could not be deemed 'material' . . . the reputational damage done to the bank is clearly material*."

39.     Two weeks after his Congressional testimony, Stumpf resigned as CEO and Chairman of USB in disgrace and announced he would have to forfeit $41 million in previously awarded compensation. In January 2020, the Office of the Comptroller of Currency announced that Stumpf would be banned from ever working at a bank again and would pay $17.5 million for his role in the fake accounts scandal. Well Fargo ultimately paid billions in fines to various state and federal agencies, including the CFPB, the SEC, the Department of Justice, the U.S. Attorney's Offices for the Central District of California and the Western District of North Carolina and the city and county of Los Angeles, along with hundreds of millions to shareholders and account holders to resolve class action investor and consumer actions in connection with the scheme.

**F.     In the Wake of the Wells Fargo Scandal, Defendant Cecere Faces Pressure to Improve USB's Growth Results and Cement its Industry-Leading Brand and Reputation**

40.     In a February 21, 2017 exposé in *American Banker* discussing the upcoming transition from USB's then-Chairman and CEO Richard Davis to Andy Cecere, who was set to take over as head of the Bank in April 2017, a senior research analyst with Sanford C. Berstein commented, "'I can't imagine a more seamless transition'" given that "the two walk in lockstep on strategy and direction" and that "'Wall Street looks at them very much as a pair.'" While Davis was well-revered as the leader of the Company for a decade, the author commented that "it's rare to see a guy so clearly at the top of his game stepping aside at such an early age," and wrote that "[a] few have speculated that he witnessed the scandal engulfing his friend and colleague, John Stumpf, the former chairman and CEO of Wells Fargo, and is getting out before something unexpected blows up." Of Cecere's upcoming challenges, the author noted that USB's "biggest issue . . . by all

accounts" is growth-related as the Bank had "fallen short of expectations" and failed to "meet its three-year growth targets set in 2013." Accordingly, Cerere was poised to enter as CEO "under pressure to deliver better results."

41. The *American Banker* exposé also discussed the Bank's "scandal-free" reputation, quoting outgoing CEO Davis in this context as stating, "'we walk a tightrope that's higher than any other bank, and we have no net . . . If we screw up, we're in trouble.'" Such efforts, the author noted:

> have made USB a regular on a list of the 'world's most ethical companies' published by Ethisphere. It is also the largest bank on the list.
>
> Tim Erblich, CEO of the Ethisphere Institute, said USB is ahead of most banking peers in recognizing the power of openness and ethical example-setting at the top. Employees take pride when their company tackles society's ills, such as a recent initiative for serving the unbanked. That, in turn, inspires loyalty and extra effort.
>
> "It's a ***secret sauce*** for success," Erblich said. "If employees trust the leadership, then your customers trust the employees and ***it all trickles to the bottom line***. It's super-smart business."

42. Quinn, the Company's Chief Administrative Officer and Managing Committee member in charge of strategy surrounding brand, reputation and culture, further commented in the exposé on the Bank's "different and unique culture," noting that two of the Bank's "five core values" included "'We do the right thing'" and "'We put people first.'" She also explained that USB's "three main business goals are embodied in the culture," including "to be customers' most trusted choice." Against this backdrop, the author concluded that, upon Cecere's elevation to CEO, "[m]aintaining USB's credibility will likely make [him] a success. Boosting revenue and the bottom line could make him a star[.]"

G.    **In Response to Congress's Probe of USB's Unlawful Conduct, the Bank's CEO Admits Responsibility but Misleadingly Attempts to Downplay Its Significance**

43.    On August 4, 2022, just a week after the CFPB issued the Consent Order against U.S. Bank, the Senate Banking Committee sent a letter to defendant Cecere about the Consent Order, expressing its deep concern with the Bank's misconduct, particularly in light of the Wells Fargo fake accounts scandal.  The committee highlighted the CFPB's findings that U.S. Bank utilized an incentive-compensation program to pressure employees to "engage[] in unlawful activity by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit," which "accrued fees and *increased profits*" and which the CFPB found "*violated federal consumer laws and violated individual consumers' control over their data privacy*."  The Senate Banking Committee also requested detailed information from the Bank regarding the misconduct and stated that it "look[ed] forward" to Cecere's testimony at the Annual Wall Street Oversight Hearing in September 2022 (the "Oversight Hearing").

44.    On September 22, 2022, seven CEOs of the largest U.S. banks – Wells Fargo, Bank of American, JP Morgan Chase & Co., Citigroup, Trust Financial Corporation, The PNC Financial Services and USB – attended the Oversight Hearing.  Each of the bank heads was asked whether his or her bank was opening unauthorized accounts, and all denied that such accounts were being opened except Cecere.  Rather than continue to deny any wrongdoing as the Bank had done in connection with the Consent Order, Cecere *admitted* to the unlawful conduct: "*I take full responsibility that we did open up unauthorized bank accounts*.  It was going back to 2010.  It's unacceptable.  *It's inconsistent with our principles and procedures as well as our ethics*."  Like Stumpf did with respect to Wells Fargo years earlier, Cecere attempted to downplay the impact of the misconduct and his disclosure by purporting to claim that the Bank only "identified 342 accounts over that time . . . against a population of 40 million opened accounts."  But Cecere's testimony

failed to provide any context for his improbable assertion and grossly misrepresented the extent of unauthorized accounts at the Bank.

45.     As an initial matter, Cecere's attempt to explain away over a decade of misconduct condoned and facilitated by senior management by suggesting that the unlawful activity at USB was infinitesimal was, according to the terms of the Consent Order itself, calculatingly and catastrophically deceptive.  That is because, as explained above, the Consent Order specifies that ***throughout*** the 11-year Findings Period, USB's processes "were not reasonably designed to determine the full scope" of the misconduct.  And for the first six years of the Findings Period – until 2016 – USB lacked ***any*** system for identifying unauthorized accounts as it relied on either: (1) consumers to self-identify improper conduct; or (2) consumers or employees to allege improper activity.  But even when consumers or employees identified misconduct, USB "only recorded or investigated the allegations if the allegation was escalated ***above*** the bank-branch level," and according to the Consent Order, USB "was ***aware*** that many allegations were not escalated or recorded."  So while Cecere's testimony proclaimed that unauthorized accounts were hardly a problem at USB, it also obscured the true scope of unauthorized accounts affected by the Bank's misconduct, which continued for years after the CFPB launched its investigation.

46.     Furthermore, Cecere's testimony before Congress not only understated the real number and scope of unauthorized account openings, it omitted any detail about the requirements for determining whether an account was unauthorized, and failed to state whether the Bank was capable of identifying accounts that bear indicia of non-authorization and how many such accounts there were.  Cecere's testimony is likewise at odds with the fact that USB agreed to pay $37.5 million in connection with the CFPB's investigation into the Bank's unlawful activity – comparatively ***more*** than what Wells Fargo paid to the CFPB (when adjusting for company size based on revenue) for

similar and universally-acknowledged egregious fraudulent conduct. USB undoubtedly would not have agreed to such a penalty had there only been 342 isolated incidents of unauthorized accounts opened over an 11-year period, which is the equivalent of a single unauthorized account opened in a single branch each year in each of the 28 states in which the Bank currently maintains branches, which is simply inconsistent with an agreement to pay an eight-figure settlement in connection with alleged wrongdoing. For comparison, in connection with Wells Fargo's $100 million penalty to the CFPB to resolve an analogous investigation of fake accounts, the company identified more than 3.5 million accounts impacted by improper and unlawful conduct. Indeed, while the Consent Order here acknowledges that the improper sales practices involved a "small percentage" of USB's new accounts, even if, for example, only 5% of new accounts were improperly opened or otherwise impacted by illicit activity, that amounts to *2 million accounts* using Cecere's own statistics.

### H. Defendants Failed to Adequately Disclose USB's Illegal Business Practices or the CFPB Investigation to Investors

47.    Despite knowing of the illicit business practices at the Bank dating back to 2010, admitting that USB had in fact opened unauthorized accounts, being aware of the CFPB investigation of specific illegal activities for years and the fact that these activities were analogues to the catastrophic Wells Fargo fake accounts scandal, Defendants failed to publicly and timely disclose the existence of the investigation, the increasing likelihood of a settlement or enforcement action being brought or the nature of the illegal business practices at the Bank. To the contrary, in statements to investors during the Class Period, Defendants repeatedly spoke about how consumer trust, ethics and reputation were "differentiators" and provided the Bank with a competitive advantage, while omitting any mention of the CFPB investigation (or, later in the Class Period, inadequately disclosing the nature of and risk associated with the investigation) or the unauthorized accounts that Defendants used to boost the Bank's consumer business.

48.    Defendants also routinely highlighted USB's robust compliance and risk management practices, claiming, for example, that the Company's "risk management" was "[b]est in class" and a key "advantage[]."  Cecere also stated that the Bank's "risk discipline" is a "*differentiator*[]." Another executive touted USB's "[b]est in class risk discipline" as a "competitive advantage," while yet another executive emphasized that "[a] strong risk culture is embedded in our corporate strategy and will continue to be *foundational* to our long-term success."  Similarly, USB's Ethics Code claimed that "[i]ncentive gaming and aggressive, deceptive, unfair or abusive sales practices are prohibited," stated that employees could not "open bogus accounts, sell products and/or open accounts without a customer's affirmative consent, [or] falsify applications" and identified "[o]pening, closing or altering accounts without proper authorization" as "[p]rohibited account transactions."

49.    Even as the CFPB investigation and the use of unauthorized accounts were already known to them, Defendants purported to warn investors about the potential risk that "*any* of" the "pending examinations, inquiries and investigations . . . *could* lead to administrative or legal proceedings or settlements."  But, they failed to disclose that USB and the Individual Defendants knew that the Bank's employees had been engaging in a host of illicit practices since at least 2010, including practices analogous to the Wells Fargo fake account scandal.  And while the Bank disclosed that it was the subject of a CFPB investigation into "consumer sales practices" later in the Class Period, it failed to disclose the nature of the practices at issue or the likelihood that a settlement or enforcement action would ensue.

50.    Despite these developments, Defendants continued to promote the Bank's reputation, trustworthiness, ethicality and superior risk management systems as "differentiators" that set USB apart from the competition and even provided it with a competitive advantage over its peers.  Indeed,

the Bank's public representations were a clear response to the scandals that preceded the onset of the Class Period.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

51.    During the Class Period, Defendants made false and misleading statements and material omissions concerning: (1) USB's trust, ethics and brand; (2) the Bank's risk environment and management; (3) the CFPB investigation; and (4) USB's Ethics Code.  The Class Period began on August 1, 2019, and USB's stock traded as high as $57.19 on that date.

