O35VTHEO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE BUHRKE FAMILY REVOCABLE
TRUST, on behalf of itself and
all others similarly situated,

                Plaintiff,

        v.                          22 Civ. 9174 (JPC)

U.S. BANCORP, ANDREW CECERE,
TERRY DOLAN, JODI RICHARD and
KATHERINE QUINN,

                Defendants.         Argument

------------------------------x
                                    New York, N.Y.
                                    March 5, 2024
                                    2:00 p.m.

Before:

                HON. JOHN P. CRONAN,

                                    District Judge

                    APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
        Attorneys for Movants Teamsters Local 710
         Pension Fund and Ohio Carpenters Pension Fund
BY:  VINCENT M. SERRA

JONES DAY
        Attorneys for Defendants
BY:  NIDHI YADAVA
        RAJEEV MUTTREJA
        SARAH EFRONSON

SOUTHERN DISTRICT REPORTERS, P.C.
            (212) 805-0300

O35VTHEO

(Case called)

THE LAW CLERK:  Can counsel, starting with plaintiff, please state your name for the record.

MR. SERRA:  Good afternoon, your Honor.

Vince Serra from Robbins Geller, on behalf of lead plaintiffs.

THE COURT:  Good afternoon, Mr. Serra.

MS. YADAVA:  Good afternoon, your Honor.

Nidhi Yadava from Jones Day, on behalf of the defendants.  And I'm joined by my colleagues Rajeev Muttreja --

MR. MUTTREJA:  Good afternoon, your Honor.

MS. YADAVA:  -- and Sarah Efronson.

MS. EFRONSON:  Good afternoon, your Honor.

THE COURT:  Good afternoon, Ms. Yadava, Mr. Muttreja, and Ms. Efronson.

So we are here for oral argument on the defendants' motion to dismiss.  As I believe I mentioned in my order scheduling this, I'm expecting about 30 minutes per side, although I don't have a stopwatch here and I'm not going to be holding people to that exact time.  I will also give the defendants and movant an opportunity for a brief reply.

I've also flagged a couple of issues that I was hoping the parties would address in addition to obviously anything else you wish to.

So, Ms. Yadava, are you going to be taking the lead?

O35VTHEO

MS. YADAVA:  I am, your Honor.

THE COURT:  Okay.

MS. YADAVA:  Your Honor, this is a classic example of a plaintiff trying to take a settlement with a regulatory authority and somehow transform it into a case of securities fraud.  But a settlement involving consumer sales practices in a relatively small number of accounts in no way suggests that the bank and its top officers were attempting to defraud the market.

Plaintiff's complaint is replete with unsupported and unspecific allegations that the PSLRA was designed to combat. And the complaint fails on nearly every element of the 10(b) standard.

As described in our papers, plaintiff's complaint should be dismissed for a number of independent reasons.

First, the alleged misstatements about the bank's brand, ethics, and risk are simply not actionable.  They are not the type of statements on which investors rely, nor are any of the target statements alleged to be false and misleading. And the statements about the CFPB investigation itself were also not alleged to be lacking in any material way.

The complaint is also devoid of allegations of *scienter*.  The complaint lacks any indications that defendants knew any more than they told the market or that they recklessly misled the market.  Both the PSLRA and 9(b) require plaintiffs

O35VTHEO

to plead *scienter* with particularity.  Did the defendants know contrary facts?  What were those contrary facts?  How did they know them and when did they know them?  Plaintiffs offer nothing but a view unsupported general allegations about the bank, which is an organization of 70,000 employees, and its purported knowledge.  That is not nearly enough to survive on *scienter*.

THE COURT:  Doesn't matter that this was not long after the Wells Fargo scandal and, in particular, that individuals in the roles of the four defendants here would be looking at what controls are in place?

MS. YADAVA:  No, your Honor, it shouldn't make a difference in the Court's analysis.

First, when we talk about the Wells Fargo scandal, those allegations that plaintiffs allege about trying to differentiate U.S. Bank from Wells Fargo, and that the defendants intended to somehow be a differentiator, they fall flat because the defendants never said that.  There's no allegation that the defendants actually said, We are distinguishing ourselves from a certain competitor or that we intend to do so.  The body of case law suggests that with an absence of actually specifically identifying or attempting to distinguish, that's not enough under the law in our circuit.

Nor do plaintiffs have any plausible allegations of motive to defraud the market.  None of the defendants profited

O35VTHEO

from the alleged misstatements, and indeed each defendant actually increased their holdings during the class period at a supposedly artificially inflated price.

THE COURT: But can I consider that? I mean, that's in the Form 4s. And haven't a number of courts said that I can only -- this may not be particularly fair, given the posture here, but I can only consider that for the fact that those forms were filed, not for the truth of what's asserted in there, including the stock purchases.

MS. YADAVA: Your Honor, I think *Campo v. Sears Holding Corp.* addresses this in detail and is instructive on this issue because it states that to the extent there are documents that are so integral to plaintiff's complaint, they should be considered on motion to dismiss. And here, the stock purchases to which plaintiffs point are entirely taken from the Form 4s. It's hard to actually understand what those Form 4s said without using them or actually incorporating. Just because they simply didn't say the name, that doesn't mean that the document is not integral to plaintiff's allegations of motive such that we would be able to use them on response.

THE COURT: But even if they are integral, can I rely on them for the truth that's asserted therein as opposed to what was filed on those dates?

MS. YADAVA: Your Honor, I think you can rely on them for the truth. And I think that the *Campo Holdings* case

O35VTHEO

explains that when -- it's a slightly different concept than sort of judicial notice, because they are integrated into plaintiff's complaint as essentially being part of the complaint itself.  And the same way we take -- you're allowed to consider the other public filings, like the 10-Ks and the 10-Qs, because they are integral to the complaint, I think Form 4s should be along those same lines of comprehension.

Your Honor, plaintiffs also fail to adequately allege loss causation.  But, your Honor, for the time allotted today, I want to talk specifically about falsity to begin with and the particular paragraphs that your Honor pointed out in his order this week.

When talking about paragraphs 106 and 107, we need to put them in context.  They are the risk disclosures themselves, right; they are the warnings to the market of what could happen that the bank is sharing with the market.

THE COURT:  And I'm particularly interested in your views on those disclosures after May 2021.  So the 2021 and the reports, the 10-K for 2021, and the use of the word -- words "it fails to safeguard" and "could expose."  Because at that point there's been a disclosure as to the CFPB investigation.  And by using those words "if" as opposed to a word that would be more definitive, why was that not an omission?

MS. YADAVA:  Your Honor, that wasn't an omission for a few reasons.  One, at the time -- the case law requires

O35VTHEO

defendants to disclose an investigation when it is reasonably certain that litigation is imminent.  So at the time that U.S. Bank disclosed the investigation, it understood that litigation was imminent.  However, there are no requirements that the bank prejudge the outcome of the investigation.