### A. Defendants' Misleading Statements and Material Omissions Regarding USB's Trust, Ethics and Brand

52.    Throughout the Class Period, the Company highlighted the importance of its ethical culture, trustworthiness and brand to investors, including referencing many of these assets as differentiators to, or competitive advantages over, its competitors.  USB's carefully cultivated corporate reputation and trust enabled the Company to significantly grow its brand, and Class Period statements about these topics served to further underscore the importance of these advantages to the Company.

#### 1. USB's September 12, 2019 Investor Day Conference

53.    On September 12, 2019, the Company filed a Current Report on Form 8-K to which Defendants appended as an exhibit presentation slides entitled "U.S. Bancorp Investor Day" for the Company's Investor Day held that same day.  Defendants Cecere, Dolan and Quinn, along with other members of the Company's executive management team, presented during the Company's Investor Day.

54.    The presentation included the following slide, presented by defendant Cecere in a "Strategic Overview," entitled "Our Advantages," in which USB underscored its "***strong reputation rooted in trust and engagement***," as reflected in the following slide:

**Our Advantages**

   

**Best-in-class
financial results
and risk
management.**
Track record of
industry leading
performance and the
highest debt ratings
in the world.

**A diverse mix of
businesses and
core financial
products.**
Balance of
customers and fee
and non-fee based
businesses.

**A strong reputation
rooted in trust and
engagement.**
Recognized inside
and outside the bank
for focus and action
in areas that matter
most.

**A clear strategy
that we are
executing
effectively.**
Nimble yet clear so
we can evolve in a
rapidly changing
environment.



55.    Cecere also presented a slide to investors explaining that "[w]e will keep what made us great," including "[o]ur culture," and explaining that "[c]ustomers and employees remain at the center of everything we do – past, present and future," as reflected in the following slide:



56.     Additionally, Cecere emphasized in slides during his presentation that "We Are Enhancing Our Capabilities to Compete in a New World," including by "[f]ocusing relentlessly on the customer," and that USB is "Positioned to Win," including because the Bank's "reputation" is a "differentiator[]."

57.     Quinn, USB's Chief Administrative Officer, presented regarding the Company's "Brand and Culture," which she described as a "Source of *Competitive Advantage*," and which included "ethics," "trust," "respect," "customer transparency," "caring" and "honesty," among other things, as reflected in the following slide:



58.     Quinn also stated that "Brand Directly Impacts Every Major Constituency" and specifically identified employees, customers, communities and *shareholders* as the aforementioned constituencies, as reflected in the following slide:

**Brand Directly Impacts Every Major Constituency**

We bring our story to life in relevant ways across each group

   

| Employees | Customers | Communities | Shareholders |
|---|---|---|---|
| *Experience, purpose, rewards and engagement* | *Ethics, experience, products and services, relationships* | *Investment, partnerships, sponsorships* | *Consistent results, best-in-class returns* |



U.S. BANCORP  26

59.    In another slide, Quinn emphasized USB's "Strong Reputation," noting that "We maintain an '***Excellent Reputation***' score as defined by our community partners."

60.    Additionally, Quinn underscored in yet another slide that USB's "brand value" grew 55% since 2016, resulting in "Strengthened ***Most Trusted Choice*** positioning," and "Deepened relationships with existing customers," as reflected in the following slide:






61.    In another slide, Quinn stated that "Trust and Reputation Are Foundational to All Constituencies," and highlighted "Prioritizing and building 'trust' at moments that matter most," as reflected in the following slide:




- 27 -

62.     During the 2019 Investor Conference, and accompanying the slide presentation, USB executives spoke about the Company to investors, elaborating on the points and topics emphasized in the slides.  Regarding the Company's priorities, Defendant Cecere stated:

> **Number one, relentlessly focusing on the customer.  Everything we do at the company is with the customer in the center and all of our capabilities around that.** The way we think about product development, technology, service, operations, communications, we're looking at the customer at the core of what we do.

63.     Additionally, Quinn assured investors during the 2019 Investor Conference that:

> **[b]rand and culture are differentiators for U.S. Bank and they are fundamental to how we run our business.**  When we met last year in 2016, we talked about how **strong brands drive better shareholder return.  They also drive higher top line growth and they outperform the S&P 500.**  I'll tell you today what we've done on our brand journey since then, where we're positioned and what's next for us.
>
> So increasingly, people are not just buying what you do, they're buying why you do it.  So when we began our brand journey, we started from the inside out.  We started with our culture, which is a unique combination of IQ and EQ and that is reflected in our purpose statement.  We invest our hearts and minds to power human potential. The trend of culture is very important.  So when you think about the sea of black and white banking, this gray space is really, really important, the space of brand and culture.  It unifies and rallies employees and it's why is felt across all of our stakeholders.
>
> The **intersection of brand and culture is differentiating**, and it is really the unwritten rule set in which all decisions are made inside the company, and where -- is felt to all of our stakeholders again and it's how we conduct business.  We were at a leadership off-site this past summer and **we asked our top 200 leaders what is the secret sauce of U.S. Bank**, and this is the word cloud that emerged from that.  So for those of us who live and breathe it every day, it's no surprise that **ethics, trust and collaboration rose to the top**.
>
> *        *        *
>
> **Ethics and trust rises to the #1 spot for all customer segments, both consumers and businesses.**
>
> *        *        *
>
> So we work on attracting, retaining and developing our relationships with both employees and customers.  And we focus on 3 things: one, creating compelling journeys for them both.  For example, personalizing their experiences with us; secondly, enhancing and enabling their digital lives.  As Andy said, you'll hear the

- 28 -

word digital throughout the day; and lastly, by establishing really deep and meaningful relationships with both. This helps us build our customer brand as well as our employee brand resulting again in revenue, retention and growth. ***Trust will remain a competitive advantage for us.*** It is not going anywhere. It is going to be a foundational driver, top driver of business in our industry.

64.     Timothy A. Welsh, the Company's Vice Chairman of Consumer Banking Sales &

Support, stated at the 2019 Investor Conference:

> We're becoming -- we're trying to become central to the lives of our customers. That's important. What that means is that we're really valuable to our customers that they depend on us, that they think of us, that they have an emotional connection to us in ways that are really meaningful. We're not just a mortgage that they pay or an auto loan bill. If all that -- if that's all we are, then we're not doing anything to power their potential. So this concept of centrality is very important, and the core underlying element of it is the idea of engagement. What we're trying to do with our customers is engage with them as frequently as we can. Derek talked about this with the large tech companies. He highlighted the fact that they focus on time spent with them. That's an idea that we're trying to replicate, but we're trying to do it in a very important way. ***We want to interact with our customers a lot, but we want to make sure that every time we do, we are helpful to them. If we are helpful to them and they interact with us a lot, it will help us build trust, which Kate and Andy highlighted, is so central to what we're doing. So that's really the core***.

65.     James B. Kelligrew, USB's Vice Chairman of Corporate & Commercial Banking,

stated the following at the 2019 Investor Conference: "Our ***best-in-class risk discipline*** and I would

add to that ***our strong ethical culture really resonates well with our client base*** with U.S. as a really

safe and dependable long-term relationship."

66.     The statements referenced above in ¶¶54-65 are false and misleading and omitted

material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-

32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated

the intervention of corporate headquarters (including the involvement of the Individual Defendants);

(ii) that USB's senior management had knowingly failed to remediate these illicit business practices;

(iii) that USB had been the target of a CFPB investigation into these known illicit business practices

and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as

a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril. The statements referenced above in ¶¶54, 56-61 and 63 regarding USB's brand and reputation are also false and misleading given that the then-undisclosed CFPB investigation into the Bank for the illicit business practices detailed in ¶¶28-32, *supra*, targeted misconduct that was strikingly similar to the misconduct at issue in the Wells Fargo fake account scandal that tarnished Wells Fargo's reputation beginning in 2016, thus putting Defendants on notice that USB's conduct was illegal and would likely tarnish the Bank's brand and reputation.

### 2.    2019 and 2020 Annual Reports

67.    On or around February 13, 2020, USB issued its 2019 Annual Report ("2019 Annual Report"), in which it highlighted the Bank's "strong reputation," noting that "***Our culture, brand and reputation are sources of competitive advantage for U.S. Bank and differentiate us from our peers***." USB further stated in the 2019 Annual Report that "Our brand value — the financial significance a brand carries — grew by 55% in the last three years[] in response to our efforts to build brand awareness and strategically market ourselves." USB further stated: "***Our commitment to operating with ethics and integrity and our focus on building trust are in everything we do***, and we're recognized for that work through accolades from organizations like The Ethisphere® Institute, Fortune®, Forbes® and DiversityInc®." The page of the 2019 Annual Report reflecting these statements is set forth in material respect below:

U.S. Bank leaders at the U.S. Bank Women of Europe Conference in 2019.

# A strong reputation

Our culture, brand and reputation are sources of competitive advantage for U.S. Bank and differentiate us from our peers.

### Inclusion at U.S. Bank:

› HRC named us a "Best Place to Work" for LGBTQ Equality

› We signed the CEO Champions for Change pledge, a commitment to advance women

› Nearly 26,000 employees engaged through our Business Resource Groups

› We invested $1 million in the Smithsonian's National Museum of African American History and Culture

**Our culture** is grounded in five core values, starting with doing the right thing. Our commitment to operating with ethics and integrity and our focus on building trust are in everything we do, and we're recognized for that work through accolades from organizations like The Ethisphere® Institute, Fortune,® Forbes® and DiversityInc®.

**Our brand** stands tall on national and international stages as we work to help people turn their dreams into reality. Our brand value — the financial significance a brand carries — grew by 55% in the last three years[1] in response to our efforts to build brand awareness and strategically market ourselves.

**Our community** giving and engagement program is focused on closing gaps and creating economic opportunities in the areas of work, home and play. We drive social impact by working with and through our partners, including the nonprofit leaders of our Community Advisory Committee, who provide perspective and feedback from underserved communities. Read more about our commitment to be a responsible corporate citizen within our communities at usbank.com/CSR2019.

**Our strength** in these areas lets us hire and retain top talent, become more central to our customers' financial lives, partner with our communities and drive top line growth.

8  U.S. Bancorp 2019 Annual Report | usbank.com/AR19

1. Brand Finance, brandfinance.com.

68.     Furthermore, under a subheading in the 2019 Annual Report entitled, "***The most trusted choice***," USB stated "***Doing the right thing is in the DNA of our culture***, and we work hard to earn the privilege of trust and the opportunity to deepen it.  We grow by investing in and staying true to our ethical culture, risk and financial discipline and our commitment to keeping customers safe and secure."