At that point, litigation could be imminent without there being damage, harm, or any of the other risks that the bank had announced as being ifs, right.  Just because there may be litigation, it doesn't mean that the CFPB may be successful in its litigation or that it may lead to any of those potential outcomes, which is why I don't think that the disclosures in 2021, that disclose the investigation, or 2022, are really any different than the disclosures previously, which are also not required to prejudge the outcome of any investigation or to prejudge what may occur, especially in light of any kind of independent duty, which I think the law is clear that there's no independent duty to disclose that.

THE COURT:  Is that more of a *scienter* argument there?  Because it does appear that it may not be anywhere close to the degree as Wells Fargo, but there were unauthorized accounts being opened.  Cecere, I guess his name is, admitted as much during his congressional testimony.  So the truth at that time was more than if this were to have occurred.  Is your point that there was *scienter* lacking for the defendants then at that point?

O35VTHEO

MS. YADAVA:  Your Honor, I think there's both.

So on the falsity point, I think falsity is lacking because when we look at the risk disclosures themselves, they say things like:  The company could face legal and reputational harm if it fails to safeguard personal information. Mishandling personal information of customers could expose the company to litigation or regulatory fines.

None of those are false or misleading simply by omission of the unauthorized accounts, because the unauthorized accounts don't necessarily lead to reputational damage, harm, the fines, or any of the other risks that the bank had disclosed in its risk disclosures.

So I do think there is a falsity argument as well that defendants should prevail on.  But additionally, your Honor, you're right.  I think you noted in your *Denny v. Canaan* opinion that sometimes falsity and *scienter* are intertwined; because to not know about whether a risk existed, you only have to disclose risks, right, that you -- that a company is aware exists, but that to be aware of something is somehow so deeply intertwined with *scienter*, that sometimes it is hard to separate out the two.

Here, I think we can separate them out by sort of discussing what kind of misleading statements -- what a misleading statement truly is, because it needs to be lacking something to make the statement not misleading.  But statements

O35VTHEO

about harm were not misleading in the absence of disclosure of the unauthorized accounts or the CFPB investigation itself.

Your Honor, in all of these statements and sort of on the topic that we've been discussing about whether these statements are false or misleading in the risk disclosures themselves, plaintiffs are adopting a fraud by hindsight theory; that because there was an investigation, because they were unauthorized accounts, somehow it was inevitable that the harm or damage would occur.

But I think the case law is clear that fraud by hindsight is not permitted in this circuit. And I think the *Xerion Partners* case, Judge Chin really identifies the issues clearly there, where he says: Plaintiffs failed to plead with particularity sufficient facts why any of the specific statements made in connection with the value of the company were false when made, even though those same relevant numbers about the value of the company were changed five months later. But he noted there that the Second Circuit does not permit fraud by hindsight, and that is the notion that the plaintiffs are trying to allege here.

Plaintiffs also allege that the risk management systems had failed at the time of the alleged disclosures. But it's slightly hyperbolic to say that the framework for managing risk had entirely fallen apart because of a small number relatively of unauthorized accounts. But also, those

O35VTHEO

statements about the risk management framework, those are the exact statements that were addressed in the CFPB consent order in the *Fifth Third* case.  And the court actually held that those kind of statements about risk frameworks are immaterial and puffery because they make no promises.  They make no guarantees that that has not occurred.

Fifth Third has statements in its risk disclosures like Fifth Third is subject to risk from employee misconduct, including noncompliance with policies and improper use or disclosure of confidential information.  And the Court dismissed all of those, saying these are simply not the type of statements upon which plaintiffs -- investors rely.

THE COURT:  But isn't employee misconduct — and I believe in *Fifth Third* the court said that it was too general to be actionable.  But employee misconduct seems like a much broader language than what we have here, dealing with a failure to safeguard customer information.

MS. YADAVA:  Your Honor, it's interesting when you look at the two disclosures, because I do see how one could appear to be more specific.  But when you think about a bank as a whole, what are we worried about with employees?  We're worried that they have access to sensitive information and they mishandle it.  So I think the disclosures are actually more similar when you think about the underlying conduct that they are targeting or the risk that they are trying to make the

O35VTHEO

market aware of, even though the language of one may be more specific than the other.

But even if your Honor is to find that the statements here are more specific and less likely to be puffery, they're still not sufficiently alleged as false or misleading because there's no allegations that any risk had materialized during that time.  There is no risk that the bank would be subject to harm or that they would be subject to litigation or regulatory fines or that there would be damage to the company's reputation at the time that these statements were made.

Your Honor, these statements are also not actionable as omissions.  And I think the omissions standard is slightly different, so I just want to make sure that we're covering both bases on this.  But the law is clear that there's no duty to disclose unauthorized accounts; you don't have to disclose uncharged, unadjudicated wrongdoing, which is exactly what the unauthorized accounts were, and nor do they have to disclose the CFPB investigation.

The *Richman v. Goldman Sachs* case is clear when it says that when regulatory investigation matures to where litigation is apparent and substantially certain to occur, then 10(b) disclosure is mandated.  That is not the allegations at any point before the bank actually disclosed the investigation itself.  There are no allegations that there was a point in time when the investigation matured to that point and

O35VTHEO

defendants did not share it with the market.

And absent an independent duty, the only time that omissions can be actionable is when there's a duty to disclose to prevent an affirmative statement from being misleading.

And your Honor pointed out something about opinions and facts in his order. And the standard for when omissions are actionable when they are in connection with opinions is actually even more favorable to defendants. And if we look at these risk disclosures, 106 and 107, there's Second Circuit law to suggest that they are actually opinions, because they are a Second Circuit law that says forward-looking statements, expressions of optimism and projections are opinions. These statements are replete with would, could, if, in the future.

So for analyzing these under an opinions rubric, then we look at *Tung* and we look at *Omnicare*, and we can see that the standard is different. It says that in *Omnicare*, omissions are only actionable if they go to the basis of the speaker's opinion. There aren't any allegations in this case about omissions that went to the basis of the speaker's opinion. So in an opinion standard, that would not -- these allegations do not hold.

Similarly, plaintiff says that the statements were misleading for omitting the CFPB investigation and the unauthorized accounts. But the *Tung* case says that that's not enough for opinion statements. Just because there are facts

O35VTHEO

that cut the other way in terms of an opinion statement, its interpretation of *Omnicare* is the correct one, I think that's consistent with *Omnicare*, that only certain types of omissions are actionable, and these are not those.

But even if your Honor were to find that these are fact statements or wanting to analyze these under the statement -- the fact standard, then they are all about potential harm to the company.  And as I've mentioned before, the unauthorized accounts and the CFPB investigation themselves don't render disclosures about potential harm to the company, false or misleading in that context.

I think there's a case actually on point on this issue, it's the *Ulbricht* case, where there were disclosures about economic and political instability in Argentina.  And the company -- there was bribery that had occurred in Argentina.  But the court held that although the bribery had occurred, the risks associated with that bribery had not occurred.  There had been no damage or harm yet, so there was no materialization of the risk.