69.     Under a section of the 2019 Annual Report entitled, "Data science," USB stated: "Being a central part of our customers' financial lives means we manage a tremendous amount of data and assume the responsibility for the ethical use of it.  We're focused on strategic decisions through centralized data and analytics and we've built a dedicated team of experienced professionals to distill and protect that data to benefit our customers in meaningful ways."

70.     On or around February 23, 2021, USB issued its 2020 Annual Report ("2020 Annual Report"), in which it stated: "There for everyone.  '***We do the right thing' leads our core values***. The culture we built and nurture is the reason we were able to successfully navigate the events of

2020 and emerge even stronger.  Our strength affords us the courage to be uncomfortable and examine areas where we can grow and implement meaningful change."

71.    Under a section of the 2020 Annual Report entitled, "Ethics and business conduct," USB stated: "Every business decision we make begins and ends with our commitment to ethics, to doing the right thing.  *Ethical behavior is at the core of our culture*.  We know we need to work at it daily, in both big and small ways.  At a time when our industry is experiencing rapid change and managing unprecedented challenges, our commitment to ethics is a powerful constant in our culture and is continually reinforced from the very top of our company."

72.    Under a section of the 2020 Annual Report entitled "Data protection and privacy," USB stated: "We are committed to protecting the confidentiality, integrity, availability and privacy of customer data.  Through clear and easily accessible policies, we tell our customers and online visitors why we collect information from them, how we will use it, and with whom we will share it. We also provide ongoing education and training to our employees and partners to ensure there are clear expectations on implementing and maintaining security and privacy technology and processes that protect our customers."

73.    The statements referenced above in ¶¶67-72 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately or promptly remediate them; and (iv) that, as a

result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril.

74.     The statements in ¶¶69 and 72 discussing the Bank's data protection and privacy practices and policies are also false and misleading and omitted material facts because Defendants were aware of, but did not disclose, their knowledge that the Bank's practices did not adhere to the requirements of the FCRA, but rather encouraged and/or allowed the use of customers' credit reports without a permissible purpose, and without customers' permission, to facilitate opening unauthorized credit cards and lines of credit.  The statements referenced above in ¶67  regarding USB's brand and reputation are also false and misleading given that the then-undisclosed CFPB investigation into the Bank for the illicit business practices detailed in ¶¶28-32, *supra*, targeted misconduct that was strikingly similar to the misconduct at issue in the Wells Fargo fake account scandal that tarnished Wells Fargo's reputation beginning in 2016, thus putting Defendants on notice that USB's conduct was illegal and would likely tarnish the Bank's brand and reputation.

### 3.     March 10, 2020 Proxy Statement

75.     On March 10, 2020, USB filed a Definitive Proxy Statement on Schedule 14A (the "2020 Proxy") with the SEC that described USB's "key sustainable and responsible business practices," including with respect to the Bank's customers, "protecting data" and "respecting privacy."  With respect to the Bank's employees, the Company identified "[b]usiness ethics" as a key responsible business practice, noting that " [o]ur global ethics program is designed to give employees the information, tools and training they need to make the right choices, find guidance when they need it, and report concerns without fear of retaliation."

76.     The statements referenced above in ¶75 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the

intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril.

77.     The statements referenced above in ¶75 regarding the Bank's purported "key . . . responsible business practices" are also false and misleading and omitted material facts because Defendants were aware of, but did not disclose, their knowledge that the Bank's practices did not adhere to the requirements of the FCRA, but rather encouraged and/or allowed the use of customers' credit reports without a permissible purpose, and without customers' permission, to facilitate opening unauthorized credit cards and lines of credit.  These statements are also false and misleading and omitted material facts because, as later revealed by the Consent Order, the Bank's practices were not responsible given the illicit business practices detailed in ¶¶28-32, *supra*, and because the CFPB ultimately required USB to submit for review a "comprehensive compliance plan" designed to ensure the Bank "complies with all applicable Federal consumer financial laws," including "policies and procedures to identify, manage, mitigate, and report risks and misconduct associated with sales-related behaviors."

**4.     September 15, 2020, September 21, 2021 and December 8, 2021 Conferences**

78.     On September 15, 2020, USB filed with the SEC a Current Report on Form 8-K to which Defendants appended as an exhibit presentation slides entitled Barclays Global Financial Services Conference 2020.  In it, defendants Cecere and Dolan presented a slide with the question,

- 34 -

"What differentiates U.S. Bank?," to which these defendants answered in part, "Culture of 'doing the right thing' for all our stakeholders."

79.    On September 21, 2021, USB filed with the SEC a Current Report on Form 8-K to which Defendants appended as an exhibit presentation slides entitled "U.S. Bancorp to Acquire Union Bank from Mitsubishi UFJ Financial Group," in which the Company touted USB's "Culture rooted in 'doing the right thing' and supporting communities from a foundation of trust and ethics[.]"

80.    On December 8, 2021, USB filed with the SEC a Current Report on Form 8-K to which Defendants appended as an exhibit presentation slides entitled "Goldman Sachs U.S. Financial Services Conference 2021," (the "2021 Goldman Conference") in which defendants Cecere and Dolan presented the following slide, proclaiming that USB's "***culture is rooted in 'doing the right thing***'":



81.     The statements referenced above in ¶¶78-80 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril.

### 5.     "Most Ethical Company" Statements

82.     Throughout the Class Period, USB consistently promoted and prominently highlighted to investors the Company's recognition as one of the "World's Most Ethical Compan[ies]" and that USB is an otherwise ethical, socially responsible and/or admired company.

83.     In the 2019 Investor Day presentation slides discussed *supra*, the Company represented that it was selected to Ethisphere's "***World's Most Ethical Companies***" for 2019, and as one of "***Fortune World's Most Admired Companies***" for 2019.

84.     In various Current Reports on Forms 8-K filed with the SEC by the Company on October 16, 2019, November 13, 2019, December 10, 2019 and January 15, 2020, USB appended as exhibits press releases that stated that "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial and corporate, and investment services customers across the country and around the world as a trusted financial partner, a commitment recognized by the Ethisphere Institute naming the bank a ***2019 World's Most Ethical Company***."

85.     On February 25, 2020, USB issued a press release entitled "***U.S. Bank Named One of the 2020 World's Most Ethical Companies***," in which the Company highlighted its "ethical business practices," and noted that "The Ethisphere Institute recognizes U.S. Bank for the sixth consecutive year." In the press release, defendant Cerece was quoted as stating, "***Our commitment to doing the right thing is at the heart of everything we do***," and "I'm proud of the work our employees do every day to earn and keep the ***trust*** of our customers."

86.     In various Current Reports on Forms 8-K filed with the SEC by the Company on March 19, 2020, April 15, 2020, June 30, 2020, July 15, 2020, October 14, 2020, December 9, 2020, December 22, 2020, January 20, 2021 and January 27, 2021, USB appended as exhibits press releases and presentations stating that, "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial and corporate, and investment services customers across the country and around the world as a trusted financial partner, a commitment recognized by the Ethisphere Institute naming the bank one of the 2020 World's Most Ethical Companies." USB's Current Reports on Forms 8-K submitted to the SEC on September 15, 2020 and October 14, 2020 appended as exhibits a press release and presentations that also highlighted that USB was "One of the 2020 World's Most Ethical Companies, Ethisphere Institute[.]"

87.     In Current Reports on Forms 8-K filed with the SEC on June 28, 2021, July 15, 2021, September 21, 2021, October 14, 2021 and December 16, 2021, USB appended as exhibits press releases and presentations stating, and/or otherwise stated, that "[t]he company has been recognized for its approach to digital innovation, social responsibility, and customer service, including being named one of the 2021 World's Most Ethical Companies and Fortune's most admired superregional bank." This statement also appeared in the Definitive Proxy Statement on Schedule 14A filed with the SEC on March 8, 2022 (the "2022 Proxy").

88.     In a statement in the opening of the Company's  2019 Annual Report, defendant Cecere referenced USB's selection as one of the "World's Most Ethical Companies" ***three separate times*** on the ***very first page*** of the report, including noting that, "We are committed to our communities and being a socially responsible corporate citizen.  We are a Fortune® Most Admired Company, one of the Ethisphere® World's Most Ethical Companies®, among Forbes® best banks in America, and recognized in the DiversityInc® Top 50 for our focus on diversity, equity and inclusion."  These statements contained on the first page of the 2019 Annual Report are contained in the following expert:



Fellow shareholders: As a leadership team at U.S. Bancorp, we are proud of our position in the industry. We are one of the largest banks in the United States with global reach through our trust and payments businesses.

We have a diverse mix of profitable businesses. We have a strong culture, an efficient operating platform and healthy customer loyalty scores. We are committed to our communities and being a socially responsible corporate citizen. We are a Fortune® Most Admired Company, one of the Ethisphere® World's Most Ethical Companies,® among Forbes® best banks in America, and recognized in the DiversityInc® Top 50 for our focus on diversity, equity and inclusion. Our financial results continue to lead the

industry; at the end of 2019 on a full-year basis, we were among the best in class in return on assets, return on equity and efficiency. We are also one of the highest-rated banks in the world.

It is clear we are doing well, and we are committed to building on this position of strength.

Our focus as we face 2020 is how to retain those attributes and use them as differentiators while recognizing that they, alone, are insufficient in a changing world.

"World's Most Ethical Companies" and "Ethisphere" names and marks are registered trademarks of Ethisphere LLC.

89.     The 2020 Proxy stated that USB was "Named one of the World's Most Ethical Companies by Ethisphere Institute in 2020, the sixth year in a row[.]"

90.     On April 21, 2020, at the USB Annual Shareholders Meeting, Defendant Cecere stated:

> We also continue to be recognized outside the company for our efforts to be one of the best banks in the world.  Fortune Magazine named U.S. Bancorp World's Most Admired Company, recognizing several of our attributes as most admired among all

companies, not just banks as well as naming us the world's most admired superregional bank for the 10th year in a row.

Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices, announced 135 companies, spanning 23 countries and 57 industries, and *we were honored as a 2020 Most Ethical Company. U.S. Bancorp was one of those for the sixth year in a row.*

\*    \*    \*

I'm extremely proud of the strong team of leaders, our Board and our management team and the standard they set for more than 70,000 employees around the world. *Everyone is intensely focused on meeting the financial needs and objectives of our customers as we operate in a culture rooted in ethics and integrity*.