Your Honor, just sort of thinking about when we talk about *Fifth Third*, and your Honor mentioned these were slightly more specific, it's an interesting case here because the way we sort of think about securities fraud is it's about hiding the ball.  But the bank did the exact opposite here, right.  It explained the risks that the bank faced, it suggested caution,

O35VTHEO

and it reminded investors continuously that it is continuously subject to regulatory investigation. It didn't disclose the specific investigation, it didn't prejudge the outcome, because it was not required to do so. But it explained the risks that investors faced. And I think that all has to be thought of when we're looking at what kind of disclosures are being made to the investors, what information they have on which to base their decisions to invest. And it's the different situation than some of the cases where -- that plaintiffs point to, *Menaldi* and *Mylan*, and the types of cases where the company said, We have no investigation or there is no issue.

Here, the company said, We have investigations all the time, and we face risks if we don't safeguard certain things, and certain things could occur. And if we don't, we have risk management systems in place, but they could fail. The company was very transparent with the market about the risks that investors faced in this stock.

Your Honor, I want to talk a little bit about materiality, because I know your Honor had brought that up in his order, hoping that I still have time for us to talk about *scienter*. But I'll focus on materiality first.

Your Honor, the statements in 106 and 107 are not adequately pled as material given the ultimate size of the fine. The *Lions Gate* case is quite instructive on this point. There, Judge Koeltl held that the fine represented less than

O35VTHEO

one percent of U.S. -- of Lions Gate's revenue for the quarter, which is the same here; and thus, it rendered any omissions immaterial because the ultimate size of the fine didn't impact the plaintiff's -- sorry, didn't impact the defendant's bottom line or it was relatively small compared to the size of their earnings.

And your Honor asked a question about analysts. Just because analysts covered the ultimate fine doesn't make the alleged misstatements material. And I think that's the paragraph you point to in your order, your Honor's 133, where it talks about the plaintiffs, and the plaintiffs allege that analysts covered the settlement, the consent order itself, but not the underlying statements that are alleged to have been false or misleading.

I also think when we talk about materiality — and I understand the analysis is not limited to quantitative materiality, but I do think where there is no quantitative materiality, the qualitative materiality standard is a higher bar. But the qualitative materiality standard, I think the *ECA v. JP Morgan* case explains that for instructions on, sort of, how to analyze whether there's qualitative materiality, we look at SAB 99. And nothing in that talks about coverage by an analyst as being indicative of materiality.

I also think the *Skechers* case is interesting on this point, because Judge Buchwald in that case noted that just

O35VTHEO

because analysts covered the alleged misstatements themselves, that still didn't make them material. And I think that's interesting because, in that case, they are talking about puffery. And Judge Buchwald says basically these statements are not actionable; they are not the kind of statements upon which investors rely. And even though the analysts chose to cover them, it doesn't convert to actionable statements. And I think we've got a similar situation here; analysts' coverage of the ultimate settlement can't be do much for materiality if analysts' coverage of the actual alleged statements can't do much on that point.

If we're talking about 106 and 107, I think we have another materiality argument as well, and that's under the bespeaks caution doctrine, which is sort of a form of materiality. 106 and 107, putting aside whether they are opinions or facts, they all talk about what could happen in the future. And courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial when that cautionary language is meaningful.

And here, I mentioned to your Honor earlier, the bank shared the risks with the market in specific ways. That should protect any omissions on those points. And I think the *In re Sina* case is instructive on that point, where the company warned investors about the regulatory landscape in China, the uncertainty over whether the Chinese government could take

O35VTHEO

action to impede the company's business. And the court held that in light of those statements, it failed to understand how plaintiffs can now allege that they weren't warned of the potential risks. Because, in fact, that cautionary language warned them of the risks that might ultimately come to pass.

So I think that's sort of a second layer of materiality that would insulate these statements.

The investors -- I'm sorry.

THE COURT: I was just going to ask, if you just walk me through here why is your view that this was a future risk and not a present risk. At the time of these statements that are mentioned in 106 and 107, the allegation is that it was a present risk because the bank was not safeguarding personal information. So how would the bespeaks caution doctrine apply to that or, more generally, why is that not a present risk?

MS. YADAVA: Sure.

So the statements themselves are forward-looking. I think plaintiff's theory is that the risk had materialized. So it doesn't change the statement itself from being forward-looking to one of present tense. We look at the statements on their face to determine if they are present tense and they are forward-looking. And each one of these lines within 106 says things like, We could face significant legal harm; we could expose the company to litigation or regulatory fines; this could impact its results. Those, by their very

O35VTHEO

nature, are forward-looking statements.

I think plaintiff is trying to say that because there are materialized risks, those statements become misleading. But I think that's a separate analysis. I think whether -- and I think defendants prevail on that as well. But the statements on their face are, in my view, from what I've seen in the case law, those are forward-looking statements. And whether there's a material realization of the risk, it doesn't convert a forward-looking statement to a statement of present tense; it just perhaps makes an omission actionable if there is materialized risk.

Your Honor, the final point I'd like to cover is about *scienter*. You know, even if your Honor were to find that 106 or 107 were actionable, they should still be dismissed because plaintiff's *scienter* allegations are entirely insufficient.

One more thing when we talk about these statements as being forward-looking, the PSLRA requires actual knowledge for forward-looking statements; mere recklessness will not suffice under the doctrine. So we needed actual knowledge. The plaintiffs need to allege actual knowledge by Cecere and Dolan, the signatories to the SEC filing, that his or her statements -- or his, in both instances, were false or misleading at the time.

And plaintiff has not a single specific allegation about what these individuals knew that was contrary to what

O35VTHEO

they stated, how they knew it or when they knew it. And that is what 9(b) and the PSLRA require.

They instead point to defendants' positions as being suggested of knowledge. But the Second Circuit is clear in *ECA v. JP Morgan* and other cases that that's unacceptable. We can't infer knowledge because of a plaintiff's -- because of a defendant's position.

They also point to the consent order itself, which doesn't say anything about who knew what or when. Same for the CFPB press release, which has a generic statement, without any specifics of who -- what was known and to whom.

THE COURT: The consent order though does have language that doesn't go as far as Director Chopra did in the press release, but paragraph 13 says that USB was aware that many allegations, again, of applying for, opening, issuing, enrolling customers without their consent, were not escalated or not recorded. Why doesn't that show knowledge there?

MS. YADAVA: Because, your Honor, it's saying U.S. Bank as a whole. It's a 70,000-employee company. We don't know who at U.S. Bank. It could be a branch manager, it could be any person. And I actually think that *scienter* allegation cuts a little bit against *scienter*, because it's saying it wasn't escalated. And we're dealing with the individual defendants who were the highest echelon of the company.

THE COURT: By the way, can I rely on those findings

O35VTHEO

in the consent order?

MS. YADAVA:  For what purpose, your Honor?