91.    In the 2020 Annual Report, USB highlighted its inclusion as one of the Ethisphere® World's Most Ethical Companies®: "The Harris Poll ranked us as America's most essential bank during COVID-19.  The Ethisphere® Institute named us to the list of World's Most Ethical Companies® for the seventh consecutive year."

92.    In USB's SEC filings on March 4, 2021 (Current Report on Form 8-K appending as an exhibit a press release), March 9, 2021 (Definitive Proxy Statement on Schedule 14A) and April 15, 2021 (Current Report on Form 8-K appending as exhibits a press release and 1Q21 Earnings Conference Call Presentation), the Company stated that "U.S. Bank is committed to serving its millions of retail, business, wealth management, payment, commercial, corporate, and investment customers across the country and around the world as a trusted and responsible financial partner. This commitment continues to earn a spot on the Ethisphere Institute's World's Most Ethical Companies list[.]"

93.    In the April 15, 2021 press release appended to Form 8-K, the Company described itself as "Most Ethical" and stated that "*[f]or the seventh consecutive year, U.S. Bank has been named one of the World's Most Ethical Companies* by the Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices."  The press release also

highlighted the Company as "Most Admired" stating that "U.S. Bancorp was ranked No. 1 in the Superregional Banks category for the eleventh straight year in Fortune magazine's annual World's Most Admired Companies list."

94.    The Company's Ethics Code, as of July 2021, (discussed more fully below) stated on the cover that the Bank was named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute.

95.    In the 2021 Goldman Conference, USB underscored that it was "Named one of the **World's Most Ethical Companies** by The Ethisphere Institute for 7 consecutive years[.]"

96.    In the 2022 Proxy, the Company included a section on "Conduct," stating: "We are deeply committed to maintaining the ***highest standards of ethical conduct*** that reflect our purpose and ***core values***.  In recognition of that commitment, for the seventh consecutive year, we were named one of the World's Most Ethical Companies® in 2021 by the Ethisphere Institute."

97.    On April 14, 2022, USB filed a Current Report on Form 8-K and appended as an exhibit a press release discussing the Company's First Quarter 2022 results.  Under the section "Most Ethical" the Company stated: "For the ***eighth consecutive year, U.S. Bank has been named one of the World's Most Ethical Companies®*** by the Ethisphere Institute, a global leader in defining and advancing the standards of ethical business practices.  Ethisphere recognized 136 honorees spanning 22 countries and 45 industries. U.S. Bank is one of five honorees in the banking category.  The award recognizes companies' dedication to integrity, sustainability, governance and community."  The April 14, 2022 press release also stated that "[t]he company has been recognized for its approach to digital innovation, social responsibility, and customer service, including being named one of the 2022 World's Most Ethical Companies and Fortune's most admired superregional

bank."  The Company reiterated this statement in a press release appended as an exhibit to  a July 15, 2022 Current Report on Form 8-K.

98.     The statements referenced above in ¶¶83-97 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to adequately and promptly remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action or settlement and faced extreme regulatory, legal, reputational and financial peril.  Defendants' ***repeated*** statements referenced above in ¶¶83-97 discussing the Company's promotion of USB as one of the "World's Most Ethical Companies" and as an otherwise ethical, socially responsible and/or admired company are also false and misleading and omitted material facts because they created the misleading impression that the Company maintained the "highest standards of ethical conduct" and were disseminated to distinguish the Bank from its competitors in the industry and cement its industry-leading brand and reputational assets.  As later revealed, however, the CFPB determined that the Company violated various consumer protection laws in connection with the illicit business practices detailed above in ¶¶28-32, *supra*.

### 6.     USB's "Ethics" Website Statement

99.     USB has issued a statement on its website, currently available at https://www.usbank.com/about-us-bank/ethics.html, that has remained on the Company's website since at least as early as October 1, 2020, entitled "Ethics at U.S. Bank" and subtitled "Trust.," containing a statement by Defendant Cecere.  In the webpage statement, Cecere communicates

USB's "commitment to **the highest ethical standards**," which he explains "is the foundation for our core values and guides every decision we make."  Cecere also explains that USB's Ethics Code "shows us how to be **the most trusted choice**," and that the Company's "**ethical leadership is driving the ways we're innovating to meet our customers' evolving expectations**."  The full website statement maintained by USB throughout the Class Period in substantially similar form, is set forth below:

About U.S. Bank  /  Ethics

# Ethics at U.S. Bank

## Trust.

Relationships are the heart of our business. We build those relationships on trust-the trust each of us earns every day, through every interaction with our customers and the communities we serve.

Our commitment to the highest ethical standards is what makes that trust possible. This commitment is the foundation for our core values and guides every decision we make. It powers our ability to act as one U.S. Bank, no matter what part of the company we work in or where on the globe we sit.

Our Code of Ethics and Business Conduct shows us how to be the most trusted choice. Acting with integrity-and speaking up when we have concerns-is how we protect our customers and help them achieve their financial goals.

Our ethics program is designed to do one thing: give our 73,000 leaders and employees the training, tools and resources they need to do the right thing. Integrity has powered our business success for more than 150 years, and ethical leadership is driving the ways we're innovating to meet our customers' evolving expectations.

We understand our responsibility to earn our customers' trust every day. Our ethical culture powers our ability to do that.

Andy Cecere
Chairman, President and CEO

100.    The statements referenced above in ¶99 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.  Defendants' statements referenced above in ¶99 promoting the Bank's ethical behavior are also false and misleading and omitted material facts because they created the misleading impression that the Company was operating under the "highest ethical standards" and were disseminated to distinguish the Bank from its competitors in the industry and cement its industry-leading brand and reputational assets.  As later revealed, however, the CFPB determined that the Company violated various consumer protection laws in connection with the illicit business practices detailed above in ¶¶28-32, *supra*.

**B.    Defendants' Misleading Statements and Material Omissions Regarding USB's Risk Environment and Risk Management**

101.    During the Class Period, USB issued generic, boilerplate representations regarding the risks it faced, stating the relevant risks as mere hypotheticals despite the fact that the Company was under investigation by the CFPB throughout the Class Period for the Company's violations of consumer protection laws and regulations.

102.    On August 1, 2019, USB filed with the SEC its 2Q19 10-Q for the period ending June 30, 2019. In its "Corporate Risk Profile," USB stated the following:

The Board of Directors, primarily through its Risk Management Committee, oversees performance relative to the risk management framework, risk appetite statements, and other policy requirements.

The Executive Risk Committee ("ERC"), which is chaired by the Chief Risk Officer and includes the Chief Executive Officer and other members of the executive management team, oversees execution against the risk management framework and risk appetite statements. The ERC focuses on current and emerging risks, including strategic and reputational risks, by directing timely and comprehensive actions. Senior operating committees have also been established, each responsible for overseeing a specified category of risk. The Company's most prominent risk exposures are credit, interest rate, market, liquidity, operational, compliance, strategic, and reputational . . . Compliance risk is the risk that the Company may suffer legal or regulatory sanctions, material financial loss, or loss to reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct. . .

The Company's Board and management-level governance committees are supported by a "three lines of defense" model for establishing effective checks and balances. The first line of defense, the business lines, manages risks in conformity with established limits and policy requirements. In turn, business line leaders and their risk officers establish programs to ensure conformity with these limits and policy requirements. The second line of defense, which includes the Chief Risk Officer's organization as well as policy and oversight activities of corporate support functions, translates risk appetite and strategy into actionable risk limits and policies. The second line of defense monitors first line of defense conformity with limits and policies, and provides reporting and escalation of emerging risks and other concerns to senior management and the Risk Management Committee of the Board of Directors. The third line of defense, internal audit, is responsible for providing the Audit Committee of the Board of Directors and senior management with independent assessment and assurance regarding the effectiveness of the Company's governance, risk management and control processes.

103.    The statements above in ¶102 were also repeated in substantially similar form in

Forms 10-Q filed by USB on November 8, 2019, May 7, 2020, August 6, 2020, November 5, 2020,

May 4, 2021, August 3, 2021, November 2, 2021 and May 3, 2022 (collectively, the "Class Period

10-Qs"); and the 2019 Annual Report, 2020 Annual Report and 2021 Annual Report issued by USB

on or about February 25, 2022 ("2021 Annual Report" and collectively, "Class Period Annual

Reports"); and Forms 10-K, signed by Defendants Cecere and Dolan, and filed with the SEC on

February 20, 2020 for the fiscal year ending December 31, 2019 ("2019 10-K"), February 23, 2021

for the fiscal year ending December 31, 2020 ("2020 10-K") and February 22, 2022 for the fiscal

year ending December 31, 2021 ("2021 10-K" and, collectively, the "Class Period 10-Ks").

104.    The August 1, 2019 10-Q also identified the following risks, which also appear in

substantially similar form in the other Class Period 10-Qs, Class Period 10-Ks and Class Period

Annual Reports:

> **Operational Risk Management** Operational risk is inherent in all business
> activities, and the management of this risk is important to the achievement of the
> Company's objectives.  Business lines have direct and primary responsibility and
> accountability for identifying, controlling, and monitoring operational risks
> embedded in their business activities.  ***The Company maintains a system of controls
> with the objective of providing proper transaction authorization and execution***,
> proper system operations, proper oversight of third parties with whom it does
> business, safeguarding of assets from misuse or theft, and ensuring the reliability and
> security of financial and other data. . .

> **Compliance Risk Management** The Company *may* suffer legal or regulatory
> sanctions, material financial loss, or damage to its reputation through failure to
> comply with laws, regulations, rules, standards of good practice, and codes of
> conduct, including those related to compliance with Bank Secrecy Act/anti-money
> laundering requirements, sanctions compliance requirements as administered by the
> Office of Foreign Assets Control, ***consumer protection*** and other requirements.  ***The
> Company has controls and processes in place for the assessment, identification,
> monitoring, management and reporting of compliance risks and issues.***

105.    The Company's September 12, 2019, Investor Day conference included a slide

presented by Defendant Cecere which emphasized USB's purported "Best-in-class financial results

and risk management," as reflected in the slide above, *supra* ¶54.  In another slide, Cecere stated that

the Bank is "Positioned to Win," including because its "risk discipline" is a "***differentiator***."

106.    In the 2019 Annual Report, under a section entitled "Operations and Business Risk,"

USB stated in pertinent part:

> ***The Company relies on its employees, systems and third parties to conduct its
> business, and certain failures by systems or misconduct by employees or third
> parties could adversely affect its operations.*** . . .