THE COURT:  I guess at all in this case.  I know that obviously when Cecere testified, he admitted to a lot of what went on.  But the consent order itself seemed to say that USB did not -- other than agreeing to allegations that go to the CFPB's jurisdiction, he was not agreeing with those findings.

MS. YADAVA:  That's correct, your Honor.

U.S. Bank admitted no wrongdoing in connection with the consent order; it admitted only to the jurisdictional premise and to the issuance of the consent order.  So your Honor is correct, those are, sort of, unspecific allegations because they are only -- they are not the bank's admissions.  But your Honor is correct also that Cecere, in his testimony — as most CEOs do — took responsibility for the action.  But again, he didn't lay out any specifics of who knew what, when, or whether the wrongdoing, you know, was known to anybody in management.

THE COURT:  And I'll let you get back to where you are now, but while we're on Cecere's testimony, do you want to take a moment to respond to the suggestion that he may not have been honest when he estimated the number of accounts that were at issue here?

MS. YADAVA:  Your Honor, there's no specific allegation to suggest that those numbers were incorrect.  This

O35VTHEO

is pure speculation, which is what the PSLRA has held is insufficient under the law.

THE COURT:  What about the fine?  The fine seems pretty high, if we're talking about just 340 or so unauthorized accounts.

MS. YADAVA:  Your Honor, $37.5 million for a bank that has billions and billions in revenue every quarter, that is not a significant amount.  I think it's hard for us to sit here as individuals and say that $37 million is not a lot of money.  I think we can all agree it is.  But when we think about the fine in terms of the bank's operations, they are one of the largest banks in the country, they have a lot more revenue to make, that's why the $37 million is less than one percent of that quarter's revenue.

THE COURT:  So it's only about one-tenth of the Wells Fargo fine from the CFPB.  I assume for Wells Fargo there are other regulators or DOJ that impose fines in addition to the CFPB fine.

MS. YADAVA:  I believe there were, your Honor.  But we do some work for Wells Fargo, and I don't know standing here in this moment what --

THE COURT:  Understood.

MS. YADAVA:  -- what I can share and what I can't.

THE COURT:  Okay.  Well, thank you.  You may go back to where you were.  Sorry about that.

O35VTHEO

MS. YADAVA:  Your Honor, I just want to take on one more point of the plaintiffs, and that's about core operations.

Your Honor aptly noted in the *Denny* decision that it's unclear whether the core operations doctrine even survived the PSLRA; and if it did, it clearly cannot stand on its own.  So just because the consumer banking division is important to the company, that's not nearly enough to show *scienter*.

And your Honor, even if this wasn't -- even if your Honor doesn't think this is the forward-looking statement in 106 and 107, and even if actual knowledge is not the standard, the recklessness bar is high too.  The recklessness bar also requires a lot more than what plaintiffs have pled.

Judge Oetken, in *City of North Miami Beach*, explained and sort of reiterated the standard again recently that we have to show -- plaintiffs have to allege the actual defendant's knowledge, even in a recklessness standard, of fact or access to information contradicting their public statements.  They have to identify the specific reports or the statements when alleging this contrary information.  We don't have any of that in this complaint.

And we talked about motive, motive being unavailable to the plaintiffs in this instance because of the defendants' stockholdings increasing.  But when we've got no motive, the bar for recklessness goes even higher.  I think the *ECA v. JP Morgan* case says that, too.  So in a situation where there's no

O35VTHEO

motive and no allegations of recklessness or actual knowledge, plaintiff's complaint should be dismissed in its entirety on *scienter*, including paragraphs 106 and 107.

Your Honor, I think I've covered everything, unless your Honor has more questions.

THE COURT:  No, I think you answered all my questions. Like I said, I'll give you the chance for a brief rebuttal after I hear from Mr. Serra.

MS. YADAVA:  Thank you.

MR. SERRA:  Good afternoon, your Honor.

Vince Serra from Robbins Geller, on behalf of lead plaintiffs.  It's a pleasure to be here before you today.

THE COURT:  Good afternoon.

MR. SERRA:  Your Honor, I think you hit the nail on the head referring to Wells Fargo.  It's undisputable that one of U.S. Bank's top competitors is Wells Fargo.  That bank was engulfed in one of the notorious financial scandals of the last few decades, which involved the same conduct that's at issue here:  Employees misusing customers' personal information to open unauthorized accounts to meet aggressive sales goals.

Now, following that scandal, defendants here told investors at paragraph 67 of the complaint:  "Our culture, brand, and reputation are sources of competitive advantage for U.S. Bank and differentiate us from our peers."

And who were defendants' peers, your Honor?  Wells

O35VTHEO

Fargo.

So defendants chose to make these statements, and they can't now run from them. So, your Honor, they were making these statements essentially saying, We're not like Wells Fargo. Our culture, which is built on ethical conduct and trustworthiness, is different from Wells Fargo. They're the unethical player.

THE COURT: They never mentioned Wells Fargo.

MR. SERRA: Correct, your Honor, they don't.

The JP Morgan analyst at the end of the class period, as your Honor pointed out in paragraph 133, does tie the conduct disclosed in the consent order to Wells Fargo, but they don't specifically mention them.

THE COURT: Let me ask you -- and I'll let you go back to where you are. But maybe just taking a step back, I'm trying to understand what the fraudulent conduct was here.

The defendants repeatedly disclosed that U.S. Bank is subject to investigations and inquiries generally and responds to them. In May of 2021, they started disclosing that the CFPB in particular was investigating certain of the companies of the bank's consumer sales practices. And then a year after that, they disclosed that the CFPB was considering a potential enforcement action.

Isn't that exactly what we want a bank to be doing in this situation?

O35VTHEO

MR. SERRA:  Well, your Honor, I think the statements at paragraph 106 and 107 that you referenced in your order and that we discussed today, specifically that the bank could face significant legal and reputational harm if it fails to safeguard personal information, and that any mishandling of the personal information of employees of customers could expose the bank to litigation or regulatory fines is misleading because it's omitting underlying misconduct that the CFPB determined the company knew about for over a decade.

Now, defendants disclaim any knowledge about the misconduct underlying the investigation.  They assert that the Wells Fargo scandal -- in the wake of the Wells Fargo scandal, that they had no reason to know about analogous misconduct involving U.S. Bank's core consumer banking division.  But this argument, your Honor, defies common sense.  And we don't have to look very far to find an example that illustrates this implausibility.

I remember a few months ago when the door panel fell off the Alaska Airlines flight midair, defendants' logic would suggest that Alaska's major airline competitors — like Delta, American — would not have thought to check their own planes' door panels were safe.  But that argument just doesn't make sense.  And again, you don't have to take my word for it; the CFPB itself found specific evidence after a five-year investigation that U.S. Bank knew for over a decade that the

O35VTHEO

sales pressure was leading employees to open accounts without permission.

And the bank, as your Honor noted, paid a $37.5 million fine.  That's actually over a third of the fines that Wells Fargo initially paid.  That was $100 million.  They eventually, years later, paid more; but the initial fine was $100 million for Wells Fargo.