> The Company could also incur losses resulting from the risk of fraud by employees
> or persons outside of the Company, unauthorized access to its computer systems, the

- 45 -

execution of unauthorized transactions by employees, errors relating to transaction processing and technology, breaches of the internal control system and compliance requirements, and business continuation and disaster recovery.  This risk of loss also includes the potential legal actions, fines or civil money penalties that could arise as a result of an operational deficiency or as a result of noncompliance with applicable regulatory standards, adverse business decisions or their implementation, and customer attrition due to potential negative publicity.

*      *      *

**The Company could face significant legal and reputational harm if it fails to safeguard personal information.**  The Company is subject to complex and evolving laws and regulations, both inside and outside of the United States, governing the privacy and protection of personal information of individuals.  The protected individuals can include the Company's customers, its employees, and the employees of the Company's suppliers, counterparties and other third parties.  Ensuring that the Company's collection, use, transfer and storage of personal information comply with applicable laws and regulations in relevant jurisdictions can increase operating costs, impact the development of new products or services, and reduce operational efficiency.  ***Any mishandling or misuse of the personal information of customers, employees or others by the Company*** or a third party affiliated with the Company ***could expose the Company to litigation or regulatory fines, penalties or other sanctions.***

Additional risks could arise if the Company or third parties do not provide adequate disclosure or transparency to the Company's customers about the personal information collected from them and its use; any failure to receive, document, and honor the privacy preferences expressed by the Company's customers; any failure to protect personal information from unauthorized disclosure; or any failure to maintain proper training on privacy practices for all employees or third parties who have access to personal data.  Concerns regarding the effectiveness of the Company's measures to safeguard personal information and abide by privacy preferences, or even the perception that those measures are inadequate, could cause the Company to lose existing or potential customers and thereby reduce its revenues.  In addition, any failure or perceived failure by the Company to comply with applicable privacy or data protection laws and regulations could result in requirements to modify or cease certain operations or practices, significant liabilities or regulatory fines, penalties, or other sanctions.

*      *      *

**Damage to the Company's reputation could adversely impact its business and financial results**.  Reputation risk, or the risk to the Company's business, earnings and capital from negative public opinion, is inherent in the Company's business.  ***Negative public opinion about the*** financial services industry generally or the ***Company specifically could adversely affect the Company's ability to keep and attract customers, investors, and employees and could expose the Company to***

- 46 -

***litigation and regulatory action.***  Negative public opinion can result from the Company's actual or alleged conduct in any number of activities, including lending practices, cybersecurity breaches, failures to safeguard personal information, discriminating or harassing behavior of employees toward other employees or customers, mortgage servicing and foreclosure practices, compensation practices, sales practices, environmental, social, and governance practices and disclosures, regulatory compliance, mergers and acquisitions, and actions taken by government regulators and community organizations in response to that conduct.

*    *    *

**The Company's framework for managing risks may not be effective in mitigating risk and loss to the Company**.  The Company's risk management framework seeks to mitigate risk and loss. The Company has established processes and procedures intended to identify, measure, monitor, report, and analyze the types of risk to which it is subject, including liquidity risk, credit risk, market risk, interest rate risk, compliance risk, strategic risk, reputation risk, and operational risk related to its employees, systems and vendors, among others.  However, as with any risk management framework, there are inherent limitations to the Company's risk management strategies as there may exist, or develop in the future, risks that it has not appropriately anticipated or identified.  In addition, the Company relies on quantitative models to measure certain risks and to estimate certain financial values, and these models could fail to predict future events or exposures accurately.  The Company must also develop and maintain a culture of risk management among its employees, as well as manage risks associated with third parties, and could fail to do so effectively.  If the Company's risk management framework proves ineffective, the Company could incur litigation and negative regulatory consequences, and suffer unexpected losses that could affect its financial condition or results of operations.

107.    The statements above in ¶106 were repeated in substantially similar form in the other

Class Period Annual Reports and Class Period 10-Ks.

108.    In the 2019 Annual Report and repeated in substantially similar form in the other

Class Period Annual Reports and Class Period 10-Ks, under a section entitled "Regulatory and Legal

Risk," USB stated:

**The Company is subject to extensive and evolving government regulation and supervision, which can increase the cost of doing business, limit the Company's ability to make investments and generate revenue, and lead to costly enforcement actions**. . . .

**The Company is subject to significant financial and reputation risks from potential legal liability and governmental actions**.  The Company faces significant legal risks in its businesses, and the volume of claims and amount of damages and

- 47 -

penalties claimed in litigation and governmental proceedings against it and other financial institutions are substantial. Customers, clients and other counterparties are making claims for substantial or indeterminate amounts of damages, while banking regulators and certain other governmental authorities have focused on enforcement. As a participant in the financial services industry, it is likely that the Company will continue to experience a high level of litigation related to its businesses and operations in the future... Substantial legal liability or significant governmental action against the Company could materially impact its financial condition and results of operations or cause significant reputational harm to the Company, which in turn could adversely impact its business prospects. Also, the resolution of a litigation or regulatory matter could result in additional accruals or exceed established accruals for a particular period, which could materially impact the Company's results from operations for that period.

109.    The Company's 2019 10-K, contained generic, boilerplate representations regarding

the risks it faced as an entity subject to consumer protection and CFPB oversight, stating, in relevant

parts:

*Consumer Protection Regulation* U.S. Bank National Association's retail banking activities are subject to a variety of statutes and regulations designed to protect consumers, including laws related to fair lending and the prohibition of unfair, deceptive, or abusive acts or practices in connection with the offer, sale, or provision of consumer financial products and services. These laws and regulations include the Truth-in-Lending, Truth-in-Savings, Home Mortgage Disclosure, Equal Credit Opportunity, Fair Credit Reporting, Fair Debt Collection Practices, Real Estate Settlement Procedures, Electronic Funds Transfer, Right to Financial Privacy and Servicemembers Civil Relief Acts. Interest and other charges collected or contracted for by banks are subject to state usury laws and federal laws concerning interest rates.

*Consumer Financial Protection Bureau* U.S. Bank National Association and its subsidiaries are subject to supervision and regulation by the CFPB with respect to federal consumer laws, including many of the consumer protection laws and regulations described above. The CFPB has undertaken numerous rule-making and other initiatives, including issuing informal guidance and taking enforcement actions against certain financial institutions. The CFPB's rulemaking, examination and enforcement authority has affected and will continue to impact financial institutions involved in the provision of consumer financial products and services, including the Company, U.S. Bank National Association, and the Company's other subsidiaries. These regulatory activities may limit the types of financial services and products the Company may offer, which in turn may reduce the Company's revenues.

110.    The statements above in ¶109 were repeated in substantially similar form in the 2020

10-K and 2021 10-K.

111.    The Class Period 10-Ks discussed the Company's "Corporate Risk Profile" and stated, in pertinent part:

> ***Management regularly provides reports to the Risk Management Committee of the Board of Directors. The Risk Management Committee discusses with management the Company's risk management performance, and provides a summary of key risks to the entire Board of Directors, covering the status of existing matters, areas of potential future concern*** and specific information on certain types of loss events. The Risk Management Committee considers quarterly reports by management assessing the Company's performance relative to the risk appetite statements and the associated risk limits, including. . .
>
> Operational and compliance risk, including losses stemming from events such as fraud, processing errors, control breaches, breaches in data security or adverse business decisions, as well as reporting on technology performance, and various legal and regulatory compliance measures[.]

112.    Appended as exhibits to the Class Period 10-Qs and Class Period 10-Ks were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein defendants Cecere and Dolan certified that the Class Period 10-Qs and Class Period 10-Ks fully comply with the requirements of §13(a) or §15(d) of the Securities Exchange Act of 1934 and the information contained therein fairly presents, in all material respects, the financial condition and results of operations of the Company.

113.    In the 2019 Annual Report, and repeated in material part in the 2020 Annual Report, 2019 10-K and 2020 10-K, under a section entitled "Litigation and Regulatory Matters," USB stated:

> The Company is subject to various litigation and regulatory matters that arise in the ordinary course of its business. The Company establishes reserves for such matters when potential losses become probable and can be reasonably estimated. The Company believes the ultimate resolution of existing legal and regulatory matters will not have a material adverse effect on the financial condition, results of operations or cash flows of the Company. However, in light of the uncertainties inherent in these matters, it is possible that the ultimate resolution of one or more of these matters may have a material adverse effect on the Company's results from operations for a particular period, and future changes in circumstances or additional information could result in additional accruals or resolution in excess of established accruals, which could adversely affect the Company's results from operations, potentially materially.

*       *       *

- 49 -

**Regulatory Matters**.  The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection. . . .  The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements.  Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

114.    On June 4, 2021, Defendant Cecere presented at Bernstein's Strategic Decisions Conference (the "Bernstein's Conference").  During the presentation, Defendant Cecere provided the following commentary:

Unidentified Analyst:  The first one is around the regulatory environment.  ***What's your sense of how things might evolve on regulation?  And which areas of interest to the regulators these days are most relevant to U.S. Bank?***

Andy Cecere:  So I do think, as an industry, there's going to be continued focus, certainly on ESG.  That's an area that we have a lot of focus on. . . .  ***The other area, John, is in consumer protection, and consumer activities.  And maybe I'll just comment on overdrafts because I know that's a very topical subject.  We've been very focused on this for a number of years.***  Our overdraft fees have been coming down, partly because we're sending notifications to customers to let them know about situations, that given their spent habits and inflow history, they may result in an overdraft situation, and set of actions they can take to avoid that.

Unidentified Analyst:  So Andy, to summarize then, you are giving customers more information and more choice and maybe a little bit more time to kind of choose how they want these things to be addressed and processed?

Andy Cecere:  Yes.  It has been a focus for us for a while. . . .

115.    The statements referenced above in ¶¶102-114 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing,

the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

116.    The statements referenced above in ¶¶104, 106-110 and 113 are also false and misleading and omitted material facts because the Company issued generic, boilerplate representations regarding the risks it faced, stating the relevant risks as mere hypotheticals despite the fact that the Company was under investigation by the CFPB for years, including throughout the Class Period, regarding improper sales practices and violations of related consumer protection laws. Additionally, the statements referenced above in ¶105 contained in the September 2019 Investor Day conference are false and misleading because the Company described its risk management as "[b]est-in-class" and "risk discipline" as a "differentiator" despite severe deficiencies in the Company's risk management systems uncovered by the CFPB following its then-ongoing investigation, which determined that U.S. Bank knew that sales pressure was leading employees to open unauthorized accounts going back to 2010.  The statements referenced above in ¶114 and contained in the Bernstein's Conference presentation are additionally false and misleading because at the time defendant Cecere made the statements, he gave the false impression of the regulatory environment surrounding USB without discussing the ongoing and intensifying CFPB investigation and related implications for the Company, including that the nature of conduct being investigated – of which U.S. Bank was aware – was strikingly similar to conduct the CFPB found to be unlawful as part of the Well Fargo enforcement action.