And then also, as was discussed, Mr. Cecere, the CEO, admitted that the conduct took place and took full responsibility for it.  And after the news of the consent order's findings was disclosed to the market, the stock price dropped and the securities analysts tied the underperformance to the negative facts disclosed in the consent order.

And your Honor, I think I'd like to address the materiality analysis that you highlighted in your order from last week.

The context that we just discussed is important, your Honor, because it's a bedrock principle in the Second Circuit that to dismiss a complaint on materiality grounds, misstatements or omissions must be so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.  And it's a fact-intensive inquiry; it's rarely dispositive on a motion to dismiss.

So the statements that we just discussed, your Honor, regarding the risk statements — and we'll talk about

O35VTHEO

materiality with respect to 106 and 107 of the complaint —
defendants argue in the reply that the risk disclosures were
too general to be actionable, and they cite the *Fifth Third*
case to support their argument that the statements were
immaterial puffery.  And it's true, your Honor, that the more
specific the caution, the more likely it is to mislead.

But the risk statements that we're dealing with here
are considerably more specific than the risk disclosures in
*Fifth Third*.  And we know that the risk disclosures can be
material and misleading, where defendants use hypothetical
qualifiers like "if," to warn that unlawful activity or
misconduct could occur when it already has.

And then the question, your Honor, becomes:  Would a
reasonable investor have considered it's significant that at
the same time defendants were representing these specific risks
as hypothetical, U.S. Bank was engaging in precisely the same
type of misconduct underpinning the Wells Fargo scandal.  And
remember, shortly before the CFPB launched its investigation
into U.S. Bank, it warned in connection with the Wells Fargo
scandal, that that action should put the entire industry on
notice that financial incentive programs, just like the one
that U.S. Bank was implementing, could carry serious legal
consequences.  And unlike in *Fifth Third*, where the most
specific risk disclosure was simply that the bank is also
subject to risk through potential misconduct, and that's at *17

O35VTHEO

of the *Fifth Third* opinion, here you have references to the specific type of misconduct:  Failing to safeguard personal information, and mishandling or misuse of personal information.

So defendants also argue that the risk disclosures are too general because no reasonable investor would conclude that the bank promised or guaranteed that no employee misconduct ever occurred.  And in response to that, your Honor, I point the Court to the Second Circuit's analysis in *Jinkosolar*, which explained, with respect to risk disclosure, that noncompliance with regulations could lead to bad publicity or fines.  That disclosure didn't guarantee 100 percent compliance, 100 percent of the time, which is often unobtainable, and reasonable investors understand that.

However, those same investors would be misled -- excuse me.  I just lost my -- they would be misled, your Honor, by a risk warning that failed to disclose facts on the ground that already occurred.  And that same logic applies here, particularly where the undisclosed facts were known to defendants, were substantial importance to investors, and defendants highlighted -- themselves highlighted the fact, as material in the risk disclosures, they repeatedly referenced the hypothetical misuse of customer information, and that reputational damage from their disclosure could adversely affect the bank's financial --

THE COURT:  When was the fact known to the defendants

O35VTHEO

that you're referring to?

MR. SERRA:  Your Honor, the investigation began after the Wells Fargo scandal.  So they disclosed in May 2021 that an investigation was ongoing, right.  The conduct, according to the consent order, took place over the scope of 11 years.  So at some point, once the CFPB began their investigation, you know, it's reasonable to infer that defendants, as senior officers of the company, were apprised of the material, information that would be these unauthorized disclosed accounts.

THE COURT:  Is that alleged though anywhere in the complaint?

MR. SERRA:  Well, certainly that the investigation was ongoing during that time period.  And defendants, again, by May 2021, disclosed the investigation.  They were cooperating with the investigation.  It would be implausible to think that following Wells Fargo, they wouldn't have checked to see if that conduct was going on at the bank.

THE COURT:  I mean, an investigation could be going on and they disclose that without them knowing even the specific details of the investigation.  The disclosure doesn't really mention what -- much about the CFPB investigation, other than it involved U.S. Bank's consumer sales practices, and that U.S. Bank had been responding to the CFPB.

How does that establish that the individual defendants

O35VTHEO

had specific knowledge as to the actual unauthorized openings of accounts?

MR. SERRA:  I think that in itself is the problem with those risk disclosures.  I don't think that they are complete.

THE COURT:  But U.S. Bank was told by the CFPB as to what they were investigating.

MR. SERRA:  Your Honor, I would point the Court to a number of factors that would go to defendants' knowledge.  And, of course, it's the cooperation with this half-decade-long investigation that we've been talking about.

THE COURT:  When did the investigation start?  Because it seems like there's one point where, in paragraph 115, the allegation is CFPB had been investigating U.S. Bank since at least 2010, but I don't think that's right.  It seems like your allegation is that it started in 2017.

MR. SERRA:  You're correct, your Honor.  We know from public reports at the end of the class period that the investigation had been ongoing for over five years.  So that puts you back to mid 2017.  So sometime -- it could have been earlier than what -- the disclosure of the Wells Fargo scandal in September 2016, but it could have been sometime in that time frame.

THE COURT:  And presumably, I would assume that the CFPB does covert investigations as well.  Is there any allegation that U.S. Bank knew about the investigation prior to

O35VTHEO

the May 2021 disclosure?

MR. SERRA:  No, your Honor, other than the common-sense argument that following the Wells Fargo, which was a behemoth in the industry and a scandal of unimaginable proportions, it would be inconceivable to think that they wouldn't have checked to see whether that similar conduct was going on at the bank.

Now, your Honor, if I can sort of circle back to the materiality analysis we were talking about.  And your Honor actually mentioned the significance of analysts' reactions.

Now, I make two points on that, your Honor.  The analysts' reactions themselves indicating the company's stock declined in response to news of undisclosed misconduct can support a finding of materiality.  And I'd refer the Court to Judge Furman's recent opinion in the *General Electric* case. It's 2023 WL 6314939 at *8 to support that notion.  And it's evident from the reactions, at paragraph 133 of the complaint, that the analysts tied the underperformance of the stock to the negative reaction of the market, which, according to one Piper Sandler analyst, included headlines no investor likes to read, especially from such a highly regarded company.  So that further supports materiality.

And the second related point, your Honor, is that one of the qualitative factors that courts look to in determining materiality is management's expectation that a misstatement

O35VTHEO

will result in a significant market reaction.  And that's certainly applicable here with the JP Morgan analyst comment that was concerned for their customer remediation and fines similar to Wells Fargo.  And this highlights that misconduct analogous to the Wells Fargo scandal would have been of particular interest to investors given that market observers immediately tied that disclosure to Wells, even at the end of the class period.

Your Honor, defendants focus on the purportedly small financial magnitude of the omission, and claim plaintiffs don't allege any specific facts about qualitative factors to support materiality.  But we know that the quantitative analysis is not dispositive materiality.