117.    Furthermore, the statements referenced above in ¶113 contained in the 2019 10-K, 2020 10-K, 2019 Annual Report and 2020 Annual Report discussing existing regulatory matters are materially false and misleading because they failed to disclose that the Company had been the subject of an ongoing, years-long CFPB investigation relating to the Company's consumer sales

practices and conduct in violating consumer protection laws and regulations, including the CFPA,

TILA, TISA and FCRA.  In fact, though the Company had been under investigation by the CFPB

throughout the Class Period, investors were unaware of the investigation until the Company

generally disclosed an investigation of the "Company's consumer sales practices" on May 4, 2021.

Even then, such disclosures were devoid of any detail about the targeted sales practices.  The

statements referenced above in ¶¶104, 106-108 and 113 are additionally materially false and

misleading because USB represented the potential imposition of a settlement, fine or reputational

damage as a mere hypothetical despite the fact that the Company knew of the improper conduct

since 2010 and that such conduct resembled the same conduct for which Wells Fargo was fined in

2016.

        **C.**       **Defendants' False and Misleading Statements and Omissions**
               **Regarding the CFPB Investigation**

      118.    On May 4, 2021, U.S. Bancorp filed its Q1 2021 Form 10-Q with the SEC, which

states, in pertinent part:

> The Company is continually subject to examinations, inquiries and investigations in
> areas of heightened regulatory scrutiny, such as compliance, risk management, third-
> party risk management and consumer protection.  ***For example, the Consumer
> Financial Protection Bureau ("CFPB") is investigating certain of the Company's
> consumer sales practices, and the Company has responded and continues to
> respond to the CFPB***.  The Company is cooperating fully with all pending
> examinations, inquiries and investigations, any of which could lead to administrative
> or legal proceedings or settlements. Remedies in these proceedings or settlements
> may include fines, penalties, restitution or alterations in the Company's business
> practices (which may increase the Company's operating expenses and decrease its
> revenue).

      119.    The statements above in ¶118 were repeated in material respect in the 2021 10-K and

Forms 10-Q filed with the SEC on August 3, 2021 and November 2, 2021.

      120.    On May 3, 2022, the Company filed a Form 10-Q with the SEC for Q1 2022, which

stated in pertinent part:

> ***Regulatory Matters***  The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection.  For example, ***the Consumer Financial Protection Bureau ("CFPB") has been investigating certain of the Company's consumer sales practices and is now considering a potential enforcement action***.  The Company is engaged in discussions with the CFPB on this matter and does not believe an enforcement action is warranted, but there can be no assurance that these discussions will result in a resolution.  The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements.  Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

121.    The statements referenced above in ¶¶118-120 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.  The statements referenced above in ¶¶118-120 are also false and misleading and omitted material facts because they misleadingly indicate the mere possibility that certain of USB's unspecified sales practices ***might*** violate relevant laws and regulations or that the Company ***may*** be subject to a fine or penalty when, in fact, Defendants knew of the improper conduct since 2010 and that such conduct resembled the same conduct that the CFPB determined was unlawful in connection with the Wells Fargo enforcement action in 2016.

**D.    Defendants' False and Misleading Statements and Omissions
Regarding USB's Ethics Code**

122.    In the 2019 10-K, 2020 10-K and 2021 10-K, USB stated: "[t]he Company has adopted a Code of Ethics and Business Conduct that applies to its principal executive officer, principal financial officer and principal accounting officer.  The Company's Code of Ethics and Business Conduct can be found at www.usbank.com[.]"

123.    The Company's Ethics Code, as detailed in a July 2021 version of the code, was purportedly issued as a "guide to doing the right thing and living [the Bank's] core values."  The Ethics Code applies to "everyone who works at U.S. Bank," including the Company's directors.  The Ethics Code further stated: "[i]n the unlikely event a waiver to this Code is requested by an executive officer or director, it must be approved by the U.S. Bancorp Board of Directors and promptly disclosed.  The chief executive officer must approve any waivers of the Code for employees in writing."

124.    The Ethics Code contained an introductory statement from defendant Cecere and Senior Vice President, Global Chief Ethics Officer, Katie Lawler, that included the following comments:

- "Our commitment to ethics will always be our strength."

- "The things we say and do define who we are to those around us.  Whether we are keeping our commitments, taking the high road, or looking for the right solution – not just the easy one, we are showing the world that we can be counted on for our ethics and integrity."

- "Our core values" . . . "We do the right thing. . .  We put people first."

125.    The Ethics Code repeated the phrase, "We do the right thing," throughout the document.  For example, in Section 1.0, entitled "We do the right thing," the Ethics Code stated in pertinent part: "***Our commitment to high ethical standards is the foundation of our purpose and core values***.  Demonstrating our core values every day through our words and actions is how we ***strengthen our ethical culture, deliver a superior customer experience and elevate our brand***." Additionally, on the very last page of the Ethics Code, under a large header entitled, "We do the right thing," USB provided the following statement: "Our Code of Ethics and Business Conduct is our shared guidebook to operating with integrity. In every part of our business around the world, our ethical culture guides how we do what we do for our customers, communities and each other."

126.    In Section 3.0, entitled "Our customers and business partners," the Ethics Code provided: "Our customer relationships are built on ***trust***—trust we earn every day, through every interaction.  ***We do what's best for our customers while protecting their interests*** and ours. Creating the best possible customer experience is another way we live our core values and strengthen our brand."

127.    In Section 3.3.2, entitled "Responsible marketing, sales and servicing activities," the Ethics Code provided in pertinent part, "When we have an experience that doesn't meet our standards, may not comply with the letter or spirit of the law or may create undue risk for our customers, we act promptly to do the right thing.  ***Sales always must be based on customer needs or requests—they should never be the result of efforts to promote products or services to meet incentive, sales or recognition goals***."

128.    In Section 3.3.2.1, entitled "Sales practices," the Ethics Code stated, in part, "***Incentive gaming and aggressive, deceptive, unfair or abusive sales practices are prohibited. You may not manipulate records, open bogus accounts, sell products and/or open accounts without a***

- 55 -

***customer's affirmative consent, falsify applications*** or skew results in any way for the benefit of yourself or other employees."

129.    In Section 4.0, entitled "Our shareholders," the Ethics Code stated, in part, "***Our reputation is our most valuable asset, and it's the cornerstone of our brand***. . ."

130.    The statements in ¶¶123-129 are false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶28-32, *supra*, and by the CFPB which had been investigating USB since at least 2010 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

131.    Defendants' statements referenced above in ¶¶123-129 about the Bank's ethics are also false and misleading and omitted material facts because they created the misleading impression that the Company operated under "high ethical standards" when in fact Defendants knew that the Company engaged in unlawful consumer sales and business practices for years as detailed above in ¶¶28-32, *supra*.  Moreover, the statements referenced above in ¶¶127-128 about employee sales practices and services are false and misleading and omitted material facts because Defendants knew that USB's employees had engaged in abusive, aggressive, unfair, deceptive and unlawful sales practices in order to meet incentive, sales or recognition goals, including by opening accounts without a customer's affirmative consent and/or falsifying applications.

## VI.     THE TRUTH BEGINS TO BE REVEALED

132.     As set forth in §IV.D., *supra*, investors learned the truth about USB's consumer sales practices when the CFPB issued the Consent Order on July 28, 2022 and identified numerous unlawful acts and practices performed by U.S. Bank and/or its employees, including: (1) the application and issuance of credit cards and lines of credit without their knowledge and consent; (2) the use or procurement of consumer reports of consumers who were not seeking an extension of credit from or involved in any form of credit transaction, account review or amount collection with the Company, where U.S. Bank had no other permissible purpose for the consumer reports it used or obtained; (3) the opening of consumer deposit accounts without consumers' knowledge and consent; and (4) creating sales pressure on its employees that led to employees opening credit cards, lines of credit, and deposit accounts without consumers' knowledge and consent.  The CFPB found that U.S. Bank violated the TILA and its implementing regulation, Regulation Z; the FCRA; the TISA, and its implementing regulation, Regulation DD, 12 C.F.R. part 1030; and the CFPA.  The CFPB also fined USB $37.5 million and ordered the Company submit a compliance plan design to ensure the Company's relevant conduct complies with all applicable federal consumer financial laws and the terms of the Order.

133.     Analysts quickly observed the negative implications for USB's stock, as Piper Sandler noted on July 28, 2022 with respect to the Consent Order, "this is obviously a ***negative*** and something the story could have done without . . . these are just headlines no investor likes to read, especially from such as [sic] highly regarded company," and explained that "[a]s for potential stock price ramifications, as one might expect, the shares are underperforming today" and the issue will likely "keep the stock in check for the time being."  On July 29, 2022, Bank of America also tied the stock price decline to the news of the Consent Order when it reported that "USB shares underperformed peers by 400bp on Thursday after the bank entered a consent order with the

Consumer Financial Protection Bureau (CFPB) tied to its sales practices between 2010-2020." Other analysts expressed concern about potential additional costs associated with the fallout from the Consent Order. JP Morgan stated that a "**[k]ey concern is cost of customer remediation and further fines similar to Wells Fargo**" given "the initial CFPB fine for Wells' fake account scandal was relatively small ($100 mil), [but] it led to billions of dollars in costs from customer and investor class-action law suits, and settlements with State Attorney Generals, the Department of Justice, and the SEC."

134.    On the news of the Consent Order, the price of USB stock declined $2.00, or 4% and closed at $46.12 on July 28, 2022. As a result of Defendant's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

135.    By virtue of the facts set forth herein, it may be compellingly inferred that Defendants knew, or at the very least recklessly disregarded, that the statements set forth in §V., *supra*, were misleading to investors and omitted material information.

136.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding USB, their control over and/or receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential

proprietary information concerning USB, were active and culpable participants in the fraudulent scheme alleged herein.