THE COURT:  But you do agree the quantitative analysis here cuts pretty strongly against you.  You need qualitative.

MR. SERRA:  Certainly qualitative factors, your Honor, courts look at.

But I would point out that -- from the Second Circuit, that qualitative factors can cause misstatements that are quantitatively small, right, to be material.  And there are even cases finding materiality, despite impacting as little as .1 percent of revenue.  And that's the *Barclays* case that we cite in our opposition.

Your Honor, I think, turning to the question about statements of opinion versus fact in *Omnicare* from your order,

O35VTHEO

your Honor, it's true that plaintiffs haven't alleged statements of opinion, they largely haven't alleged statements of opinion.  And defendants argue now that the opinion standards are more favorable for them; but in their motion, they didn't make that argument.  But if the Court determines that any of the misstatements are statements of fact or opinion, the Court's analysis is going to vary slightly; but either way, it should lead the Court to the same analysis, the same conclusion.

So if the risk statements were determined to be objective statements of fact, they would be actionable as half-truths, literally true statements that created a materially misleading impression.  So by cautioning that U.S. Bank could have reputational litigation or regulatory exposure, or if it fails to safeguard customers' personal information, defendants put the issue of safeguarding personal information at play, and we're required to tell the whole truth.  And that's the *Jinkosolar* case, which said "a generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculation of probability."  And that's 761 F.3d at 251.  So by raising the issue of failing to safeguard personal information, defendants had a duty to disclose facts that undermine those comforting impressions that they gave to investors.

But if the Court finds that defendants' statements are

O35VTHEO

statements of opinion, under *Omnicare* and *Sanofi*, they would be actionable if the speaker omitted information that makes the opinion statement misleading to a reasonable investor.  And if that's the case, *Omnicare* instructs that investors must identify particular material facts going to the basis of the opinion, whose omission makes the statement, in context, misleading to a reasonable investor.  And then under *Sanofi*, the core inquiry is whether the omitted fact would conflict with what a reasonable investor would take from the statement itself.

And your Honor, to synthesize these standards, I'd refer the Court to the Second Circuit's decision in *Abramson v. Newlink Genetics* — it's actually cited in defendants' reply — 965 F.3d, 174-176.  I believe it provides a helpful analysis for why it may not even be necessary to characterize the statements one way or the other to begin about.

So in *Abramson* at 175, the Court explains:  "When a statement of opinion implies fact or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow."

And it's noteworthy to point out that the statement in *Abramson* was about the survival rate for pancreatic cancer based on all the major studies in the context of a drug company trying to obtain FDA approval.  And the district court found

O35VTHEO

the statement to be one of opinion, plaintiffs disagreed, and then the Second Circuit ultimately said it need not decide the issue.

The Court explained that before *Omnicare*, the characterization of a statement of an opinion as an opinion was all but fatal to plaintiff's case.  But *Omnicare*, quote, reduced the significance of district court's classification of statements, as those are factor opinion.  And then the Court determined that the outcome of plaintiff's claims would not differ based on the difference in the classification.

So here, defendants' statements, if deemed to be opinions, are actionable in that they each omit material facts going to the basis of their statements.  And this omission conflicts with what reasonable investors would take from the statement, particularly in the context of Wells Fargo scandal, which we know was still on the minds of investors.  So in either scenario, your Honor, the statement would be misleading for omitting material information regarding the failure to safeguard customer information in this situation.

Now, your Honor, with respect to the other statements, competitive advantage, differentiator-type statements, the crux of these claims is that defendants strategically and repeatedly promoted U.S. Bank's brand and culture, including specifically customer trust and ethics, as central to U.S. Bank's competitive strengths in the wake of Wells Fargo, yet they

O35VTHEO

omitted these long-standing ethical misconduct and misuse of customer data that Mr. Cecere admitted was actually inconsistent with the company's ethics.

Defendants argue that these statements are, one, immaterial puffery, and otherwise not misleading. But, your Honor, the problem with the first argument regarding puffery is that the Second Circuit's opinion in *SAIC*, 18 F.3d 98, which dismissed general statements about a company's culture for ethical conduct, but clarified the statements that emphasize company's reputation for integrity or ethical conduct that design to distinguish the company from competitors, can, in context, be actionable. And that's precisely what we have here. Not that defendants are making these statements touting their culture, brand, and reputation in a vacuum, but they're emphasizing these traits as competitive assets over its peers, including Wells Fargo.

THE COURT: There's no allegation that U.S. Bank made any statements particularly referencing Wells Fargo or even trying to distinguish itself from Wells Fargo.

MR. SERRA: Correct, your Honor. They're making these statements to distinguish themselves from their peers. They are not specifically referencing Wells Fargo, but Wells Fargo is, in fact, one of the bank's major competitors.

THE COURT: And they do make statements saying that their brand, culture, and ethics are differentiators for U.S.

O35VTHEO

Bank.  But how does that show that the statements were clearly designed — which I think is what the language -- is the language the Second Circuit used — to distinguish itself from Wells Fargo?

MR. SERRA:  Your Honor, I think the context of the magnitude of that scandal, it being top of mind not only within the industry, but this was one of the most public-facing scandals of the last few decades, other than maybe Enron and Bernie Madoff, it provides, you know, a backdrop for why these statements would be -- it's reasonable to infer that when they're saying, you know, We have a competitive advantage over our peers because of our ethical conduct, you know, we're the most trusted choice or the most trustworthy bank, the implication, your Honor, I believe it's reasonable to infer that Wells Fargo, of course, being one of their peers, would be someone that they're distinguishing themselves from.

And the cases on which the defendants rely at pages 3 to 4 of their reply to suggest these statements are too general, *ECA* and *In re Braskem*, they don't involve competitive advantage-type statements, let alone statements made in the context of a previously disclosed industry-shocking scandal.

Defendants also argue that there isn't a sufficiently close nexus between these statements and the underlying misconduct.  But, again, I think that's another way of arguing that they're too generic and ignores that the omitted

O35VTHEO

information, the misuse of personal information, goes to the very heart of U.S. Bank's consumer banking business.

So circling back, I know we touched earlier on *scienter*, but we know that recklessness serves as an independent basis for finding *scienter*. And defendants' assertion that in the wake of Wells Fargo, that they'd had no reason to know about analogous misconduct involving U.S. Bank's core business, just defies common sense, your Honor.

And what plaintiffs have to show is that defendants knew facts or had access to information suggesting that their public statements were not accurate. So it's a *Wayne* analysis, right. You have to weigh the competing inferences to determine whether, looking at the totality of the circumstances, the inference that we put forward is at least as compelling as the opposing inference. So the tie goes to the plaintiff.