          **1.**      **The Individual Defendants Were Directly Involved in Overseeing the Business Operations Associated with the Improper Conduct at Issue**

137.    The Individual Defendants' roles at the Company further demonstrate scienter by showing their responsibility for and knowledge of the Bank's misconduct concerning its unlawful acts and practices. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

138.    The Individual Defendants are long-time executives at USB, serving in senior roles throughout the time period targeted in the CFPB investigation. Defendant Cecere has been USB's President since January 2016, CEO since April 2017 and Chairman since April 2018. He also served as Vice Chairman and Chief Operating Officer from January 2015 to January 2016 and was the Company's Vice Chairman and Chief Financial Officer from February 2007 until January 2015. Defendant Dolan has been USB's Vice Chair and Chief Financial Officer of the Company since August 2016. From July 2010 to July 2016, he served as Vice Chair, Wealth Management and Investment Services at the Bank. Defendant Richard has been USB's Vice Chair and Chief Risk Officer since October 2018. Prior to that, she served as the Bank's Executive Vice President and Chief Operational Risk Officer from January 2018 until October 2018, and served as Senior Vice President and Chief Operational Risk Officer from 2014 until January 2018. Defendant Quinn has been USB's Vice Chair and Chief Administrative Officer since April 2017. Before that, she served

in various roles at USB, including Chief Marketing, Strategy and Reputation Officer, from September 2013 to April 2017

139.    During the Class Period, defendant Quinn was responsible for leading efforts around corporate strategy, marketing, reputation, corporate social responsibility, governmental relations and communications.  According to USB, Quinn was instrumental in building U.S. Bank into a "national brand" and developing its position as "one of the world's most ethical companies."  According to one report, "it was Quinn, first as chief marketing officer and then as chief strategy and reputation officer, who had the vision to set U.S. Bancorp apart from its peers by emphasizing culture above all else."  Thus, Quinn, as the driving force behind the Company's positioning as one of the most ethical companies, along with her branding, corporate social responsibility and corporate strategy responsibilities and position on the Managing Committee, would have known of the Bank's unlawful business conduct that was antithetical to her efforts.  Additionally, given Quinn's oversight of government relations, she would have knowledge of the CFPB's investigation into the Bank, which had been underway for at least two years (or more) by the start of the Class Period and required the Company's cooperation.  As the Company later revealed, "the Company has responded and continues to respond to the CFPB" and "is cooperating fully with" the investigation.

140.    In their roles at the Bank, defendants Cecere and Richard also served on the Company's Executive Risk Committee, which is chaired by Richard and "oversees execution against the risk management framework and risk appetite statements."  The focus of the Executive Risk Committee is on "current and emerging risks, including strategic and reputational risks, by directing timely and comprehensive actions."  Additionally, Cecere served on the Risk Management Committee, which "oversees performance relative to the risk management framework, risk appetite statements, and other policy requirements."

141.    The Bank's Board and management-level governance committees are supported by a "three lines of defense" model for establishing effective checks and balances.  The first line of defense, the business lines, manages risks in conformity with established limits and policy requirements.  Business line leaders and their risk officers establish programs to ensure conformity with these limits and policy requirements.  The second line of defense, which includes Richard's risk team, develops risk limits and policies.  The second line of defense monitors the first line of defense's conformity with limits and policies, and provides reporting and escalation of emerging risks and other concerns to senior management and the Risk Management Committee.  The third line of defense, internal audit, is responsible for providing the Audit Committee of the Board of Directors and senior management with independent assessment and assurance regarding the effectiveness of the Company's governance, risk management and control processes.

142.    The Risk Management Committee regularly receives reports and discusses with management the Company's risk management performance, and provides a summary of key risks to the entire Board of Directors, covering the status of existing matters, areas of potential future concern and specific information on certain types of loss events.  The Risk Management Committee considers quarterly reports by management assessing the Company's performance relative to the risk appetite statements and the associated risk limits, including: "litigation developments," "[o]perational and compliance risk, including . . . various legal and regulatory compliance measures" and "[s]trategic and reputation risk considerations, impacts and responses."  In their roles on the Executive Risk Committee and/or Risk Management Committee, defendants Cecere and Richard were undoubtedly aware of the Bank's unlawful acts and practices described herein.  The purview of the Executive Risk Committee, and by extension these defendants, included overseeing execution of

the risk management framework with a specific focus on current, emerging and reputational risks and directing timely and comprehensive actions.

143.    Defendant Richard's organization was an integral part of the Bank's "three lines of defense" model for establishing checks and balances.  As part of her role as Chief Risk Officer, Richard developed risk limits and policies, monitored conformance with those limits and policies and provided reporting and escalation of risks and concerns to the Risk Management Committee. The Risk Management Committee, in turn (which included defendant Cecere), regularly received reports, including litigation developments, operational and compliance risk and strategic and reputation risk considerations – *i.e.*, the very topics covering the unlawful acts and practices detailed in the Consent Order.  Likewise, defendants Cecere and Dolan's senior roles as CEO and CFO, respectively, and Quinn's position on the Managing Committee, necessarily required them to conduct oversight of the Company's financials and/or sales practices generating the Bank's inflated revenues.  Given the CFPB investigation here, which came on the heels of a similar massive fake accounts scandal at Wells Fargo, coupled with the Individual Defendants' roles and responsibilities over the operations associated with the targeted misconduct, it is inconceivable that the Individual Defendants were unaware of the Bank's unlawful acts and practices described herein.

> **2.    The Consent Order Attributed Knowledge of the Improper Conduct to Defendants, Who Were Also Aware of the Reputational Damage to USB Resulting from an Enforcement Action or Settlement**

144.    As discussed *supra*, ¶¶33-39, beginning in late 2016, the CFPB, along with a host of other regulators, determined that Wells Fargo illegally and secretly opened unauthorized deposit and credit card accounts, resulting in numerous lawsuits, settlements and fines.  CFPB Director Cordray remarked at the time, "'***Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal***

*consequences*.'"  The CFPB launched its investigation of USB at least as early as 2017, as detailed in public reports by *CNN* and other media outlets following issuance of the Consent Order, which stated that the investigation had been pending for over five years.  The initiation of the CFPB investigation thus followed closely on the heels of the Wells Fargo revelations and focused on misconduct dating back to 2010.  In fact, when USB's conduct came to light in 2022, CFPB Director Chopra stated that "[f]or over a *decade*, U.S. Bank *knew* its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts."  The CFPB investigation "found *specific evidence* that revealed that U.S. Bank was *aware* that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts."

145.    Given these circumstances, once similar conduct at Wells Fargo was exposed – and certainly by the time the CFPB launched its analogous investigation of USB – Defendants were well aware that similar unlawful practices at the Bank posed serious risk of damage to the USB's reputation, brand and image as the "most trusted choice" among major banks.  Yet as the CFPB determined, the misconduct continued for years after the initiation of the investigation.  Indeed, following the revelations in the Consent Order, a JP Morgan analyst noted that it is "unclear to us why these practices were not completely stopped after 2016 when US Bancorp found these practices – it seems from the order they continued through 2020[.]"

146.    By the beginning of the Class Period, the CFPB investigation had been underway for at least two years, if not longer.  As the Company later revealed in its May 4, 2021 Q1 10-Q, the CFPB was "investigating certain of the Company's consumer sales practices, and *the Company has responded and continues to respond to the CFPB*" and "is *cooperating fully* with" the investigation.  The following year, in the Company's May 3, 2022 Q1 10-Q, USB further revealed

that the CFPB "has been investigating certain of the Company's consumer sales practices and is now considering a potential enforcement action," explained that the Company "does not believe an enforcement action is warranted, but there can be no assurance that these discussions will result in a resolution" and noted that "[t]he Company is cooperating fully with" the investigation. Thus, by the very nature of their senior roles at the Company and involvement in the oversight of the Company's core operations and risk profile, the Individual Defendants' scienter can reasonably be inferred given the Company's cooperation with and responsiveness to the CFPB.

### 3. Defendants' Public Comments Contribute to a Compelling Inference of Scienter

147.    When defendant Cecere appeared before Congress at the September 2022 Oversight Hearing, while each of the other CEO's of the major banks operating in the U.S. denied opening unauthorized accounts on behalf of customers, Cecere **admitted** to the Bank's unlawful conduct described in the CFPB Consent Order, stating: "***I take full responsibility that we did open up unauthorized bank accounts***. It was going back to 2010. It's unacceptable. It's inconsistent with our principles and procedures as well as our ethics." Taken collectively with the other indicia of scienter described herein, Cecere's admission demonstrates a strong inference that Defendants acted with scienter in making the misrepresentations and omissions challenged herein.

148.    Furthermore, Cecere and Dolan both signed the Company's Forms 10-K and certified the Forms 10-Q and 10-K filed during the Class Period pursuant to the Sarbanes-Oxley Act ("SOX"). These SOX certifications also evidence that Defendants knew or recklessly disregarded USB's unlawful acts and practices, stating that Cecere and Dolan were "responsible for establishing and maintaining disclosure controls and procedures," that they "designed" and "evaluated the effectiveness of" USB's "disclosure controls and procedures," and that they have "disclosed" "all significant deficiencies and material weaknesses" and "any fraud, whether or not material, that

involves management or other employees who have a significant role in the Registrant's internal control over financial reporting."

### 4.    USB's Sales Practices at Issue Were Critical to Its Core Operations

149.    Knowledge of the Bank's unlawful acts and practices detailed herein and in the Consent Order can also be inferred to the Individual Defendants because the unlawful sales acts and practices involved a core business at the Bank – *i.e.*, the Bank's Consumer and Business Banking, which, for the fiscal year prior to the beginning of the Class Period (2018), for example, comprised 40% of the Bank's total net revenue, 84% of which was specifically attributed to consumer banking. Given the importance of the Company's consumer sales products and practices to USB's business, as well as the importance of customer trust, reputation and the employee incentive program instituted and/or approved by executives at the highest levels of the Bank and designed to increase sales, knowledge of the Bank's improper sales practices can therefore be imputed to the Individual Defendants.