Now, defendants argue that plaintiffs don't allege who knew what, when, or how. But this argument ignores the reasonable inference from the totality of the complaint's allegation, including the consequential nature of the undisclosed information. And I refer the Court to your Honor's recent opinion in the *TaskUs* case, 2024 Westlaw 68571, which postdated the briefing here, but I believe it's instructive. At *26, in rejecting a similar argument, namely, that it was implausible that the CEO and CFO did not know about the company's glass door rating policy, your Honor noted that the

O35VTHEO

glass door rating there wasn't comparable to "the consequential nature of the information at issue" in the Wells Fargo derivative case, which involved operations central to Wells Fargo's business and far-reaching, undisclosed facts, negative facts. And that's precisely what the allegations demonstrate here: Omitted facts involving operations central to the business of U.S. Bank that would be nearly impossible for defendants not to know.

So, your Honor, in terms of the facts that we do allege --

THE COURT: And I'm sorry, but without the case, even given the extremely small number of unauthorized accounts that were opened here?

MR. SERRA: Your Honor, Mr. Cecere did testify that there were 342 accounts that were affected. But, your Honor, I'd say that clearly the market considered the relegation of that misconduct to be material, right, because it sounded like Wells Fargo, right, the stock price declined and the analysts said, Wait a minute, this headline is something that no investor likes to read, right, from such a highly regarded company.

And we know materiality is a highly fact-intensive inquiry. Also, the misconduct took place over 11 years. So temporally, it's significant. And of course, the first six years of that investigation, which is the findings period by

O35VTHEO

the CFPB, the CFPB determined that the bank had inadequate procedures to detect these accounts.

And again, we mentioned the fine; but the fine itself is indicative of how important this information was to defendant.  They paid $37.5 million.  U.S. Bank is a fraction of the size of Wells Fargo.  Comparatively, it's a very similar fine to what Wells Fargo paid initially to the CFPB.

THE COURT:  Were there not other fines with Wells Fargo?  I mean, it seems like this would sound like --

(Indiscernible crosstalk)

THE COURT:  -- global resolution.

MR. SERRA:  Yes.  In 2020, I believe it was February 2020, they ended up paying $3 billion to the DOJ, SEC, and various regulators.  That was several years after the initial finding by the CFPB.

So again, the allegations, when viewed holistically, defendants knew facts or, at a minimum, were reckless not knowing facts that were at odds with their statements.  And then again, this is the cooperation in the investigation, defendants' roles as senior officers in the company; the fact that this went to the core of the company; the critical Wells Fargo context; Mr. Cecere's admission acknowledging that the conduct took place; and, of course, most importantly, the CFPB's finding of specific evidence that the bank knew of misconduct for over a decade.

O35VTHEO

So together, when viewed in context, your Honor, and considering the totality of the allegations, plaintiffs submit that it would be implausible that they didn't know about these undisclosed facts. And as we discussed, by May 2021, Mr. Cecere and Mr. Dolan are signing 10-Ks, acknowledging the existence of this investigation into consumer sales practices generally, and that they are cooperating with all pending investigation. So by this time, the investigation had been pending for four years. So as I had mentioned earlier, it's reasonable to infer that defendants would have been apprised of the developments in this investigation given the context of the Wells Fargo scandal.

But defendants make a strained argument that knowledge of the investigation doesn't equate to defendants' knowledge of the underlying misconduct. But that again ignores the totality of plaintiff's allegations. And the competing inference that defendants urged the Court to find outweighs plaintiff's inference that they did not know about the practices, despite the decades-long scope of the misconduct, the consequential nature of the misconduct, and despite the regular specific finding of knowledge just is implausible.

THE COURT: The finding of knowledge, to what extent are you suggesting that I rely on anything from the CFPB's investigation, whether it be the statement by Director Chopra or anything in the findings?

O35VTHEO

MR. SERRA:  Your Honor, I think they're all allegations in our complaint that go to the Court's analysis of whether defendants knew or were recklessly -- you know, were reckless in not knowing about this misconduct.  So the findings in the consent order, your Honor, they are on defendants' knowledge.  It was a five-year, half-decade-long investigation.  And taken together with Mr. Cecere's admission that the conduct did take place and the consequential nature of the misconduct, when viewed holistically, your Honor, support a finding of recklessness here.

Your Honor, defendants focus on motive, but the plaintiffs aren't required to show motive when they've adequately alleged recklessness.  But defendants' motive here is obvious from plaintiff's perspective.  They didn't want these undisclosed account practices to tarnish U.S. Bank's otherwise flawless reputation for trustworthiness and ethicality.  They sold $26 million worth of stock during the class period.  The Form 4s were discussed earlier, your Honor.

THE COURT:  And the Form 4s, let me ask you about that, it seems like you're relying on them for your allegations of *scienter*; I assume that's how you arrived at the stock sales for the defendants?

MR. SERRA:  Well, your Honor, the allegations in the complaint are that defendants did, in fact, sell $26 million worth of stock.  Your Honor can consider allegations in the

O35VTHEO

context of recklessness arguments, but defendants attempt to interject the Form 4s as evidence that they increased their holdings during the class period.  And those allegations aren't in the complaint, your Honor.

As to causation, I think we've talked about that a bit, your Honor, already.  Plaintiffs alleged misstatements and omissions that concealed information that, when disclosed negatively, affected the value of the security.  Defendants argue that the Supreme Court's decision in *Goldman* supports a mismatch between the specific disclosure and the purportedly generic misstatements.  But the link between the misstatements and the correct disclosure is evident by the nature of the misstatements themselves.  The risk disclosure specifically referenced the misuse and mishandling of customer information which is foundation of the unauthorized account practices.

The bespeaks caution doctrine that was mentioned, as I understand defendants' argument, it boils down to because we warned a potential risk, they don't have to predict how those risks will manifest.  But that's not plaintiff's argument.

It's not that defendants failed to predict the future, but that the warnings that the defendants did provide were misleading because they suggested that the misconduct directly related to the risk, to the risk had not yet occurred, when they had.  And the company, had, in fact, been under investigation for the conduct which mirrored that of the Wells

O35VTHEO

Fargo scandal.

Your Honor, unless your Honor has any questions, I have nothing further.

THE COURT:  It appears you're not pursuing on any -- with respect to any theory concerning the bank's code of ethics; is that right?

MR. SERRA:  Plaintiffs acknowledge that isolated statements in the code of conduct may not, standing alone, be individually actionable.  But they do provide context, your Honor, for why the more specific statements that we've discussed about the bank's competitive and risk -- competitive advantage and risk disclosures are, in fact, actionable.

And I point your Honor to one statement at paragraph 129 that "Our reputation is our most valuable asset and it's the cornerstone of our brand."  While not independently actionable, it does provide context for why the other statements are.

THE COURT:  Thank you very much.

MR. SERRA:  Thank you.

MS. YADAVA:  Thank you, your Honor, I'll be brief.

This is not *Enron*.  This is not *Madoff*.  I just want to make sure that we're all on the same page.  If it was, there would be a lot more lawyers in this courtroom here today.

But plaintiff's counsel talks a lot about Wells Fargo and this being some kind of -- the differentiators -- U.S. Bank

O35VTHEO

releasing the information that if a differentiator in the market somehow was a direct comparison to Wells Fargo.