### 5.    The Individual Defendants Reaped over $26 Million in Insider Trading

150.    Defendants were also motivated to engage in the fraudulent course of conduct in order to enable certain Company insiders, including defendants Cecere, Dolan, Richard and Quinn, to collectively sell shares of their personally-held stock.  Indeed, during the Class Period but before disclosure of the CFPB Consent Order detailing the scope of the Bank's unlawful acts and practices dating back over a decade, the Individual Defendants collectively sold 463,700 shares of their personally-held stock, earning gross proceeds of more than $26 million, to the unsuspecting investing public while in possession of material non-public information, thereby profiting from their failure to disclosure the truth to the market, as set forth below:

| Insider | Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| Cecere, Andrew J. (Chief Executive Officer) | 11/15/2019 | $58.81 | 165,564 | $9,736,819 |
| | 4/22/2021 | $56.48 | 184,187 | $10,402,882 |
| | | | 349,751 | $20,139,701 |
| | | | | |
| Dolan, Terrance R. (Chief Financial Officer) | 11/14/2019 | $58.59 | 17,200 | $1,007,748 |
| | 11/19/2020 | $42.98 | 50,000 | $2,149,000 |
| | 4/30/2021 | $59.11 | 19,149 | $1,131,897 |
| | | | 86,349 | $4,288,645 |
| | | | | |
| Richard, Jodi L. (Chief Risk Officer) | 11/18/2019 | $59.61 | 2,600 | $154,986 |
| | | | 2,600 | $154,986 |
| | | | | |
| Quinn, Katherine B. (Chief Administrative Officer) | 5/18/2021 | $61.47 | 25,000 | $1,536,750 |
| | | | 25,000 | $1,536,750 |
| | | | | |
| Grand Total: | | | 463,700 | $26,120,082 |

151.    The shares sold by the Individual Defendants during the Class Period were highly unusual in both amount (based on the sheer dollar value of shares sold) and timing (made during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).  All of the sales by the Individual Defendants detailed above were made *after* the CFPB investigation began and *before* the CFPB disclosed the full scope of the Bank's unlawful acts and practices to the investing public.  And defendants Cecere and Dolan collectively sold over $11.5 million worth of stock shortly before USB's May 4, 2021 initial disclosure of the CFPB's investigation of the Company's "consumer sales practices."  Likewise, defendants Quinn and Richard did not sell any stock at all in the approximately two years immediately before the Class Period or at any time following the Class Period (as of April 26, 2023), yielding their sole Class Period sales highly unusual.  Accordingly,

Defendants were motivated to make materially false and misleading statements and conceal material adverse information from investors so that they could personally profit from the artificial inflation in the trading price of USB's common stock resulting from their false and misleading statements and omissions during the Class Period and before the truth of the CFPB Consent Order was disclosed to the investing public.

### 6. USB Acted with Corporate Scienter

152.    The allegations above also establish a strong inference that USB as an entity acted with corporate scienter throughout the Class Period, as its officers, management and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the adverse facts detailed herein from the investing public. Indeed, as the CFPB found, U.S. Bank "knew" about the improper and unlawful conduct, was "aware" that sales pressure was leading employees to open accounts without authorization and had inadequate procedures to prevent and detect these accounts. By concealing these material facts from investors, USB maintained and/or increased its artificially inflated securities prices throughout the Class Period. Further, as noted above, it is inconceivable the Individual Defendants were unaware of the Bank's unlawful conduct and practices and their scienter is imputable to the Company.

## VIII. LOSS CAUSATION AND ECONOMIC LOSS

153.    During the Class Period, as detailed herein, Defendants made false and misleading statements and/or omitted material information, and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of USB securities and operated as a fraud or

deceit on Class Period purchasers of USB securities by misrepresenting the Company's business, operations and prospects.  Later, as the falsity of Defendants' statements began to be revealed to investors, the prices of securities fell as the artificial inflation dissipated.  As a result of their purchases of USB securities during the Class Period, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

154.    The market for USB securities was open, well developed and efficient at all relevant times.  As a result of the materially misleading statements and failure to disclose the true state of the Company's business, operations and prospects, USB securities traded at artificially inflated prices.  Plaintiffs and other Class members purchased USB securities relying upon the integrity of the market for USB securities and suffered economic loss as a result thereof.  Defendants' false or misleading statements or omissions had the intended effect and caused USB securities to trade at artificially inflated levels.

155.    At the end of the Class Period, analysts quickly observed the negative implications for USB's stock, as Piper Sandler noted on July 28, 2022 with respect to the Consent Order, "this is obviously a negative and something the story could have done without . . . these are just headlines no investor likes to read, especially from such as [sic] highly regarded company," and explained that "[a]s for potential stock price ramifications, as one might expect, the shares are underperforming today" and the issue will likely "keep the stock in check for the time being."  On July 29, 2022, Bank of America also tied the stock price decline to the news of the Consent Order when it reported that "USB shares underperformed peers by 400bp on Thursday after the bank entered a consent order with the Consumer Financial Protection Bureau (CFPB) tied to its sales practices between 2010-2020."  Other analysts expressed concern about potential additional costs associated with the fallout from the Consent Order.  JP Morgan stated that a "**[k]ey concern is cost of customer remediation**

**and further fines similar to Wells Fargo**" given "the initial CFPB fine for Wells' fake account scandal was relatively small ($100 mil), [but] it led to billions of dollars in costs from customer and investor class-action law suits, and settlements with State Attorney Generals, the Department of Justice, and the SEC."

156.    On the news of the Consent Order, the price of USB stock declined $2.00, or 4% and closed at $46.12 on July 28, 2022.  As a result of Defendant's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

157.    The decline in the prices of USB securities at the end of the Class Period was the direct result of the nature and extent of Defendants' prior false statements and material omissions being revealed to and/or leaking into the market.  The timing and magnitude of the price declines in USB securities negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

158.    The economic loss Plaintiffs and other members of the Class suffered was caused by Defendants' fraudulent scheme to artificially inflate the prices of USB securities and maintain that price at artificially inflated levels, as was revealed by the subsequent and significant declines in the value of USB securities when Defendants' earlier misrepresentations and omissions became publicly available.

## IX.    PRESUMPTION OF RELIANCE

159.    As noted above, the market for USB shares was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, USB's shares traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon

the integrity of the market price of USB shares and market information relating to USB and have been damaged thereby.

160.    During the Class Period, the artificial inflation of U.S. Bancorp's shares was caused by the material misrepresentations and/or omissions particularized herein causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and omissions about U.S. Bancorp's business, prospects and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of USB's financials and its business, operations and prospects, thus causing the price of USB's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the USB shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing USB shares at such artificially inflated prices, and each of them has been damaged as a result.

161.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- USB and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiffs and the Class;

- USB's shares were traded on the NYSE and were covered by numerous analysts;

- USB shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the USB shares; and

- Plaintiffs and Class members purchased and/or sold USB securities between the time USB and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

162.    As a result of the foregoing, the market for USB shares promptly digested current information regarding USB from all publicly available sources and reflected such information in USB's share price.  Under these circumstances, all purchasers of USB's securities during the Class Period suffered similar injury through their purchase of USB's shares at artificially inflated prices.  Thus, a presumption of reliance applies.

163.    Accordingly, Plaintiffs and Class members are entitled to a presumption of reliance upon the integrity of the market.

164.    In the alternative, Plaintiffs and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Defendants omitted material information during the Class Period, violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding USB's business operations and compliance risks – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

165.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, USB and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of USB who knew that those statements were false and misleading when made.

## XI.    CLASS ACTION ALLEGATIONS

166.    Plaintiffs bring this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on their own behalf and as representatives of a Class, consisting of all those who purchased or otherwise acquired USB securities during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are: Defendants, the current and Class Period officers, and directors of the Company, the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

167.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, USB shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Company's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

168.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

169.    The Plaintiffs will fairly and adequately protect and represent the interests of members of the Class.  Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

170.    Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class.  These common questions of law include, without limitation:

- whether statements made by USB and the Individual Defendants to investors during the Class Period included misrepresentations of material facts or omitted material information about the severity and scope of the investigation by the CFPB into the Company's consumer sales practices;

- whether USB and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether USB's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of USB shares during the Class Period were impacted by USB's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiffs and Class members; and

- the appropriate measure of damages suffered by Plaintiffs and Class members.

171.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

172.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct USB and the Individual Defendants.

173.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### For Violation of §10(B) of the Exchange Act and SEC Rule 10b-5
### Against USB and the Individual Defendants

174.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

175.    Defendants are liable for making false statements and failing to disclose adverse facts known to them about USB.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of USB securities was a success, as it: (i) deceived the investing public regarding USB's business, operations and prospects; (ii) artificially inflated the price of USB securities; and (iii) caused Plaintiffs and other members of the Class to purchase USB securities at inflated prices.

176.    During the Class Period, USB and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

177.    USB and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of USB securities during the Class Period.

178.    USB and the Individual Defendants acted with scienter because they knew that the statements issued in the name of USB were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws.  USB and the Individual Defendants, through receipt of information reflecting true facts about USB, their control over, and/or receipt of or modification to USB's allegedly materially misleading statements, which made them aware of USB's confidential proprietary information, participated in the fraudulent scheme complained of herein.

179.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by USB, and intended to deceive Plaintiffs and Class

members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other USB employees to investors, including Plaintiffs and Class members. These misrepresentations and omissions were material. A reasonable investor would consider the facts-such as the severity of investigation by the CFPB into certain of USB's consumer sales practices important in deciding whether to buy shares of USB stock and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material facts.

180.    Accordingly, the price of USB shares was artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by USB and the Individual Defendants, Plaintiffs and Class members relied on the statements made by USB and the Individual Defendants and/or the integrity of the market price of USB shares during the Class Period in purchasing USB securities at prices that were artificially inflated due to false and misleading statements made by USB and the Individual Defendants.

181.    Were Plaintiffs and Class members made aware that the market price of USB shares was artificially and falsely inflated by misleading statements made by USB and the Individual Defendants, and by material adverse information that USB and the Individual Defendants failed to disclose, they would not have purchased USB securities at artificially inflated prices, or purchased them at any price.

182.    Based on the wrongful conducts alleged herein, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

183.    USB and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and Class members for significant damages suffered via their purchases of USB shares during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

184.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

185.    During the Class Period, the Individual Defendants were involved in the management and operation of USB.  Due to their senior positions, they had knowledge of adverse non-public information regarding USB's false representations discussed herein.

186.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding USB's financial condition and results of operations, and to correct any public statements issued by USB which were materially false or misleading.

187.    Due to their positions of authority at USB, the Individual Defendants controlled the contents of various public filings, press releases and reports which USB disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause USB to execute the wrongful acts alleged herein.  The Individual Defendants were therefore "controlling persons" at USB pursuant to §20(a) of the Exchange Act.  On this basis, they were participants in the unlawful conduct alleged which caused the prices of USB shares to be artificially inflated.

188.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by USB pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.      Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class Representatives;

B.      Awarding damages in favor of Plaintiffs and members of the Class against USB and the Individual Defendants, jointly and severally, for all damages sustained as a result of USB's wrongdoing, in an amount to be proven at trial;

C.      Awarding Plaintiffs and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.      Awarding Plaintiffs and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.      Directing such further relief as it may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: May 5, 2023

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
VINCENT M. SERRA
WILLIAM A. MASSA

*/s/ Vincent M. Serra*
VINCENT M. SERRA

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
vserra@rgrdlaw.com
wmassa@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JONAH H. GOLDSTEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*