There are two things I think I need to make clear about that.

One is that in the *Eletrobras* case, the court is very clear that if you're going to be liable for statements about being a differentiator, it has to be to a specific competitor on a specific issue. Otherwise, these are just puffery. Saying that you're a differentiator in the market, that you're different from your competitors, these are exactly the same types of soft statements that we hear over and over again that courts dismiss as being those kind of statements on which investors do not place reliance.

Second, plaintiff's counsel talks a lot about the allegations, what allegations are in the complaint and what those mean. But he doesn't actually point to the allegations themselves. Plaintiffs have constructed a theory of what may have been false or what may have been leading according to plaintiff's, sort of, view of the -- view of the circumstances.

But we have to look at the allegations themselves; that's what the PSLRA and 9(b) require us to do: To look at the complaint, to look at the allegations pled, and to determine whether on the face of those allegations this complaint can survive a motion to dismiss. And it cannot, for a number of reasons that I've already been through.

O35VTHEO

For example, Mr. Serra didn't identify any allegations establishing or even suggesting that the investigation's progress was known to defendants before the investigation was shared with the market, or that it progressed to a point of harm or potential litigation before it was expressed to the market. Mr. Serra talked a lot about plausible, what is plausible. But plausibility is not our standard, your Honor; it's whether there is actually strong circumstantial evidence, not whether the allegations taken together lead to plausibility. And I think we need to remember that we are in the securities litigation standard, that the PSLRA and 9(b) have heightened obligation from the plaintiffs here that they cannot meet.

The other point I wanted to make quickly was the idea of the *General Electric* case as somehow suggesting that the analyst reports were indicative of qualitative materiality. That is not a case we had seen before, but I will say that plaintiffs don't actually allege in their complaint that analyst reports are the source of their qualitative materiality. And even if they did, Mr. Serra made a point that in the qualitative materiality standard, what plaintiff seems to be relying on is management's expectation of a market reaction. There are no allegations that management expected a market reaction. And the analyst reports cannot be indicative of what management actually expected.

O35VTHEO

I want to talk quickly about the Form 4s as well.

Even if your Honor were to disregard the Form 4s, which we believe your Honor should consider them in his determinations, there are no allegations that this particular stock sales mentioned in the complaint were of suspicious timing or amount.  The standard itself requires that, to show motive, the stock sales have to be suspicious.  There's no allegation that these stock sales were suspicious or how they were suspicious.

Mr. Serra mentioned *Jinkosolar*, and I also wanted to address that particular case.

Your Honor was correct in his order that *Jinkosolar* articulates the standard for falsity for statements of facts.  However, the *Jinkosolar* case is entirely distinguishable.  In that case, the court found that the particular risk disclosures about potential actions from regulators regarding pollution were actionable because, in the same breath, the company also said, Here's the five things we're doing to prevent that from occurring.  We have 24-hour monitoring teams.  We have pollution-preventing equipment.

So the court held, when looking at those risk disclosures in connection with a specific assurance to the market, that it was doing everything it could to prevent that from happening, that disclosure was misleading as a whole.

That is not the situation here.  That's not what's

O35VTHEO

alleged.

And what is more, in *Jinkosolar*, the plaintiff there had alleged a specific fact that three weeks after this disclosure was made, the company itself told regulators of the massive problems it had with its pollution prevention programs. We don't have any kind of temporal allegation of timing of anything like that in this particular instance. So *Jinkosolar*, correct standard for what makes the fact statement misleading, but very different from our circumstances here.

I want to talk about *Omnicare* for a second.

Mr. Serra said that *Omnicare* -- he articulated the standard the same way I did at first, which is that omissions are only actionable when they go to the basis of a speaker's opinion. But then when describing what *Tung* and the *Sanofi* case said, Mr. Serra said an omission is actionable if it conflicts with what a reasonable investor would take away from the statement. But that is not the standard, your Honor, it is much more nuanced than that. It is about the basis of the speaker's opinion. In fact, I believe the *Tung v. Sanofi* court actually held that you don't get to know everything that might contradict an opinion statement, only those that go to the basis of the speaker's opinion.

Your Honor, *scienter* I think we've spoken about enough, but I'll just end by saying that there's not a single allegation that Mr. Serra articulated about specific knowledge

O35VTHEO

by these specific defendants.  There were three random facts that may suggest someone at the bank knew something.  That is not enough — even those three facts together — to demonstrate strong circumstantial evidence of recklessness, and definitely not of actual knowledge that is required for forward-looking statements.

THE COURT:  I believe the standard -- this was articulated in *Tellabs*.  But why is that inference and Mr. Serra's asking me to draw that the defendants knew about the unauthorized accounts as of May 2020, at least as compelling as a contrary inference that you're asking me to draw?

MS. YADAVA:  Your Honor, because there's no facts. There's not a single allegation that suggests, other than in conclusory fashion, that the defendants knew about the unauthorized accounts.  There's a simple line in the complaint that defendants must have known, but those are the kind of inferences that the securities laws prevent.

We can't make those kind of inferences if there are specific allegations about how they knew about the unauthorized accounts.  I think we talked about Judge Chin's opinion in which he says you need to actually have -- show what information the defendants were provided that is contrary to that statement.  There are no allegations of what defendants Cecere, Dolan, or any of the other defendants actually received

O35VTHEO

that would have shown them the unauthorized accounts, the magnitude, or anything else to suggest their statements were false or misleading.

THE COURT:  What about the whole atmospherics here that this followed Wells Fargo, which obviously was very significant in the industry; the defendants knew that the CFPB was investigating.  Why is it not an inference that can be drawn then that these defendants would have looked into whether or not this was occurring at U.S. Bank?

MS. YADAVA:  Your Honor, there may have been -- first of all, there's no allegations that because of what's happening, it's inevitable that U.S. Bank must have been looking into its practices.  And those are definitely not specific enough, what exists in the complaint, to satisfy Rule 9(b).

But even if defendants were looking into the Wells Fargo scandal and looking into what was happening in its own bank, there's no allegations that they knew about the unauthorized accounts at the time of their statements.  And that has to be pled with particularity to survive.

If your Honor has no further questions for me, I would respectfully request that your Honor dismiss the complaint in its entirety.  And because there are multiple independent grounds here for dismissal, we respectfully request a dismissal with prejudice.

O35VTHEO

THE COURT:  Thank you.

Well, thank you both for excellent argument today.

Obviously we'll take it under consideration and endeavor to issue a written opinion in the relatively near future.

I assume counsel will be ordering a transcript of today's oral argument?

MR. SERRA:  Yes, your Honor.

THE COURT:  Great.

Is there anything further then that we should take up this afternoon, Mr. Serra?

MR. SERRA:  No, your Honor.

THE COURT:  Ms. Yadava?

MS. YADAVA:  No, your Honor.

THE COURT:  Great.

Well, thank you, all, and have a good rest of the day.

*   *   *