UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                               :

THE BUHRKE FAMILY REVOCABLE TRUST, *on*   :
*behalf of itself and all others similarly situated*,   :
                               :

               Plaintiff,         :        22 Civ. 9174 (JPC)
                               :

          -v-                   :       OPINION AND ORDER
                               :

U.S. BANCORP, ANDREW CECERE,        :
TERRY DOLAN, JODI RICHARD, and      :
KATHERINE QUINN,              :
                               :

             Defendants.      :
                               :
--------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Lead Plaintiffs Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund bring this putative securities class action against U.S. Bancorp ("USB" or the "Company") and four of its corporate officers—Andrew Cecere, Terry Dolan, Jodi Richard, and Katherine Quinn (collectively, the "Individual Defendants")—for alleged misstatements and omissions made from August 1, 2019 through July 28, 2022 (the "Class Period"). Lead Plaintiffs plead two counts, alleging that Defendants knowingly made false and misleading statements and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

      Defendants have moved to dismiss, arguing that the Amended Complaint fails to adequately plead a Section 10(b) and Rule 10b-5(b) violation because of the absence of allegations that Defendants made a material misstatement or omission, that Defendants did so with the

requisite scienter, or that any misstatements or omissions caused Lead Plaintiffs' losses. Defendants additionally argue that Lead Plaintiffs have not adequately pleaded scheme liability under Rule 10b-5(a) and Rule 10b-5(c), nor have they adequately pleaded control person liability under Section 20(a). For the following reasons, the Court grants Defendants' motion to dismiss, but will allow Lead Plaintiffs to file a Second Amended Complaint in the event they can cure the pleading deficiencies identified herein.

## I. Background

### A. Facts[1]

#### 1. Defendants

With "nearly 77,000 employees and $675 billion in assets," USB is the "fifth largest bank in the U.S." Am. Compl. ¶ 22. It is the parent company of U.S. Bank, "which is engaged in the general banking business, principally in domestic markets." *Id.* USB's "largest business unit" is "[c]onsumer and business banking," a unit that "generat[es] 40% of the Company's net revenue," *id.*, of which 84% comes from consumer banking, *id.* ¶ 149.

Cecere is the Chairman, President, and Chief Executive Officer ("CEO") of USB. *Id.* ¶ 16. He has served as President since January 2016, CEO since April 2017, and Chairman since April 2018. *Id.* Before that, Cecere served as USB's Vice Chairman and Chief Operating Officer from

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 33 ("Am. Compl."), as well as documents incorporated by reference in the Amended Complaint and other documents susceptible to judicial notice. *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that, on a motion to dismiss, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

January 2015 to January 2016, and as its Vice Chairman and Chief Financial Officer ("CFO") from February 2007 to January 2015. *Id.* ¶¶ 16, 138. At all relevant times, he has been a member of USB's Executive Committee and Risk Management Committee. *Id.* ¶ 16. Dolan is USB's Vice Chair and CFO, a role he has held since December 2016. *Id.* ¶ 17. "From July 2010 to July 2016, he served as Vice Chair, Wealth Management and Investment Services at the Bank." *Id.* ¶ 138. Richard, also Vice Chair, "has held the role of Chief Risk Officer of USB since October 2018." *Id.* ¶ 18. "Prior to that, she served as the Bank's Executive Vice President and Chief Operational Risk Officer from January 2018 until October 2018, and . . . as Senior Vice President and Chief Operational Risk Officer from 2014 until January 2018." *Id.* ¶ 138. Finally, Quinn is USB's Vice Chair and Chief Administrative Officer, a role she has held since April 2017. *Id.* ¶ 19. Before that, she "served in various roles at USB, including as Executive Vice President and Chief Strategy, Marketing and/or Reputation Officer, from September 2013 to April 2017, and has served on the Managing Committee since 2015." *Id.* Dolan and Cecere signed and certified the accuracy of the quarterly and annual reports filed with the SEC during the Class Period; Richard and Quinn did not. *Id.* ¶¶ 16-19, 148.

## 2. Key Events

Lead Plaintiffs' allegations begin chronologically with a discussion of the widely-publicized Wells Fargo unauthorized account scandal.[2] As alleged, "[o]n September 8, 2016, the [Consumer Financial Protection Bureau ('CFPB')] published an enforcement action and Consent Order against Wells Fargo," penalizing the company for its "illegal practice of secretly opening

---

[2] *See, e.g.*, *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization*, Dep't of Just. (Feb. 21, 2020), available at https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices (last visited Mar. 27, 2024).

unauthorized deposit and credit card accounts." *Id.* ¶ 34.  The CFPB focused on four categories of conduct, finding that Wells Fargo had:

> (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts without the customers' knowledge or consent; (2) submitted applications for credit cards in customers' names without the customers' knowledge or consent; (3) enrolled customers in online banking services they did not request; and (4) ordered and activated debit cards using customers' information without their knowledge or consent.

*Id.*  The CFPB's announcement accused Wells Fargo of relying on "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking" and alleged that "Wells Fargo employees illegally enrolled customers in these products and services without their knowledge or consent in order to obtain financial compensation for meetings sales targets." *Id.* ¶ 35.  Richard Cordray, the CFPB Director at the time, cautioned that the action "should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences." *Id.*  Lead Plaintiffs allege that this comment "was directed at defendants Cecere, Dolan, Quinn, and Richard, among other banking executives," by virtue of their positions "[a]s senior executives in the banking industry." *Id.*

Wells Fargo suffered additional consequences stemming from the unauthorized account openings.  The company's CEO resigned, forfeited $41 million in previously awarded compensation, was fined $17.5 million by the Office of the Comptroller of Currency, and was "banned from ever working at a bank again." *Id.* ¶ 39.  In addition,

> Wells Fargo ultimately paid billions in fines to various state and federal agencies, including the CFPB, the SEC, the Department of Justice, the U.S. Attorney's Offices for the Central District of California and the Western District of North Carolina and the city and county of Los Angeles, along with hundreds of millions to shareholder and account holders to resolve class action investor and consumer actions in connection with the scheme.

*Id.* Having laid out that background, Lead Plaintiffs' allegations turn to USB and the alleged misconduct that gives rise to this case.

"The CFPB launched [an] investigation of USB at least as early as 2017 . . . ." *Id.* ¶ 144. That means, "[b]y the beginning of the Class Period," the CFPB had been investigating USB "for at least two years, if not longer." *Id.* ¶ 146. Lead Plaintiffs do not specifically allege when USB or the Individual Defendants learned of the CFPB's investigation, and, as discussed below, USB did not publicly disclose that it was being investigated by the CFPB until May 4, 2021. Prior to that disclosure, USB had made general disclosures on government examinations, inquiries, and investigations, as well as the possibility of resulting proceedings and penalties. For purposes of the Class Period, such general disclosures were made in USB's 2019 Annual Report, 2019 Form 10-K,[3] 2020 Annual Report, and 2020 Form 10-K, under a section of those documents titled, "Litigation and Regulatory Matters":

> **Regulatory Matters.** The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection. . . . The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

*Id.* ¶ 113 (alteration in Amended Complaint). On May 4, 2021, in its Form 10-Q[4] for the first quarter of 2021, however, USB expressly disclosed for the first time that the CFPB was "investigating certain of the Company's consumer sales practices" and that USB "ha[d] responded

---

[3] A Form 10-K is a comprehensive financial report that public companies must file annually with the SEC. *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.310.

[4] A Form 10-Q is a comprehensive financial report that public companies must file with the SEC at the end of each of the first three quarters of the fiscal year. *See* 15 U.S.C. § 78m; 17 C.F.R. § 294.308a.

and continue[d] to respond to the CFPB." *Id.* ¶ 118. This disclosure was repeated in SEC filings made on August 3, 2021 (Form 10-Q for the second quarter of 2021), November 2, 2021 (Form 10-Q for the third quarter of 2021), and February 22, 2022 (Form 10-K for 2021). *Id.* ¶ 119; *see also id.* ¶ 103 (alleging that USB's Form 10-K for 2021 was filed with the SEC on February 22, 2022).

On May 3, 2022, in a Form 10-Q for the first quarter of 2022, USB updated its disclosure, again telling investors that the CFPB "ha[d] been investigating certain of the Company's consumer sales practices," but adding that the CFPB was "now considering a potential enforcement action." *Id.* ¶ 120. USB further explained that it did "not believe an enforcement action [was] warranted, but there c[ould] be no assurance that" discussions with the CFPB would "result in a resolution," and noted that USB was "cooperating fully with the investigation." *Id.* ¶ 146 (internal quotation marks omitted); *accord id.* ¶ 120.

On July 28, 2022, the CFPB issued a Consent Order memorializing an agreement with USB that concluded the investigation. *Id.* ¶ 7; *see* Dkt. 42-4 ("Consent Order").[5] When the Consent Order was issued, CFPB Director Rohit Chopra "stated that 'for over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts." Am. Compl. ¶ 144 (brackets omitted). Also appearing to quote Chopra, the Amended Complaint alleges that "[t]he CFPB investigation 'found specific evidence that revealed that U.S. Bank was aware that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts.'" *Id.* The CFPB fined USB $37.5 million "and ordered the Company [to] submit a

---

[5] The Court may consider the Consent Order at this stage because it is integral to the Amended Complaint, which "relies heavily upon its terms and effect." *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

compliance plan design to ensure the Company's relevant conduct complies with all applicable federal consumer financial laws and the terms of the Order." *Id.* ¶ 132; *see* Consent Order ¶¶ 33-35, 49.

USB explicitly did not admit or deny the CFPB's findings of fact or law in the Consent Order, other than admitting to those facts necessary to establish the CFPB's jurisdiction. Consent Order ¶ 2. With that caveat, the CFPB represented in the Consent Order that it found the following:

- "In response to sales pressure or to obtain incentive rewards, [USB] employees opened deposit accounts, submitted applications for and issued credit cards, and opened lines of credit linked to deposit accounts without consumers' knowledge and consent. These acts or practices involved a small percentage of [USB]'s new accounts." *Id.* ¶ 10.

- "In 2016, [USB] began enhancing its processes for account opening and retention of affirmative consent. The number of accounts bearing indicia of non-authorization trended downward after these process improvements." *Id.* ¶ 12.

- "In 2016, [USB] began enhancing its processes for detecting and investigating sales misconduct." *Id.* ¶ 13.

- "[USB] was aware that many allegations [of applying for, opening, issuing, activating, or enrolling a consumer in, without the consumer's knowledge and consent, credit cards, Premier lines of credit, Reserve lines of credit, or deposit accounts] were not escalated or recorded." *Id.*

- USB violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1642, and Regulation Z, 12 C.F.R. § 1026.12(a), "[b]y issuing credit cards to consumers without the consumers' knowledge and consent and not in response to an oral or written request

or application for the card or as a renewal of, or substitute for, an accepted credit card."  Consent Order ¶ 16; *see also id.* ¶¶ 15-16.

- USB violated Section 604(f) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(f), "[b]y using or obtaining consumer reports without a permissible purpose."  Consent Order ¶ 23; *see also id.* ¶¶ 17-23.

- USB violated the Truth in Savings Act ("TISA"), 12 U.S.C. § 4301(b), and Regulation DD, 12 C.F.R. § 1030.4, "[b]y opening deposit accounts without consumer authorization and, in the process, failing to provide the required disclosures to the account-holder."  Consent Order ¶ 26; *see also id.* ¶¶ 24-26.

- USB violated Section 1036(a)(1)(A) of the Consumer Financial Protection Act, 12 U.S.C. § 5536(a)(1)(A), "[b]y violating TILA, FCRA, and TISA" and thus "committ[ing] acts or omissions in violation of Federal consumer financial laws." Consent Order ¶ 30; *see also id.* ¶¶ 27-30.

After the Consent Order was published, "the price of USB stock declined 4% to close at $46.12 on July 28, 2022."  Am. Compl. ¶ 9.

Shortly thereafter, on August 4, 2022, the Banking Committee of the U.S. Senate sent Cecere a letter regarding the Consent Order and expressing the Committee's "deep concern with [USB]'s misconduct, particularly in light of the Wells Fargo fake accounts scandal."  *Id.* ¶ 43.  The Committee requested information from USB regarding the conduct detailed in the Consent Order and "highlighted the CFPB's findings that [USB] utilized an incentive-compensation program to pressure employees to 'engage[] in unlawful activity by utilizing customers' personal identifying information to open deposit accounts, apply for and issue credit cards, and open lines of credit,' which 'accrued fees and increased profits' and which the CFPB found 'violated federal consumer

laws and violated individual consumers' control over their data privacy.'" *Id.* About a month and a half later, on September 22, 2022, Cecere testified at an oversight hearing before the Senate Banking Committee. *Id.* ¶ 44. When questioned whether USB was "opening unauthorized accounts," Cecere responded that he took "full responsibility that [USB] did open up unauthorized bank accounts. It was going back to 2010. It's unacceptable. It's inconsistent with our principles and procedures as well as our ethics." *Id.* ¶ 8; *accord* ¶¶ 44, 147. Cecere also provided some specifics, informing the Banking Committee that USB "identified 342 accounts over that time . . . against a population of 40 million opened accounts." *Id.* ¶ 44 (alteration in original). Lead Plaintiffs question the accuracy of Cecere's statistic, alleging that Cecere "failed to provide any context for his improbable assertion and grossly misrepresented the extent of unauthorized accounts at the Bank." *Id.*

The basis of Lead Plaintiffs' skepticism—which implies the extremely serious accusation that Cecere made misrepresentations when testifying before Congress—is twofold. First, they emphasize the CFPB's finding in the Consent Order that USB's procedures from January 1, 2010 through December 31, 2020 "were not reasonably designed to determine the full scope" of unauthorized accounts prior to 2016. *Id.* ¶ 45. Second, they question the plausibility of the number of unauthorized accounts Cecere provided to Congress based on the relative size of the fine assessed against USB when compared to the fine the CFPB levied on Wells Fargo. The CFPB fined Wells Fargo $100 million dollars based on more than 3.5 million accounts that were "impacted by improper and unlawful conduct." *Id.* ¶ 46. Lead Plaintiffs therefore reason that it is implausible that the CFPB would fine USB $37.5 million based on only 342 unauthorized accounts. *Id.*

9

Lead Plaintiffs also allege that the Individual Defendants executed a number of stock sales during the Class Period, reflecting their fraudulent intent.  Specifically, "during the Class Period but before disclosure of the CFPB Consent Order . . . the Individual Defendants collectively sold 463,700 shares of their personally-held stock, earning gross proceeds of more than $26 million." *Id.* ¶ 150.  The alleged sales break down as follows:

| Insider | Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| Cecere (Chief Executive Officer) | 11/15/2019 | $58.81 | 165,564 | $9,736,819 |
| | 4/22/2021 | $56.48 | 184,187 | $10,402,882 |
| | Subtotal: | | 349,751 | $20,139,701 |
| | | | | |
| Dolan (Chief Financial Officer) | 11/14/2019 | $58.59 | 17,200 | $1,007,748 |
| | 11/19/2020 | $42.98 | 50,000 | $2,149,000 |
| | 4/30/2021 | $59.11 | 19,149 | $1,131,897 |
| | Subtotal: | | 86,349 | $4,288,645 |
| | | | | |
| Richard (Chief Risk Officer) | 11/18/2019 | $59.61 | 2,600 | $154,986 |
| | | | | |
| Quinn (Chief Administrative Officer) | 5/18/2021 | $61.47 | 25,000 | $1,536,750 |
| | | | | |
| | Total: | | 463,700 | $26,120,082 |

*Id.*  All these sales "were made after the CFPB investigation began and before" issuance of the Consent Order.  *Id.* ¶ 151.  "[D]efendants Quinn and Richard did not sell any stock in the two years immediately before the Class Period or at any time following the Class Period (as of April 26, 2023)." *Id.*

## B.   Procedural History

The Buhrke Family Revocable Trust filed the original Complaint in this action on February 26, 2022.  Dkt. 1.  The Honorable Sarah L. Cave then appointed Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund as Lead Plaintiffs on February 10, 2023.  Dkt. 28.  On May 5, 2023, Lead Plaintiffs filed the operative Amended Complaint, which contains two counts. Dkt. 33.  Count I alleges violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5,

subsections (a)-(c), by all Defendants.  Am. Compl. ¶¶ 174-183.  Lead Plaintiffs allege four categories of statements, each of which they claim misleadingly omitted material information about the unauthorized account openings and the associated CFPB investigation, namely: (1) statements regarding USB's "Trust, Ethics and Brand," Am. Compl. ¶¶ 54-65, 67-75, 78-80, 83-97, 99, (2) statements regarding USB's "Risk Environment and Risk Management," *id.* ¶¶ 102-114, (3) statements regarding the CFPB investigation, *id.* ¶¶ 118-120, and (4) statements regarding USB's Ethics Code, *id.* ¶¶ 123-129.  Count II alleges violations of Section 20(a) of the Exchange Act by the Individual Defendants.  *Id.* ¶¶ 184-188.

Defendants filed the instant motion to dismiss on July 11, 2023, Dkts. 40, 41 ("Motion"), Lead Plaintiffs filed their opposition on September 8, 2023, Dkt. 43 ("Opposition"), and Defendants replied on October 23, 2023, Dkt. 45 ("Reply").  The Court held oral argument on the motion on March 5, 2024.  Dkt. 48 ("Tr.").

## II.  Standard of Review

### A.    Federal Rule of Civil Procedure 12(b)(6)

Defendants have moved to dismiss Lead Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541,

544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

**B.      Securities Fraud Claims**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Subsection (b) of the SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted).

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b).  *ATSI Commc'ns*, 493 F.3d at 99.  Accordingly, a plaintiff alleging fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  Conclusory allegations or allegations unsupported by factual assertions are insufficient.  *See ATSI Commc'ns*, 493 F.3d at 99.

Securities fraud claims under Section 10(b) must also satisfy the PSLRA's heightened pleading requirements. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). The PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *accord Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Tellabs*, 551 U.S. at 321. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. For an inference of scienter to be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324).

The Second Circuit has also cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021)). Simply put, the PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

13

### III.   Discussion

**A.     Defendant Jodi Richard's Liability Under Rule 10b-5(b)**

The Court begins with whether Lead Plaintiffs have made sufficient allegations of conduct by Richard to allow for her liability under Rule 10b-5(b).  Defendants argue that the Amended Complaint fails to allege any statements that Richard made.  Motion at 32-33.  This is significant because "only the 'maker' of a misstatement, *i.e.*, the person with ultimate authority over the statement, can have primary liability under Rule 10b-5(b)."  *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (quoting and citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)).  In opposing Defendants' motion, Lead Plaintiffs cite paragraphs of the Amended Complaint that they maintain allege that Richard presented slides at a September 2019 investor conference.  *See* Opposition 19-20 n.18 (citing Am. Compl. ¶¶ 27, 48).

The actual allegations, however, do not establish that Richard made any statements that could give rise to liability for her under Rule 10b-5(b).  The cited passages of the Amended Complaint merely allege that Cecere and an unnamed "executive" presented at the conference. *See* Am. Compl. ¶¶ 27, 48.  Lead Plaintiffs also direct the Court to the slides from that presentation that Defendants submitted in moving to dismiss, while also criticizing Defendants for "cho[osing] to omit the slide containing" Richard's statement.  Opposition at 20 n.18 (citing Dkt. 42-6).  While the agenda slide submitted in that filing does mention Richard and another individual as speakers on the topic of "Risk Management," Dkt. 42-6 at 6, an agenda identifying Richard as being scheduled to present does not demonstrate that she in fact ended up speaking on risk management at the conference, let alone what she said about that topic.  Nor does the mention of Richard on an agenda provided by Defendants in any way remedy the failure of Lead Plaintiffs to allege in the Amended Complaint that Richard made any relevant statement at the conference.  And of course

14

it is not Defendants' obligation to provide that information or the entirety of the slides, nor have Lead Plaintiffs provided the supposedly omitted slides (assuming *arguendo* it would be appropriate to consider such extraneous evidence at this stage).

Lead Plaintiffs also assert in their opposition brief that Richard made statements—although they do not specify which ones—by virtue of her role on the Executive Risk Committee and her attendant responsibility "for the risks related to the Company's illegal sales practices."  Opposition at 20 n.18.  Richard's responsibility for managing risks is inapposite; the question is whether Richard was "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Cap. Grp.*, 564 U.S. at 142.  Lead Plaintiffs have identified no portion of the Amended Complaint in which they allege that Richard controlled the content of any alleged misstatement or omission.  Thus, Lead Plaintiffs have failed to allege a violation of Rule 10b-5(b) as to Richard.

## B.    Material Misstatements or Omissions

Lead Plaintiffs allege that, when making statements in four categories, discussed below, Defendants omitted material information regarding the opening of unauthorized accounts, the CFPB investigation and USB's corresponding exposure to regulatory consequences, the risk associated with the sales incentive compensation program being publicly revealed, and the ineffectiveness of USB's risk management program.  Opposition at 11, 18-19, 21-22.

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives*, 563 U.S. at 44.  Instead, "[t]he Supreme Court has instructed that 'silence, absent a duty to disclose, is not misleading under Rule 10b-5.'"  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100-01 (2d Cir. 2015) (brackets omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  "Such a duty may arise when there is 'a corporate

insider trading on confidential information,' a 'statute or regulation requiring disclosure,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'" *Id.* at 101 (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)).  The Second Circuit has clarified that, with respect to the last of these three potential avenues for a duty to disclose to arise, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)).  With that said, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  In assessing whether an omission renders a statement inaccurate, incomplete, or misleading, courts must look at the "context and manner of presentation."  *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) (internal quotation marks omitted).

### 1.  Trust, Ethics, and Brand

The first category is comprised of statements emphasizing the level of trust that USB's customers placed in the bank, the importance of that trust for USB's brand and success, and USB's record of ethical business practices.  For example, a slide presented at the September 2019 investor conference contained the statement: "Our Advantages: a strong reputation rooted in trust and engagement."  Am. Compl. ¶ 54.[6]  Another slide from the same presentation stated that USB's "brand value" had grown 55% since 2016, citing "Brand Finance," and noted that this resulted in "Strengthened Most Trust Choice positioning."  *Id.* ¶ 60; *see also id.* ¶ 67 (statement in 2019

---

[6] Many of the statements on which Lead Plaintiffs rely are emphasized in bold italics in the Amended Complaint.  Those emphases have been removed herein when quoting the statements.

Annual Report: "Our brand value — the financial significance a brand carries — grew by 55% in the last three years[] in response to our efforts to build brand awareness and strategically market ourselves." (alteration in Amended Complaint)).  During the same investor conference, Quinn told investors that USB's "secret sauce" was the combination of "ethics, trust and collaboration" and that trust would "remain a competitive advantage" for USB.  *Id.* ¶ 63.  Similarly, throughout the Class Period, USB repeatedly emphasized that a strong sense of ethics, often referred to as "doing the right thing," was at the core of its culture.  *See id.* ¶¶ 65 (statement by USB's Vice Chairman of Corporate & Commercial Banking following the September 2019 investor conference that "our strong ethical culture really resonates well with our client base"), 68 (statement in USB's 2019 Annual Report that "doing the right thing is in the DNA of our culture"), 70-71 (statements in USB's 2020 Annual Report that "'[w]e do the right thing' leads our core values" and "[e]thical behavior is at the core of our culture"), 78-80 (statements in USB's Forms 8-K[7] filed on September 15, 2020, September 21, 2021, and December 8, 2021 referring to its "culture" of "doing the right thing"), 85 (statement by USB in a February 25, 2020 press release that "[o]ur commitment to doing the right thing is at the heart of everything we do"), 90 (Cecere's statement at an April 21, 2020 annual shareholders meeting that "we operate in a culture rooted in ethics and integrity"), 99 (statement on USB's website, as of at least October 1, 2020: "Relationships are the heart of our business. . . . Our commitment to the highest ethical standards is what makes that trust possible."). USB also continually referenced in its SEC filings and public statements that it ranked among the most ethical companies in the world in 2019 and 2020 according to "Ethisphere."  *Id.* ¶¶ 83-97.

---

[7] A Form 8-K is a "Current Report" that companies are required to file pursuant to Section 13 or Section 15(d) of the Exchange Act.  *See* Securities and Exchange Commission, Form 8-K, https://www.sec.gov/about/forms/form8-k.pdf (last visited Mar. 27, 2024).

Defendants argue that these statements touting USB's trust, ethics, and brand are non-actionable puffery.  Motion at 7-9.  They further urge the Court to find statements in this category not false or misleading because they neither contained any objectively false statement of fact nor misleadingly omitted any material information.  *Id.* at 9-14.  As to the latter argument, Defendants maintain that Lead Plaintiffs have failed to plead both the existence of any fact that was omitted and a sufficiently close nexus between the statements and the allegedly omitted information.  *Id.* In response, Lead Plaintiffs argue that "the undisclosed misconduct revealed by the Consent Order – longstanding violations of USB's ethics and the known misappropriation of customer data through the creation of fictious accounts without customer knowledge – directly contradicts Defendants' representations" in this category of statements.  Opposition at 14-17.  Defendants' first argument largely carries the day: the statements in this category are, with one small exception, non-actionable puffery.  As to that exception, that statement lacks a sufficient nexus to any allegedly omitted information to render it misleading.

"It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'"  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG* ("*UBS*"), 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA, Loc. 134 IBEW Jt. Pension Tr. of Chicago v. JP Morgan Chase Co.* ("*JP Morgan Chase*"), 553 F.3d 187, 206 (2d Cir. 2009)). "This is particularly true where . . . the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"  *Id.*  "[G]eneral declarations about the importance of acting lawfully and with integrity, fall squarely within this category."  *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).  And "[w]hile a bank's reputation is undeniably important, that does not

render a particular statement by a bank regarding its integrity per se material." *JP Morgan Chase*, 553 F.3d at 206.

Meanwhile, "[a]ssertions of satisfactory regulatory compliance can be materially misleading if 'the descriptions of compliance efforts' are 'detailed' and 'specific.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S* ("*Danske Bank*"), 11 F.4th 90, 103 (2d Cir. 2021) (quoting *Singh*, 918 F.3d at 63). Likewise, the Second Circuit has declined to excuse as puffery specific representations about the amount of cash a company had available for investing, the results produced by a particular business line, or the status of inventory. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (holding that statements regarding cash for investing and business line results were not puffery); *Novak*, 216 F.3d at 315 (holding that statements that the defendant-company's "inventory situation was 'in good shape' or 'under control'" were not puffery). The Second Circuit also has observed, albeit in *dicta*, that when viewed in context, "a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry" might "amount to more than 'puffery' and may in some circumstances violate the securities laws." *Indiana Pub. Ret. Sys. v. SAIC, Inc.* ("*SAIC II*"), 818 F.3d 85, 98 (2d Cir. 2016).

The statements in this category are far more analogous to those in *Singh*, *JP Morgan Chase*, *Danske Bank*, and *UBS* than those in *Vivendi* and *Novak*; they are simply too general for a reasonable investor to have considered them as material information that should be relied upon. For example, in *JP Morgan Chase*, the Second Circuit found that statements regarding a bank's "standard-setting reputation for integrity" were puffery. 553 F.3d at 205-06. Many of the statements cited by Lead Plaintiffs in this category plainly land closer to such a statement than a

19

concrete assertion regarding the status of inventory or the results of a particular business line.  *See, e.g.*, Am. Compl. ¶¶ 24 (Cecere's statement at the September 2019 investor conference that "one of the Company's key '[a]dvantages' [was] a 'strong reputation rooted in trust'"), 54 (statement at the September 2019 investor conference "in which USB underscored its strong reputation rooted in trust and engagement"), 59 (Quinn's statement at the September 2019 investor conference: "We maintain an 'Excellent Reputation' score as defined by our community partners.").   Some statements were also explicitly aspirational.  *E.g.*, *id.* ¶¶ 72 (statement in USB's 2020 Annual Report: "We are *committed to* protecting the confidentiality, integrity, availability and privacy of customer data." (emphasis added)), 85 (USB's statement in a February 25, 2020 press release: "Our *commitment* to doing the right thing is at the heart of everything we do." (emphasis added)), 90 (Cecere's statement at an April 21, 2020 annual shareholders meeting: "Everyone is intensely *focused on* meeting the financial needs and objectives of our customers as we operate in a culture rooted in ethics and integrity." (emphasis added)).  And as to the statements about USB's ranking on Ethisphere's list of the World's Most Ethical Companies, *see id.* ¶¶ 83-97—which are more concrete assertions in this category—this Court agrees with another judge in this District who held that a company's statement regarding its ranking on the Ethisphere list was non-actionable puffery. *In re SAIC, Inc. Sec. Litig.* ("*SAIC I*"), No. 12 Civ. 1353 (DAB), 2013 WL 5462289, at *12-13 (S.D.N.Y. Sept. 30, 2013), *on reconsideration*, 2014 WL 407050 (S.D.N.Y. Jan. 30, 2014), *aff'd in relevant part sub nom. SAIC II*, 818 F.3d 85.

Lead Plaintiffs try to distinguish *SAIC I* by contending that the statements there "did not distinguish the company from its competitors in light of specific industry concerns."  Opposition at 12.  And, therefore, Lead Plaintiffs argue that USB's statements instead fall under the situation the Second Circuit envisioned in its *dicta* in *SAIC II* because they were designed to distinguish

USB from Wells Fargo in the wake of Wells Fargo's fake account scandal, by USB "emphasiz[ing] its reputation for integrity or ethical conduct as central to its financial condition." *Id.* (quoting *SAIC II*, 818 F.3d at 98). This argument is unavailing. The Amended Complaint has no non-conclusory allegations that USB's statements were designed to distinguish it from Wells Fargo. The Amended Complaint does not contain any statements from USB that mention Wells Fargo or even any associated industry-wide concern about opening unauthorized accounts or sales incentive compensation. The closest the Amended Complaint comes to making such allegations are certain statements where USB asserted, in a general sense, that brand, culture, and ethics were differentiators. *See* Am. Compl. ¶¶ 63 (alleging that Quinn stated at the September 2019 investor conference that "[b]rand and culture are differentiators for U.S. Bank and they are fundamental to how we run our business" (alteration in Amended Complaint)), 67 (alleging that USB noted in its 2019 Annual Report that its "culture, brand and reputation are sources of competitive advantage for U.S. Bank and differentiate us from our peers"), 78 (alleging that Defendants presented a slide, appended to a September 15, 2020 Form 8-K, which stated that USB's "[c]ulture of 'doing the right thing' for all our stakeholders" "differentiates U.S. Bank"). This is insufficient to establish that the statements in this category were "*clearly* designed" to distance U.S. Bank from Wells Fargo in particular, and even more specifically from Wells Fargo's compliance issues.[8] *SAIC II*,

---

[8] Lead Plaintiffs also argue that Defendants waived any challenge to the subset of allegations in this category that specifically discussed USB's asserted "competitive advantage" based on its ethics and integrity. Motion at 8-9. Opposition at 10 n.5. This argument is itself only presented in a footnote, so the Court need not consider it. *See, e.g., City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 537 (S.D.N.Y. 2020) (collecting cases). Furthermore, Defendants have explicitly argued that the entire category of statements from which these statements are drawn is immaterial puffery. Motion at 8-9. Lead Plaintiffs filed an eighty-three-page complaint, containing more than fifty alleged misstatements or omissions, some of which are multiple paragraphs long. *See, e.g.*, Am. Compl. ¶ 106. Given this pleading—one that might be reasonably criticized as not being a "short and plain statement" of Lead Plaintiffs' claims, Fed. R. Civ. P. 8(a)—Lead Plaintiffs cannot demand that Defendants address every single allegation in detail.

818 F.3d at 98 (emphasis added); *see also Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (finding statements that "transparency" was a "competitive strength" and that the company "actively managed 'reputational risks'" to be non-actionable puffery).

Nor is USB alleged to have emphasized "its reputation for integrity or ethical conduct as central to its financial condition" in a way that overcomes the generality of these statements. Plaintiffs rely on three cases stemming from the exposure of widespread corruption in Brazil where courts in this District found that statements about integrity or ethical conduct were materially misleading because the defendants had made "repeated references" emphasizing the defendant-companies' ethical standards or corporate governance practices "in response to specific press reports indicating that" those companies were implicated in the corruption scandal. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017); *accord Wash. St. Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 73-74 (S.D.N.Y. 2020) (holding that statements about risks from international competition and regarding competitive bidding processes misleadingly omitted that the company was involved in another part of the bribery scheme); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see* Opposition at 9-12. Here, however, there are no allegations of any reports that the Wells Fargo fake account scandal indicated similar non-compliance by USB or otherwise implicated USB. Instead, the allegations only support the conclusion that the statements about USB's trust, ethics, and brand were issued "in the ordinary course of business." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 757 (S.D.N.Y. 2017) (finding statements about corporate integrity and ethics non-actionable puffery).

Of the cases emerging from the Brazilian corruption scandal, the most helpful to Lead Plaintiffs probably is a fourth case, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017). There, the defendant-company's "statements about compliance with the law, in

general, and bribery, in specific, were made" after "the public had learned of the vast bribery revelations stemming from [the Brazilian corruption scandal]." *Id.* at 659.  Even though there was no allegation of reports implicating the defendant-company in the scandal, the court in *Banco Bradesco* found that the statements were not immaterial puffery because the plaintiffs alleged that the "scandal . . . intensified investors' focus on the policies in place at Brazilian companies to prevent similar misconduct" and the statements were therefore made "in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern." *Id.* at 621 (describing the corruption scandal and related allegations), 660 (holding on puffery).  USB is analogous to the defendant-company in *Bradesco* in that neither company had itself been implicated in the scandal in question.   And USB certainly emphasized the importance of its brand and that its brand was premised on a reputation of trust.  *See* Am. Compl. ¶¶ 58 (Quinn's statement at the September 2019 investor conference regarding the impact of USB's brand on shareholder returns), 63 (Quinn's statement at the September 2019 investor conference: "[S]trong brands drive better shareholder return.  They also drive higher top line growth and they outperform the S&P 500."), 129 (USB's statement in its code of ethics that "[o]ur reputation is our most valuable asset, and it's the cornerstone of our brand").  But *Bradesco* remains distinguishable because Lead Plaintiffs have not alleged the same type of explicit references to Wells Fargo, or otherwise to opening unauthorized accounts or sales incentive compensation, in USB's SEC filings that the defendant-company in *Bradesco* made to the Brazilian corruption scandal:

> Bradesco acknowledged in its own public filings the risks and uncertainties [the corruption scandal] could bring to its own operations and the confidence of its investors, cautioning investors that they "may have momentarily harmed the reputation of Brazil, which could reduce investor confidence," and that, "[i]f uncertainty continues or a reduction in investor confidence as a result of these investigations is material, it may adversely affect the results of our operations."

*Bradesco*, 277 F. Supp. 3d at 659-60 (second alteration in original).  While Lead Plaintiffs argue that "Defendants' statements were made repeatedly in the wake of the Wells Fargo scandal and were specifically intended to reassure the public that its brand, reputation and customer trust – key components of the Bank's strategy to compete – were intact," Opposition at 11, they identify no allegation in the Amended Complaint to support their contention that USB's statements were responding to that scandal.[9]  In sum, the statements in the category of discussing USB's trust, ethics, and brand amount no more than mere puffery, with the following exception.

One statement in this category is sufficiently specific that it does not clearly qualify as puffery: the statement that USB's brand value had grown by 55% since 2016.  Am. Compl. ¶¶ 60 (Quinn's statement at the September 2019 investor conference), 67 (statement in the 2019 Annual Report).  As this statement asserted a concrete numerical increase in brand value that could presumably be verified as false or true, it cannot be dismissed as puffery.  *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417-18 (2d Cir. 2023).[10]  But this statement still is non-actionable because it was not misleading by virtue of the allegedly omitted information.  To be actionably misleading, there must be a "sufficiently close nexus" between the statement and the allegedly omitted information.  *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272-73 (S.D.N.Y. 2021) ("[T]o prevail on [an omission] theory, plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to

---

[9] Furthermore, Lead Plaintiffs allege that the marketing effort in question began in 2013 when USB hired Quinn, which was well *before* the Wells Fargo account scandal became public in 2016.  *See* Am. Compl. ¶ 23.

[10] Because it can be objectively true or false, this statement is also a statement of fact.  *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418-19; *see also infra* III.B.2 (discussing distinction between statements of fact and statements of opinion).  The Court has not addressed whether the other statements in this category are statements of fact or opinion because their generality renders them non-actionable regardless of their categorization as fact or opinion statements.  *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 417-18.

24

demonstrate that" there is "a duty to disclose the omitted information . . . in order to prevent the statement from being materially misleading."); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019) (collecting cases).  In other words, the subject matter of the alleged statement must relate closely enough to the allegedly omitted information such that a reasonable investor might have drawn inferences about the omitted information because of the statement.  *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 Civ. 7536 (NRB), 2021 WL 1199035, at \*15 n.13 (S.D.N.Y. Mar. 30, 2021) (collecting cases), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022).  Here, a reasonable investor would not interpret statements about a bank's improvement in brand value to imply anything regarding the existence *vel non* of unauthorized account openings or related government investigations.  Thus, this statement is not actionable either, rendering the entirety of this first category of statements not actionable.

### 2.  Risk Environment and Risk Management

The second category generally consists, first, of statements about USB's risk management policies and procedures and, second, of statements about the compliance, legal, and regulatory risks USB was exposed to during the Class Period.  As an example of the former, USB consistently provided a disclosure describing its "three lines of defense" framework for risk management and the roles of the Executive Risk Committee, Board of Directors, CEO, Chief Risk Officer, and Risk Management Committee in managing risk for USB.  Am. Compl. ¶¶ 102-104, 111.  Relatedly, USB promoted the claimed effectiveness of its risk management practices, stating that its "risk discipline" was a "differentiator."  *Id.* ¶ 105.  As to the latter—USB's exposure to compliance, legal, and regulatory risks—USB provided comprehensive disclosures on the panoply of legal and reputational harms it might suffer if its risk management and compliance systems failed to prevent prohibited behavior.  *Id.* ¶¶ 106-110, 113.  Of particular relevance, and as noted above, USB

informed investors in both its 2019 and 2020 Annual Reports, filed with the SEC on February 13, 2020, *id.* ¶ 67, and February 23, 2021, *id.* ¶ 70, respectively, as well as in its 10-K Forms filed for 2019 and 2020:

> **Regulatory Matters.**   The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection. . . .   The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements.   Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue).

*Id.* ¶ 113.  Also notable were USB's disclosures that it "could face significant legal and reputational harm if it fail[ed] to safeguard personal information" and that "[a]ny mishandling or misuse of the personal information of customers, employees or others by the Company . . . could expose the Company to litigation or regulatory fines, penalties, or other sanctions."  *Id.* ¶ 106.  These two disclosures were provided in the 2019 Annual Report, the 2020 Annual Report, and the 2021 Annual Report (filed on February 25, 2022), as well as the associated Form 10-K filings with the SEC.  *Id.* ¶¶ 106-107.

For this category of statements, Defendants largely reiterate the three arguments that they made as to the trust, ethics, and brand category of statements.  *See* Motion at 17 (puffery), 18 (no false statement), 19 (no misleading omission).  In response, Lead Plaintiffs again rely on a half-truth theory, primarily arguing that this category of statements is actionable because the statements misleadingly suggested that USB might suffer legal and reputational harm if customer information was mishandled when it already knew that it had, in fact, failed to safeguard customer information by virtue of the unauthorized account openings starting in 2010.  Opposition at 17-18.  In addition, pointing to the statement in the Consent Order that "the bank had inadequate procedures to prevent and detect" unauthorized accounts, Lead Plaintiffs argue that the risk management framework

described in this category was ineffective, and therefore the statements were misleading by suggesting otherwise. *Id.* at 18-19. Finally, Lead Plaintiffs assert that Defendants emphasized USB's risk management capabilities as a competitive advantage, and that they did so set against the backdrop of, and in response to, the investing public's concern following the Wells Fargo accounts scandal; this amalgamation, they contend, vitiates Defendants' position that such statements are puffery. *Id.* at 19-21.

For the first subset of statements in this category—USB's descriptions of its risk management procedures and policies and the two associated theories of liability—the statements, like those on USB's trust, ethics, and brand, are too general to give rise to liability. For example, paragraphs 102, 103, and 115 of the Amended Complaint allege that the high-level description of USB's risk governance, including its "three lines of defense" framework, was misleading, "[b]ut these are exactly the types of 'routine representations' of 'risk-management practices' that 'almost every . . . bank makes' and which are inactionable." *In re Citigroup Sec. Litig.*, No. 20 Civ. 9132 (LAP), 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (second alteration in original) (quoting *JP Morgan Chase*, 553 F.3d at 206) (collecting cases); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) ("Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable." (internal quotation marks omitted)). Other statements falling under this category suffer from the same fatal flaw. *See, e.g.*, Am. Compl. ¶¶ 104 (statement in the August 1, 2019 Form 10-Q: "The Company maintains a system of controls

with the objective of providing proper transaction authorization and execution.")[11], 104 (statement in the August 1, 2019 Form 10-Q: "The Company has controls and processes in place for the assessment, identification, monitoring, management and reporting of compliance risks and issues."), 105 (Cecere emphasizing at the September 2019 investor conference USB's "best-in-class" risk management and asserting that USB's risk discipline was a "differentiator"), 111 (statements in Class Period 10-K Forms: "Management regularly provides reports to the Risk Management Committee of the Board of Directors.  The Risk Management Committee discusses with management the Company's risk management performance, and provides a summary of key risks to the entire Board of Directors, covering the status of existing matters, areas of potential future concern and specific information on certain types of loss events.").  Regardless of whether, as Lead Plaintiffs contend, these statements can be proven to have been false, their generality renders them immaterial puffery.[12]  *See UBS*, 752 F.3d at 183 ("Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."); *see also Schiro*, 396 F. Supp. 3d at 298 n.5 (explaining that statements at issue regarding compliance would be puffery even if they "had not been explicitly aspirational" due to their use of "broad generalities").[13]

---

[11] This statement, by discussing "the objective" of USB's system of controls, also is aspirational, which additionally renders it puffery.  *See UBS*, 752 F.3d at 183 (holding that statements are particularly likely to be puffery where "the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should'").

[12] Given the conclusion that these statements are nonactionable puffery, the Court does not reach Lead Plaintiffs' argument that these statements were misleading because the risk management framework was ineffective at the time the statements were made.  *See* Opposition at 18-19.

[13] Although slightly different in nature, certain statements made by Cecere at a June 2021 conference similarly qualify as puffery and otherwise nonactionable for a lack of sufficient nexus.

The second subset of statements in this category are those warning investors about legal and regulatory risks, such as:

- "The Company may suffer legal or regulatory sanctions, material financial loss, or damage to its reputation through failure to comply with laws, regulations, rules, standards of good practice, and codes of conduct, including those related to . . . consumer protection and other requirements."  Am. Compl. ¶ 104 (August 1, 2019 Form 10-Q).

- "The Company could face significant legal and reputational harm if it fails to safeguard personal information."  *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107 (alleging that the statements alleged in paragraph 106 "were repeated in substantially similar form in other Class Period Annual Reports and Class Period 10-Ks").

- "Any mishandling or misuse of the personal information of customers, employees or others by the Company . . . could expose the Company to litigation or regulatory fines, penalties, or other sanctions."  *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107.

- "The Company's framework for managing risks may not be effective in mitigating risk and loss to the Company."  *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107.

- "Damage to the Company's reputation could adversely impact its business and financial results.  Reputation risk, or the risk to the Company's business, earnings and capital from negative public opinion, is inherent in the Company's business.  Negative

---

In response to a question from an analyst about the areas of most interest to regulators regarding USB's business, Cecere said that the two areas were "ESG" and "consumer protection, and consumer activities."  Am. Compl. ¶ 114.  He went on to discuss overdrafts as an example of an issue from the latter two areas.  *Id.*  These statements were highly general in nature, and no reasonable investor would have relied upon them to draw any inferences about the status of USB's account opening practices or USB's engagement with the CFPB.

public opinion about the financial services industry generally or the Company specifically could adversely affect the Company's ability to keep and attract customers, investors, and employees and could expose the Company to litigation and regulatory action." *Id.* ¶ 106 (2019 Annual Report); *accord id.* ¶ 107.

- "The Company is subject to extensive and evolving government regulation and supervision, which can increase the cost of doing business, limit the Company's ability to make investments and generate revenue, and lead to costly enforcement actions." *Id.* ¶ 108 (2019 Annual Report, as well as "in substantially similar form," other Class Period Annual Reports and 10-K Forms).

- "The Company is continually subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection. . . . The Company is cooperating fully with all pending examinations, inquiries and investigations, any of which could lead to administrative or legal proceedings or settlements. Remedies in these proceedings or settlements may include fines, penalties, restitution or alterations in the Company's business practices (which may increase the Company's operating expenses and decrease its revenue)." *Id.* ¶ 113 (2019 Annual Report, as well as "in material part," 2020 Annual Report, 2019 Form 10-K, and 2020 Form 10-K).[14]

---

[14] Lead Plaintiffs also allege that the certifications signed by Dolan and Cecere pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), "wherein [they] certified that the Class Period" quarterly and annual reports filed with the SEC fairly presented the financial condition and results of operations of USB, were false or misleading. Am. Compl. ¶ 112. In opposing Defendants' motion, however, Lead Plaintiffs have not presented any argument that Defendants' financial statements were inaccurate, nor is any such theory alleged in the Amended Complaint. Indeed, this paragraph of the Amended Complaint is not cited once in Lead Plaintiffs' Opposition. Therefore, any argument on this front has been abandoned. *See, e.g., Harrington Glob.*

These statements were not the same kind of general, platitudinal affirmative statements the Court has already found to be puffery. Rather, they addressed more specific risks that threatened USB's business performance, such as the failure to safeguard personal information and that its risk management framework might be ineffective, or made descriptive statements about the status of regulatory enforcement, such as that USB was "cooperating fully with all pending . . . investigations" and that USB was "continually subject to examinations, inquiries and investigations." Nor were these statements aspirational in nature such that they would be shielded by the puffery doctrine. Because Lead Plaintiffs do not posit that these statements were objectively false, the question is whether they were materially misleadingly by way of omission; in other words, whether the statements were misleading half-truths.

In the Amended Complaint, Lead Plaintiffs theorize that these statements were misleading by not disclosing:

> (i) the illicit business practices detailed in [the Consent Order and accompanying Press Release], and by the CFPB which had been investigating USB since at least 2010[15] and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that USB's senior management had knowingly failed to remediate these illicit business practices; (iii) that USB had been the target of a CFPB investigation into these known illicit business practices and that Defendants consciously failed to remediate them; and (iv) that, as a result

---

*Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405, 423 (S.D.N.Y. 2022) ("At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to [a] defendant's arguments in support of dismissing that claim." (citations omitted)).

[15] This reference to 2010 suggests that Lead Plaintiffs allege the CFPB investigation to have started in 2010. At oral argument, however, Lead Plaintiffs' counsel confirmed that they allege the investigation began in "mid 2017." *See* Tr. at 30:19; *accord* Am. Compl. ¶ 144 ("The CFPB launched its investigation of USB at least as early as 2017, as detailed in public reports by *CNN* and other media outlets following issuance of the Consent Order, which stated that the investigation had been pending for over five years. The initiation of the CFPB investigation thus followed closely on the heels of the Wells Fargo revelations and focused on misconduct dating back to 2010.").

> of the foregoing, the Bank was likely to be the subject of a CFPB enforcement
> action and faced extreme regulatory, legal, reputational and financial peril.[16]

Am. Compl. ¶ 115; *accord id.* ¶ 121.  Defendants argue that Lead Plaintiffs have not pleaded facts

establishing that the Individual Defendants were involved in, or knowingly failed to remediate, the

alleged misconduct.  Motion at 19 (referencing Motion at 11).  Likewise, they argue that Lead

Plaintiffs have not adequately pleaded that the CFPB fine was inevitable and therefore should have

been disclosed as a likely event at the time the statements were made.  *Id.* at 18.  They concede,

however, that there were two omitted facts: the existence of the CFPB investigation and the

existence of the unauthorized accounts.  *Id.*  As to these facts, Defendants argue that they were

under no duty to disclose them.  *Id.* at 19-20; Reply at 7-9.

Defendants are correct that Lead Plaintiffs have failed to allege both the Individual

Defendants' involvement in the unauthorized account opening practices and their knowing failure

to remediate such practices.  There are no particularized allegations tying any of the Individual

Defendants to the unauthorized account openings, and the scope of the misconduct makes

implausible any inference that they would have been aware of the misconduct; the 342

unauthorized accounts that Cecere admitted had been opened roughly amount to "a single

unauthorized account opened in a single branch each year in each of the 28 states in which the

Bank currently maintains branches." Am. Compl. ¶ 46.  While Lead Plaintiffs suggest that Cecere

downplayed the volume of the unauthorized accounts when he testified before Congress, that

hypothesis is purely speculative and finds no support in the factual allegations of the Amended

---

[16] The lengthy and somewhat repetitive Amended Complaint purports to articulate a variety of independent reasons why the statements in this category were misleading by omission.  *See* Am. Compl. ¶¶ 116-117.  These purported reasons are either substantively indistinguishable from the four listed in the text above or are not relevant because they pertain to statements the Court has found to be puffery.

Complaint.  Thus, Lead Plaintiffs have not adequately alleged that Defendants' statements were misleading by virtue of omitting the Individual Defendants' involvement in the unauthorized account openings or their knowing failure to remediate such wrongdoing.  That, however, only covers some of the theories of liability asserted by Lead Plaintiffs, as their theories premised on the CFPB investigation, including the likelihood of a fine, and on the actual unauthorized opening of accounts remain.

With respect to the former, Lead Plaintiffs argue that the CFPB investigation should have been disclosed sooner and accompanied by a disclosure that a substantial fine was likely. Opposition at 21-22.  On the latter, Lead Plaintiffs argue that Defendants should have disclosed that unauthorized accounts had been opened by USB employees and Defendants therefore misleadingly presented risks as possibilities when, in fact, the risks had already materialized.  *Id.* at 18, 21-22.  The parties appear to agree that no statute or regulation imposed an independent duty to disclose either piece of information, but disagree as to whether a duty emerged from Defendants' obligation, once having spoken on a topic, "to be both accurate and complete."  *Caiola*, 295 F.3d at 331.  Defendants argue that there was an insufficient nexus between the statements and the omitted information and that "'no reasonable investor would have construed these generic risk disclosures' or risk management statements 'as representations that the company had conducted itself in a manner that negated the risk of future adverse action.'"  Motion at 19 (quoting *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 165 (S.D.N.Y. 2018)) (brackets omitted).

In the absence of an independent duty to disclose, "companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"  *UBS*, 752 F.3d at 184 (quoting *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd without opinion*, 956 F.2d 1161 (2d Cir. 1992)).  Applying this principle, the Second Circuit held in *UBS* that "[b]y disclosing its

involvement in multiple legal proceedings and government investigations and indicating that its involvement could expose [the defendant-company] to substantial monetary damages and legal defense costs, as well as injunctive relief, criminal and civil penalties, and the potential for regulatory restrictions," the defendant-company "complied with its disclosure obligations under our case law." *Id.* Liability is further circumscribed by the requirement of a sufficiently close nexus between the statements in question and the allegedly omitted information. *Denny v. Canaan Inc.*, No. 21 Civ. 3299 (JPC), 2023 WL 2647855, at *7 (S.D.N.Y. Mar. 27, 2023); *see also Menora Mivtachim Ins.*, 2021 WL 1199035, at *17-18. As discussed, statements lacking such a nexus would not mislead a reasonable investor, as the investor would have no basis to infer anything regarding the allegedly omitted information absent the requisite nexus. These limitations on liability are counterbalanced by a company's obligation to speak accurately and completely once it has elected to speak on a topic. *See Caiola*, 295 F.3d at 331. And "[i]n all cases . . . the court must keep in mind that a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

In determining whether an investor could have been misled, the Court also considers whether the statements in question are statements of fact or opinion. Statements "whose objective factual truth or falsity c[an] be ascertained with certainty" are statements of fact, whereas statements that are "inherently subjective" are statements of opinion. *See In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418 (internal quotation marks, brackets, and citations omitted). Where, as here, there is no independent duty to disclose, omissions allegations regarding factual statements are sufficient if the absence of the omitted information renders the statement in question "inaccurate, incomplete, or misleading." *Stratte-McClure*, 776 F.3d at 101 (internal quotation

marks omitted).  Statements of opinion, on the other hand, may be false or misleading in three

circumstances: (1) "the speaker disbelieved the opinion at the time it was made"; (2) "a statement

of opinion contained one or more embedded factual statements that can be proven false"; or (3) "a

statement of opinion, without providing critical context, implied facts that can be proven false."

*Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174-75 (2d Cir. 2020) (citing *Omnicare, Inc.*

*v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185, 188 (2015)).  As to the

final of these three, a plaintiff can adequately plead such a theory of falsity by alleging that "the

speaker implied he or she had a reasonable basis for the opinion but in fact did not."  *Shapiro v.*

*TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 423 (S.D.N.Y. 2023) (citing *Abramson*, 965 F.3d at

175).

      USB's disclosures about the risks it faced are almost entirely statements of opinion because

they expressed inherently subjective views on the nature and scope of the risks that USB was

facing.  For example, USB stated that it could "face *significant* legal and reputational harm if it

fail[ed] to safeguard personal information."  Am. Compl. ¶ 106 (2019 Annual Report) (emphasis

added); *accord id.* ¶ 107 (statement "repeated in substantially similar form in other Class Period

Annual Reports and Class Period 10-Ks").  Whether the failure to safeguard personal information

could expose USB to significant, rather than minimal or some, harm is a subjective assessment

USB made.  Indeed, even the more fundamental aspect of this statement—that USB would be

exposed to risk by failing to safeguard personal information—is not susceptible to objective truth

or falsity, as it too represents USB's subjective view on the potential consequences of certain

events.  The vast majority of the other statements warning investors about risks USB faced are

likewise statements of opinion.  *See, e.g.*, Am. Compl. ¶¶ 104 (statement in the August 1, 2019

Form 10-Q: "The Company may suffer legal or regulatory sanctions, material financial loss, or

damage to its reputation through failure to comply with laws, regulations, rules, standards of good

practice, and codes of conduct, including those related to . . . consumer protection and other

requirements."), 106 (statements in the 2019 Annual Report: "Any mishandling or misuse of the

personal information of customers, employees or others by the Company . . . could expose the

Company to litigation or regulatory fines, penalties, or other sanctions."; "The Company's

framework for managing risks may not be effective in mitigating risk and loss to the Company.";

and "Damage to the Company's reputation could adversely impact its business and financial

results.  Reputation risk, or the risk to the Company's business, earnings and capital from negative

public opinion, is inherent in the Company's business.  Negative public opinion about the financial

services industry generally or the Company specifically could adversely affect the Company's

ability to keep and attract customers, investors, and employees and could expose the Company to

litigation and regulatory action."), 107 (same statements as alleged in paragraph 106 in other Class

Period Annual Reports and 10-K Forms).  Two statements, however, are comprised of both facts

and opinions.

First, USB's disclosure regarding government investigations in the lead up to its eventual

May 4, 2021 disclosure of the CFPB investigation is a mix of opinion and fact.  Again, that

disclosure read:

> The Company is continually subject to examinations, inquiries and investigations
> in areas of heightened regulatory scrutiny, such as compliance, risk management,
> third-party risk management and consumer protection. . . .  The Company is
> cooperating fully with all pending examinations, inquiries and investigations, any
> of which could lead to administrative or legal proceedings or settlements.
> Remedies in these proceedings or settlements may include fines, penalties,
> restitution or alterations in the Company's business practices (which may increase
> the Company's operating expenses and decrease its revenue).

Am. Compl. ¶ 113 (2019 Annual Report, as well as "in material part," 2020 Annual Report, 2019

Form 10-K, and 2020 Form 10-K).  The first sentence could be proven to be objectively false if,

for example, USB was not subject to any "examinations, inquiries and investigations" at the time of the disclosure nor had it been at any time in the past. The second sentence, however, is a statement of opinion: whether a company is "cooperating" is a matter of perspective and degree, and a characterization on which regulators and the companies they regulate may disagree. *Cf. Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, No. 19 Civ. 3354 (VM), 2020 WL 3268531, at *12 (S.D.N.Y. June 17, 2020) (finding statement that the defendant-company was cooperating with the Food and Drug Administration was, to the extent not borne out by subsequent events, "optimism that, in retrospect, was misguided" rather than a misrepresentation of fact). As for the third sentence, while it accurately identifies potential outcomes of regulatory actions, the statement as to what may occur in the future is not susceptible to being proven true or false at the time the statement was made.

Second, USB's disclosure that it was "subject to extensive and evolving government regulation and supervision, which can increase the cost of doing business, limit the Company's ability to make investments and generate revenue, and lead to costly enforcement actions" is similarly a composite of both fact and opinion statements. That USB was subject to government regulation and supervision is a statement of fact: either USB was or was not subject to regulation. But the statements that the regulation is "extensive and evolving," could "limit the Company's ability to make investments and generate revenue," and could lead to costly enforcement actions" are less susceptible to being proven true or false. Thus, aspects of this disclosure are opinions. With this framework in mind, the Court turns first to whether any of the remaining statements in this category were misleading by omitting the fact that unauthorized accounts had been opened.

As to this theory of liability, two disclosures are at least facially related to the openings of unauthorized accounts. Those disclosures, both contained in the 2019 Annual Report, are: (1)

"[t]he Company could face significant legal and reputational harm if it fails to safeguard personal information" and (2) "[a]ny mishandling or misuse of the personal information of customers, employees or others by the Company . . . could expose the Company to litigation or regulatory fines, penalties, or other sanctions." Am. Compl. ¶ 106.[17]  At the time that these disclosures were made, USB had, as alleged, failed to safeguard customer personal information or prevent the misuse of customer personal information by virtue of the unauthorized account openings.  *See, e.g.*, Am. Compl. ¶¶ 28 (alleging that the CFPB press release that accompanied the Consent Order stated that "U.S. Bank employees unlawfully accessed customers' credit reports and sensitive personal data to apply for and open unauthorized accounts"), 44 (alleging that Cecere admitted to Congress that the unauthorized account openings dated back to 2010).  But that allegation alone does not render these two opinion statements misleading.

The fact that there had been unauthorized account openings does not support the inference that Defendants lacked a reasonable basis for these statements.  If anything, that fact arguably supports the reasonableness of USB's caution to investors that it might face penalties as a result of a failure to safeguard personal information.  Nor did these statements contain an embedded misleading statement of fact.  Read in context, these disclosures informed investors about the risks of financial loss that USB faced if there was a failure to safeguard personal information.  No reasonable investor would have interpreted such a warning to imply that USB had never failed to safeguard personal information.[18]  Furthermore, the specific risk that USB warned against—the

---

[17] As mentioned earlier, the statements in paragraph 106 were allegedly repeated in other SEC filings, specifically, the Class Period Annual Reports and the Class Period 10-K Forms, as alleged in paragraph 107 of the Amended Complaint.

[18] Although the Court finds that Lead Plaintiffs have failed to plead misleading omissions, Defendants' reliance on *Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, No. 20 Civ. 2176, 2022 WL 1642221 (N.D. Ill. May 24, 2022), is

financial loss resulting from a failure to safeguard personal information—had not materialized at that point, which additionally cuts against the notion that these statements were misleading. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) ("At the time that the cautionary statements were made, the risk that FBR's noncompliance with securities regulations would actually cause a loss to the company or its shareholders had neither transpired nor become a near certainty. To be sure, the alleged noncompliance had occurred. But the Complaint does not allege that it was sufficiently clear when the 10-Ks were filed on March 28, 2003 and March 15, 2004 that FBR's noncompliance (in 2001) would cause a financial loss. Therefore the Complaint does not allege that this risk had already transpired."); *see also Okla. L. Enf't Ret. System v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020) ("Even if the risk that Schnatter [*i.e.*, the company's founder and executive] would be disgraced or fired increased with the expanding influence of the #MeToo movement, an increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading." (internal quotation marks and brackets omitted)). Thus, these two disclosures were not misleading by failing to include the fact that unauthorized accounts had been opened.

Nor were the statements that dealt specifically with the safeguarding of personal information misleading by not disclosing the fact of the unauthorized account openings. First, because the other opinion statements did not deal in any manner with the topic of unauthorized account openings, no reasonable investor would have read them to imply anything about that topic.

---

somewhat misplaced on this point. In *Fifth Third Bancorp*, the court dismissed securities fraud claims based on another bank's similar issues with unauthorized account openings. The alleged misstatements in *Fifth Third Bancorp*—which were that the defendant-bank was "subject to risk from potential employee misconduct"—was "too general to be actionable." *Id.* at *17. "Employee misconduct" is far broader than the failure to customer safeguard personal information, or the misuse of such personal information, at issue here.

Likewise, the fact that unauthorized account openings had occurred does not mean that the opinions expressed in those statements lacked a reasonable basis, given that the opinions did not deal with related subject matter.   As to the statements that USB was subject to pending investigations and was cooperating with such investigations, the statements again lack a sufficiently close nexus to the fact of the unauthorized account openings, as no reasonable investor would take a statement that USB was subject to investigations and cooperating with such investigations to imply anything about whether USB ever experienced unauthorized account openings.

Turning to Plaintiffs' other theory of liability—that the statements were misleading by not disclosing the CFPB investigation and that USB was, according to Lead Plaintiffs, likely to be subject to a fine from the investigation—the above-quoted disclosure that generally concerned the existence of government investigations, *see* Am. Compl. ¶ 113, bears a sufficiently close nexus to the omitted fact of the CFPB investigation that, as alleged, began "at least as early as 2017," *id.* ¶ 144.  This disclosure, which appeared in USB's 2019 Form 10-K, 2019 Annual Report, 2020 Form 10-K, and 2020 Annual Report omitted any mention of the specific investigation being conducted by the CFPB and about the status of that investigation.  *See id.* ¶ 113.  But whether analyzed as a fact statement or an opinion statement, USB's general disclosure regarding the status of investigations was not misleading.  Considered as a fact statement, this disclosure was made multiple times during the Class Period in the lead up to the May 4, 2021 disclosure of the CFPB investigation.  In this timeframe, Lead Plaintiffs allege that the CFPB was investigating USB, but they do not allege that USB had any knowledge of that investigation.  And even had Lead Plaintiffs alleged that USB was aware of the investigation, this disclosure did not imply that no investigation by the CFPB was taking place.  To the contrary, the disclosure stated that USB was "continually

subject to examinations, inquiries and investigations in areas of heightened regulatory scrutiny, such as compliance, risk management, third-party risk management and consumer protection." *Id.* ¶ 113. Under the same reasoning, if viewed as an opinion statement, the disclosure did not contain a misleading statement of embedded fact. To the contrary, it cautioned that USB was subject to "pending . . . investigations" when that was indeed the case (regardless of whether that investigation was overt and known to USB or not). *Id.* Nor did USB lack a reasonable basis for the opinion aspect of this disclosure; the opinion—that pending investigations might "lead to . . . legal proceedings or settlements"—was clearly reasonable and not in any sense undermined by the fact of the investigation. And Lead Plaintiffs have made no allegation to support the inference that, at the point of this disclosure, USB knew or should have known that it would in fact face a fine by the CFPB.

The disclosure quoted in paragraph 113 of the Amended Complaint thus stands in contrast to those in cases on which Lead Plaintiffs rely, *see* Opposition at 18, where courts found disclosures about the status of investigations to be misleading for implying facts that were directly contradicted. *See In re Mylan N.V. Sec. Litig.*, No. 16 Civ. 7926 (JPO), 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) (holding the disclosure to be misleading because "[a] reasonable investor could have concluded from Mylan's statement that although the government 'may' disagree with Mylan, and 'could' open an investigation, such unfavorable events had not yet occurred," when the government had in fact both opened an investigation and disagreed with Mylan); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (finding disclosure that "[f]rom time to time, the Company responds to subpoenas and requests for information from Governmental agencies" to misleadingly imply the absence of an investigation). The language in the disclosure here appropriately conveyed "current investigative activity." *In re Inv. Tech. Grp., Inc. Sec. Litig.*,

251 F. Supp. 3d 596, 616 (S.D.N.Y. 2017).  In fact, as discussed above, the Amended Complaint does not even allege that Defendants knew the CFPB was investigating USB at the time of any statements made prior to the May 4, 2021 Form 10-Q, nor does it allege any facts indicating that, at the time of the statements with the disclosure in paragraph 113, Defendants were aware that a fine or enforcement action by the CFPB was likely.  There are no allegations that USB received, for example, a civil investigative demand ("CID") from the CFPB and suggested otherwise.  *Cf. In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. at 727-28 (finding the company's disclosures regarding investigations misleading where the company failed to disclose it had received a civil investigative demand).  Thus, because there is no duty to disclose uncharged conduct, and USB's disclosure concerning the existence of government investigations was not otherwise misleading, Lead Plaintiffs' case cannot proceed based on alleged omissions in connection with the statement alleged in paragraph 113.

In sum, this category of statements is either non-actionable puffery or otherwise not misleading.

### 3.  CFPB Investigation

The next category is comprised of two disclosures directly related to the CFPB's investigation.  *See* Am. Compl. ¶¶ 118-120.  First is the disclosure that USB made on May 4, 2021 in its Form 10-Q, in which USB told the market that the CFPB was "investigating certain of the Company's consumer sales practices" and that USB "ha[d] responded and continue[d] to respond to the CFPB."  *Id.* ¶ 118.  As noted above, the same statement was then reiterated in SEC filings made on August 3, 2021, November 2, 2021, and February 22, 2022.  *Id.* ¶ 119.  And second is the May 3, 2022 disclosure in a Form 10-Q, in which USB revealed that the CFPB "ha[d] been investigating certain of the Company's consumer sales practices and [was] now considering a potential enforcement action."  *Id.* ¶ 120.  This second disclosure was accompanied by the caveat

that USB did "not believe an enforcement action [was] warranted, but there can be no assurance that" discussions with the CFPB would "result in a resolution," and noted that USB was "cooperating fully with the investigation." *Id.* ¶ 146 (internal quotation marks omitted).

As to this category, Defendants largely reprise their prior arguments, contending that the statements did not contain any objectively false assertion, that Lead Plaintiffs did not adequately plead the existence of any facts allegedly omitted, that Lead Plaintiffs' allegations amount to nothing more than an improper attempt to argue "fraud by hindsight," and that Lead Plaintiffs have not pleaded a sufficient nexus between the alleged omissions and the statements in this category. Motion at 20-21.  Defendants specifically argue that the Amended Complaint did not sufficiently allege facts showing: (1) the involvement of the Individual Defendants in "the purported misconduct"; (2) "that USB's senior management had *knowingly failed* to remediate these illicit business practices; and (3) "the other omitted 'facts.'"  *Id.* at 11.  And as previously noted, Defendants acknowledge that Lead Plaintiffs have sufficiently alleged the existence of the CFPB investigation and USB's opening of unauthorized accounts. *Id.* at 12.  Lead Plaintiffs argue that Defendants' statements in these disclosures were "wholly insufficient to apprise investors of the scope and nature of, and known risks associated with, the CFPB investigation" and that "the true nature of the CFPB investigation and its implications for USB" had been withheld.  Opposition at 23.[19]  Thus, their position seems to be that the statements in this category should have mentioned the existence of the unauthorized account openings and other practices detailed in the Consent

---

[19] Lead Plaintiffs also argue that Defendants' statement that USB did "not believe an enforcement action is warranted"—which was made as part of the May 3, 2022 disclosure—entailed a materially misleading opinion because "it is unimaginable how this 'belief' was sincere at the time the statement was made."  Opposition 23 n.22.  This argument, which is not developed by any argument or citation to allegations in the Amended Complaint, is only raised in a footnote, so the Court declines to reach it.  *See City of Philadelphia*, 498 F. Supp. 3d at 537 (collecting cases).

Order and that USB was "likely to be subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril."  Am. Compl. ¶ 115.  In reply, Defendants posit that the Amended Complaint: (1) did "not allege any specific facts about the CFPB investigation—such as how it progressed—that [Lead] Plaintiffs contend should have been disclosed," (2) did "not adequately allege how the investigation's *ultimate result* made any earlier statements misleading at the time," and (3) reiterate their position that USB was under no obligation to disclose the "alleged misconduct that was the investigation's subject."  Reply at 10.  The Court agrees with Defendants.

To start, the statements in this category are again a mix of fact and opinion statements.  The first disclosure is of a clearly factual nature.  The facts of the investigation and USB's responses thereto are amenable to classification as objectively true or false.  The second disclosure incorporates both fact and opinion statements.  The first part of the disclosure—informing the market that the CFPB was considering an enforcement action—is again a fact statement; it can be ascertained whether the CFPB was, in fact, considering such a step.  The latter part of the disclosure, however, is an opinion statement: it disclosed USB's subjective views that an enforcement action was not "warranted" and that it was cooperating with the investigation.  None of these facts and opinion statements was misleading.

First, the disclosures here did not misleadingly imply anything regarding the fact of the unauthorized account openings.  For the fact statements, the disclosures lack a sufficient nexus to the topic of unauthorized account openings.  Defendants did not speak on that topic in these disclosures, nor they did assert that they had fully complied with account opening regulations or anything similar.  No reasonable investor would have read the disclosures to imply anything regarding the specific issue of unauthorized account openings.  On the same reasoning, the opinion

44

statements did not include any embedded factual statements on that topic.  As to Lead Plaintiffs' argument that USB lacked a reasonable basis for the opinion that an enforcement action was not warranted, they have failed to allege that Defendants were sufficiently aware of the unauthorized accounts so as to make the opinion unreasonable at the time it was stated.  *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at 619 (finding an opinion statement not misleading where the plaintiff "fail[ed] to allege particular facts regarding the knowledge Defendants did (or did not) possess at the time the opinion statements were made, whose omission made those statements misleading"); *infra* III.D.2.  And even if the Defendants were aware of the unauthorized accounts, the occurrence of merely 342 unauthorized accounts would not render unreasonable the position that an enforcement action was unwarranted.

Second, Lead Plaintiffs have failed to allege any facts suggesting that Defendants knew or should have known that they were going to be subject to an enforcement action, and in particular one on the scale that materialized.  There are no allegations, for instance, that USB received anything comparable to a so-called Wells Notice, which the SEC issues when it is considering bringing charges.  *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 19 (S.D.N.Y. 2016) ("A Wells Notice only informs an individual or company that the SEC Enforcement Division staff is considering recommending that the SEC file an action, but the SEC itself has not yet determined whether or not to bring a case.").  Yet, in *Lions Gate*, where the company had received a Wells Notice, a disclosure apparently less forthcoming than those here was found not misleading.  *See id.* at 15-16 (finding the company's disclosure that it was "involved in certain claims and legal proceedings arising in the normal course of business" not misleading when the company had received a Wells notice, because the plaintiffs did not "allege so-called half-truths by the defendants where the statements mislead investors by saying one thing and holding back

45

another," but instead "at most plead[ed] that the defendants disclosed an investigation was ongoing, but refused to provide details" (internal quotation marks omitted)).  The disclosures here accurately conveyed that USB was indeed subject to a CFPB investigation and did not imply anything regarding the likelihood of an enforcement action until an affirmative disclosure that the CFPB was considering an enforcement action.  Accordingly, the factual aspects were not misleadingly incomplete or inaccurate, nor did the opinion statement imply any embedded false facts.  And as to the opinion statement that USB did not believe an enforcement action was warranted, there are no allegations reflecting the progress of the CFPB's investigation that would have rendered that opinion unreasonable.  Indeed, in the absence of any allegations that Defendants previously knew that USB was going to be subject to an enforcement action, there is no basis from which to conclude that USB failed to accurately disclose its impression of the progression of the investigation.  The statements in this category therefore are not alleged to have been misleading.

### 4.  Code of Ethics

Finally, the fourth category is comprised of statements USB made describing its code of ethics.[20]  Defendants argue that its alleged statements concerning USB's code of ethics were non-actionable puffery and not otherwise false or misleading.  Motion at 14-16.  Lead Plaintiffs do not present any argument in defense of this category, with one minor exception.  In their brief opposing dismissal, Lead Plaintiffs cite the statement in USB's code of ethics that "[USB's] reputation is our most valuable asset."  Opposition at 10 n.4 (citing Am. Compl. ¶ 129).  But while this allegation appears in the Amended Complaint's section concerning statements about USB's code of ethics, *see* Am. Compl. at 54-56, Lead Plaintiffs cite it in support of their arguments about

---

[20] A further description of these statements is unnecessary because, as discussed in this subsection, Lead Plaintiffs have abandoned any theory of liability premised on Defendants' statements concerning USB's code of ethics.

omissions regarding USB's trust, ethics, and brand, *see* Opposition at 10 n.4 (citing Am. Compl. ¶ 129).  The Court therefore has considered that statement as part of its analysis on the trust, ethics, and brand category of statements, *see supra* III.B.1, and otherwise deems Lead Plaintiffs' allegations regarding USB's code of ethics, *see* Am. Compl. ¶¶ 123-128, abandoned.  *See, e.g.*, *Harrington Glob. Opportunity Fund*, 585 F. Supp. 3d at 423 ("At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to [a] defendant's arguments in support of dismissing that claim."); *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("'[W]hen a party fails adequately to present arguments' in a brief, a court may properly 'consider those arguments abandoned.'" (quoting *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004))); *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) (noting that particularly "in the case of a counseled party," "a court may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned").

## C.    Materiality

Defendants additionally argue that the size of the CFPB fine, coupled with a lack of qualitative importance to USB's business, render immaterial any alleged misstatements or omissions about the unauthorized account openings, the CFPB's investigation, and the resulting fine.  Motion at 21-22.  They also argue that the bespeaks caution doctrine nullifies Lead Plaintiffs' allegations.  *Id.* at 22-25.[21]

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000)

---

[21] Because the Court ultimately grants leave to amend, *see infra* III.H, the Court reaches its alternative grounds for dismissal for lack of materiality and scienter, so Lead Plaintiffs are on notice of the identified pleading deficiencies should they opt to file a Second Amended Complaint.

(citing *Basic*, 485 U.S. at 231). Thus, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 232 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

"[B]oth quantitative and qualitative factors must be considered in determining materiality." *JP Morgan Chase*, 553 F.3d at 204. Deviations of less than 5% with respect to a particular item in a company's financial statements because of a misstatement "may provide the basis for a preliminary assumption" of immateriality. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150, 45,151 (1999)). Courts in this District have interpreted this to mean that restatements of financial performance involving a less than 5% downward revision are "presumptively immaterial." *E.g.*, *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 403 (S.D.N.Y. 2022) ("The alleged misstatements in the third and fifth bullet points, net cash from financing activities and net cash used in investing activities for 2017, are presumptively immaterial because the restatements were 1.9% and 2.5% lower, respectively, then the originally stated financials."); *City of Omaha Police & Fire Ret. System v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 415-16 (S.D.N.Y. 2020) ("Plaintiffs allege $4.4 million revenue, and Evoqua's FY17 revenue was $1.25 billion. Plaintiffs thus allege an impact of 0.37% on Evoqua's revenue. Courts have stated that such a small a percentage, by itself, can evince a lack of materiality."); *In re Insys Therapeutics, Inc. Sec. Litig.*,

No. 17 Civ. 1954 (PAC), 2018 WL 2943746, at *14 (S.D.N.Y. June 12, 2018) ("[R]estatements of financial performance are presumptively immaterial unless the financial performance is revised downward by more than 5%.").  In the context of a civil fine, one court in this District has compared the size of the penalty to the defendant-company's revenue to determine whether this presumption applies.  *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d at 13.  Courts must also consider qualitative factors when assessing materiality, and "that consideration should be undertaken in an integrative manner."  *Litwin*, 634 F.3d at 717.  These qualitative factors include: (1) whether the alleged misstatement or omission "conceal[ed] . . . an unlawful transaction," (2) the "significance of the misstatement in relation to the company's operations, and (3) management's expectation that the misstatement [would] result in a significant market reaction."  *JP Morgan Chase*, 553 F.3d at 197-98 (citing SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. at 4150-52).

 Lead Plaintiffs do not dispute that the CFPB fine falls below the 5% threshold for presumptive immateriality, *see* Opposition at 13-14, and for good reason.  They allege that USB has $675 billion in assets, Am. Compl. ¶ 22, and paid a $37.5 million fine as a result of the Consent Order, *id.* ¶ 28.  With this fine being less than one percent of USB's assets,[22] the allegedly omitted information—which all ultimately relates to the conduct disclosed by and penalized through the Consent Order—bears at least the initial indicia of immateriality.

 Lead Plaintiffs have failed to sufficiently allege that the qualitative factors overcome this presumption.  They argue that the alleged omissions "called into question the integrity of the

---

[22] Although Defendants also argue that the same is true when the fine is compared to USB's revenue, Lead Plaintiffs have not alleged facts pertaining to USB's total revenue during the Class Period.  And while the Court may consider information in SEC filings, it may not do so for the truth of the matter asserted therein.  *See Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

company as a whole," so it is "inappropriate to focus only on" the size of the fine.  Opposition at

13 (quoting *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015)).  Given

the relatively *de minimis* scope of the misconduct here, it is a step too far to conclude that the

alleged omissions "called into question the integrity of the company as a whole."  Furthermore,

the nature of the alleged misconduct here differs dramatically from that in *Strougo*.   There,

Barclays was engaged in a campaign to repair its public image after its involvement in the wide-

ranging LIBOR scandal that occurred from 2005 through 2009.  *Strougo*, 105 F. Supp. 3d at 337.

In contrast, as extensively discussed above, USB was not trying to distance itself from a scandal.

In addition, in *Strougo* the misleading statement concerned a very specific product that one of the

high-level corporate defendants was focused on and communicated to the public that he was

"intimately knowledgeable" about.  *Id.* at 351.  Thus, the fact that that same individual was found

to have been misleading the public with scienter called into question Barclay's integrity in a

manner that is simply not present here.  *See infra* III.D (finding no scienter).  Lead Plaintiffs also

rely on the allegation that the fine implicated USB's consumer banking division, *see* Opposition

at 13, which based on the allegations in the Amended Complaint itself generated 33.6% percent of

USB's revenue in the fiscal year prior to the Class Period, *see* Am. Compl. ¶ 149 (alleging that, in

fiscal year 2018, USB's "Consumer and Business Banking . . . comprised 40% of the Bank's total

net revenue, 84% of which was specifically attributed to consumer banking").  The Court does not

place great weight on this point, however, as there is no allegation that the Consent Order imperiled

the revenue-generation capabilities of USB's consumer banking division in the aftermath of the

Consent Order.  Accordingly, Lead Plaintiffs have failed allege facts sufficient to overcome the presumption of immateriality triggered by the size of the fine here.[23]

### D.     Scienter

Lead Plaintiffs' claims also must be dismissed for the independent reason that they have failed to adequately plead scienter with particularity.[24]

To plead scienter, a complaint must allege facts showing "either: 1) a 'motive and opportunity to commit the fraud'; or '2) strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99).  The Second Circuit recently clarified that, in deciding a motion to dismiss, courts must "assess the total weight of . . . circumstantial allegations *together with* . . . allegations of motive and opportunity."  *In re Hain Celestial Grp. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021).  Thus, "'the strength of the circumstantial allegations must be correspondingly greater' if there is no motive."  *JP Morgan Chase*, 553 F.3d at 199 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  And as noted above, based on an assessment of the relevant allegations in their totality, "[a] complaint will survive if a

---

[23] In light of the above conclusion finding no materiality, the Court does not reach Defendants' bespeaks caution doctrine argument.  *See* Motion at 22 ("[E]ven if otherwise actionable . . . , Plaintiffs' omissions theories are immaterial under the 'bespeaks caution' doctrine insofar as they contend Defendants were obligated to make predictions about the future.").  Similarly, the Court does not reach Defendants' argument that some of the at-issue statements were "forward-looking" and therefore protected by the PSLRA's safe harbor for such statements. Motion at 25 n.11; 15 U.S.C. § 78u-5.  The Court does not reach the latter argument for the additional reason that it is presented only in a footnote.  *See, e.g.*, *City of Philadelphia*, 498 F. Supp. 3d at 537.

[24] Although the Court concludes above that the Amended Complaint fails to allege Richard made any relevant statements for purposes of Rule 10b-5(b), *see supra* III.A, the Court addresses the Amended Complaint's allegations of scienter as they apply to Richard in the event Lead Plaintiffs choose to bring a claim against her under Section 10(b) and Rule 10b-5 in a Second Amended Complaint.

reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Blanford*, 794 F.3d at 306 (internal quotations omitted); *accord ATSI Commc'ns*, 493 F.3d at 99.  Congress has directed that in pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

### 1.  Motive[25]

Defendants argue that Lead Plaintiffs have failed to allege facts showing motive on behalf of the Individual Defendants.  Specifically, they argue that the Individual Defendants increased their holdings over the Class Period, were holding significant amounts of shares when the Consent Order was disclosed, and sold a relatively small percentage of their total holdings, and further that the timing of the sales does not allow for an inference of impropriety.  Motion at 25-28.  Lead Plaintiffs argue that the Court cannot consider the SEC filings that the Individual Defendants rely on to argue that they increased their holdings and that their sales were made after the CFPB investigation began but before the Consent Order was released.  Opposition at 31-33.  The Court therefore must first resolve what information may be considered in assessing the Individual Defendants' stock holdings during the Class Period.

---

[25] Defendants do not contest that the Individual Defendants, as corporate officers, had the requisite opportunity.  *See generally* Motion at 25-28; *see also Lozada v. TaskUs, Inc.*, No. 22 Civ. 1479 (JPC), 2024 WL 68571, at *21 n.28 (S.D.N.Y. Jan. 5, 2024) ("Corporate officers are generally considered to have the opportunity to commit fraudulent acts based on insider information." (citing *In re Scholastic*, 252 F.3d at 74)).

The parties' disagreement centers on whether the Court may take judicial notice of the Individual Defendants' Form 4 filings made with the SEC.[26]  If the Court were to consider this information, the Individual Defendants' shareholdings during the Class Period would be:

| Insider | Date of Form 4 | Number of Shares Beneficially Owned |
|---|---|---|
| Cecere (Chief Executive Officer) | 2/19/2019 (Dkt. 42-41 at 2) | 734,554 (Dkt. 42-41 at 2) |
| | 3/5/2022 (Dkt. 42-42 at 2) | 956,742 (Dkt. 42-42 at 2) |
| | | |
| Dolan (Chief Financial Officer) | 2/19/2019 (Dkt. 42-43 at 2) | 128,604 (Dkt. 42-43 at 2) |
| | 3/5/2022 (Dkt. 42-44 at 2) | 165,051 (Dkt. 42-44 at 2) |
| | | |
| Richard (Chief Risk Officer) | 2/19/2019 (Dkt. 42-45 at 2) | 36,171 (Dkt. 42-45 at 2) |
| | 3/5/2022 (Dkt. 42-46 at 2) | 84,755 (Dkt. 42-46 at 2) |
| | | |
| Quinn (Chief Administrative Officer) | 2/19/2019 (Dkt. 42-47 at 2) | 79,737 (Dkt. 42-47 at 2) |
| | 3/5/2022 (Dkt. 42-48 at 2) | 110,252 (Dkt. 42-48 at 2) |

Defendants argue that the filings are incorporated by reference into the Amended Complaint, are integral to the Amended Complaint, and may also be relied upon as legally required disclosures filed with the SEC.  Reply at 11-12.  Lead Plaintiffs reject all three positions, accepting only that the Court can consider the filings for what they stated rather than for the truth of the matters asserted therein.  Opposition at 32-33.  While the Court acknowledges the somewhat odd and perhaps unfair result, Lead Plaintiffs have the better of the argument under governing Second Circuit law.

"Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered."  *Roth*, 489 F.3d at 509.  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies

---

[26] "Section 16(a) of the Exchange Act requires a public company officer to file a Form 4 with the SEC disclosing any purchase or sale of the company's stock by the officer within two business days of the trade execution date."  *SEC v. Honig*, No. 18 Civ. 8175 (ER), 2023 WL 6386918, at *11 (S.D.N.Y. Sept. 29, 2023).

heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted). "[M]ere notice or possession of the document in question is not enough." *Id.* And only "mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks and brackets omitted). The Amended Complaint does not reference the Form 4 filings at any point, so they are not incorporated by reference. The filings are arguably integral to the Amended Complaint, as the allegations of scienter based on motive and opportunity rely heavily on allegations of the Individual Defendants' stock sales, information that Lead Plaintiffs presumably gleaned from the Form 4 filings.[27] *See* Am. Compl. ¶¶ 150-151. But even if the Form 4 filings are integral to the Amended Complaint, the Court cannot consider the filings for the truth of the matters asserted in those documents. *See Roth*, 489 F.3d at 509. Likewise, while the Court may take judicial notice of SEC filings, it cannot do so to establish the truth of the matters asserted therein. *Id.* The Court therefore declines to consider at this stage the apparent stock acquisitions completed by the Individual Defendants during the Class Period.

Moving to the substance of the analysis, to properly allege motive, plaintiffs "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307-08). "Motives generally possessed by most corporate directors and officers do not suffice." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 420 (S.D.N.Y. 2011) (citing *Kalnit*, 264 F.3d at 139). "Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount." *In re*

---

[27] Lead Plaintiffs' counsel was somewhat noncommittal at oral argument when asked about the source for the stock sales allegations but did not seem to deny that the Form 4 filings were the source. *See* Tr. 42:19-43-4.

*Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).  Stock sales by insiders "made a short time before a negative public announcement are suspiciously timed."  *Id.*  Other "[f]actors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74-75.

Lead Plaintiffs do point to some allegations to support a finding of motive.  The Individual Defendants allegedly benefited concretely from stock sales throughout the Class Period, collectively selling 463,700 shares to earn gross proceeds of more than $26 million.  *See* Am. Compl. ¶ 150.  And the Amended Complaint does not allege that they executed stock sales after the Class Period—*i.e.*, following the Consent Order.  On the other hand, the stock sales all predated the Consent Order by more than a year, and sales that do not directly precede negative announcements are less indicative of scienter.  *See Lozada*, 2024 WL 68571, at *22 (finding that a lapse of three months between the last sales and a negative announcement undermined an inference of scienter and collecting cases).  The sales also are not so unusual as to, by themselves, support a finding of scienter, independent of circumstantial evidence of scienter.  But Lead Plaintiffs also do not need to have alleged "correspondingly greater" circumstantial evidence of scienter as would be required in the absence of any valid motive allegations.  *See Hain*, 20 F.4th at 137-38; *JP Morgan Chase*, 553 F.3d at 199.

### 2.  Conscious Misbehavior or Recklessness

On the second prong of the scienter analysis, Defendants argue that Lead Plaintiffs have failed to allege that the Individual Defendants knew of the unauthorized accounts or any associated misconduct at the time the allegedly misleading statements were made, and that Lead Plaintiffs improperly attempt to rely on the Individual Defendants' roles at USB to compensate for the

absence of particularized scienter allegations.  Motion at 29-31.  They further argue that Lead Plaintiffs cannot rely on the allegation that the misconduct "involved a core business at USB" to support an inference of scienter.  *Id.* at 31-32.  And, finally, they argue that Lead Plaintiffs have not adequately pleaded corporate scienter because no individual's scienter can be imputed to USB and the corporate statements involved are not so "important and dramatic" such that their falsehood would be obvious.  *Id.* at 32 (quoting *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 775 (S.D.N.Y. 2019)).  Lead Plaintiffs counter that the Individual Defendants must have known about the investigation and underlying alleged misconduct by virtue of their positions, and, as to Cecere in particular, point to his admission during his congressional testimony that USB had opened unauthorized accounts as further evidence of scienter.  Opposition at 29-31.  As to corporate scienter, Lead Plaintiffs cite the "the Bank's admission that it cooperated with the CFPB's investigation and actively responded to the bureau's requests for information over at least a five-year period," *id.* at 25 (citing Am. Compl. ¶ 146), emphasize the statement in the press release issued by the CFPB that "[f]or over a decade, U.S. Bank knew its employees were taking advantage of its customers by misappropriating consumer data to create fictitious accounts," *id.* at 25, and claim that the CFPB's findings in the Consent Order suggest that the Bank caused the unauthorized account openings through its policies and therefore must have known about the openings, *id.* at 25-26.  And they additionally argue that the importance of the consumer banking division to USB belies any suggestion that USB was not aware of the unauthorized account openings.  *Id.* at 27.

    In this context, recklessness means "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Stratte-McClure*, 776 F.3d at 106 (internal quotation marks omitted).  Recklessness also has been defined as "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger

was either known to the defendant or so obvious that the defendant must have been aware of it."

*JP Morgan Chase*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 308). "Circumstantial evidence

can support an inference of scienter in a variety of ways, including where defendants (1) benefitted

in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal

behavior; (3) knew facts or had access to information suggesting that their public statements were

not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d

at 306 (internal quotation marks omitted). The assessment of whether conscious misbehavior or

recklessness has been adequately pleaded "is a highly fact-based inquiry," *Kalnit*, 264 F.3d at 142,

and courts must "analyz[e] scienter holistically," *Setzer*, 968 F.3d at 213 n.11; *accord Tellabs*, 551

U.S. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the

allegations holistically."). Finally, there are two routes for pleading corporate scienter: "by

pleading facts sufficient to create a strong inference either (1) that someone whose intent could be

imputed to the corporation acted with the requisite scienter or (2) that the statements would have

been approved by corporate officials sufficiently knowledgeable about the company to know that

those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797

F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted).

Defendants are correct that Cecere's September 2022 congressional testimony does not

support an inference of scienter. The Amended Complaint does not allege any statements by

Cecere during his testimony to suggest that he or any other Individual Defendant was aware of the

unauthorized account openings at the time the allegedly misleading statements were made. Rather,

his comments before the Senate Banking Committee only prompt the inference that Cecere

prepared for an important Congressional hearing, and as part of that preparation, he likely collected

relevant information and familiarized himself with the full scope of the misconduct that led to the

Consent Order.  The Court also agrees with Defendants that little significance should be ascribed to the mere fact that Dolan and Cecere signed certifications for the SEC filings made during the Class Period; Lead Plaintiffs have not provided specific allegations to demonstrate that Dolan and Cecere were exposed to information about the unauthorized accounts during any review process associated with those certifications, nor do those certifications somehow establish that those Defendants were aware of any such information.  *See Woodley v. Wood*, No. 20 Civ. 2357 (ER), 2022 WL 103563, at *8 (S.D.N.Y. Jan. 11, 2022) ("[T]he fact that a defendant had a duty to review the Company's internal controls is not a substitute for specific allegations that he was provided with information that demonstrated the inadequacy of those internal controls." (quoting *Schiro*, 396 F. Supp. 3d at 307), *aff'd sub nom. Rotunno v. Wood*, No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022).  Stripped of these bases for scienter, Lead Plaintiffs' theory amounts to asking the Court to infer scienter on the part of the Cecere, Dolan, Quinn, and Richard by virtue of their positions at USB and the alleged significance of the CFPB investigation.

This theory of scienter is the type of conclusory allegation that the PSLRA was enacted to prevent.  There is no allegation of any specific meeting between the CFPB and any of Cecere, Dolan, Quinn, or Richard at which they received any information about the unauthorized account openings or the progress of the CFPB's investigation.  *Cf. Gagnon*, 368 F. Supp. 3d at 774-75 (declining to find scienter for statements by the defendant-company, a drug manufacturer, that touted its net sales growth but did not disclose facts pertaining to its marketing of the drug to the criminal justice sector and the role of those effort in the drug's financial success, even though the Secretary of Maryland's Department of Health and Hygiene had called a meeting with the company to tell it to back off of talking down competing drugs to legislators).  Lead Plaintiffs make much of the statement by the Director of the CFPB that "for over a decade, U.S. Bank knew

its employees were taking advantage of its customers by misappropriating consumer data to create fictious accounts."  Am. Compl. ¶ 29; *see also id.* ("The CFPB's investigation found specific evidence that revealed that U.S. Bank was aware that sales pressure was leading employees to open accounts without authorization, and the bank had inadequate procedures to prevent and detect these accounts.").  But it is not clear what standard of proof or knowledge the CFPB Director relied on what he made this statement.  It therefore is also not clear, based on the Director's statement, who at U.S. Bank supposedly knew what and when.  This is insufficient, standing alone, to support a finding of scienter as to either the individuals or USB as a whole; again, corporate scienter must be alleged by stating allegations "(1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading."  *Loreley Fin. (Jersey) No. 3*, 797 F.3d at 177 (internal quotation marks omitted).  Neither route is adequately invoked by a single stray comment in a press release.

To the extent that Lead Plaintiffs seek to rely on the Individual Defendants' positions as executives at USB as the basis for scienter, that argument strays dangerously close to the core operations doctrine.  "The core operations doctrine provides that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue."  *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 n.4 (2d Cir. Oct. 25, 2022) (internal quotation marks omitted).  This doctrine holds little sway here, however, because the number of unauthorized accounts was, in comparison to USB's vast business, negligible.  In addition, the Second Circuit has "not clearly affirmed the validity of this doctrine following the passage of the PSLRA."  *Id.* And so courts in this Circuit generally treat core operations allegations as providing

"supplementary but not independently sufficient means to plead scienter." *Cortina v. Anavex Life Sci. Corp.*, No. 15 Civ. 10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016) (internal quotation marks omitted).

Even were one to assume that Lead Plaintiffs' argument does not rely on the core operations doctrine, their approach is unconvincing. While it is a plausible inference that, from May 4, 2021 onward, USB executives were likely aware of an CFPB investigation, Lead Plaintiffs have made no allegations that the CFPB informed USB that its investigation involved the unauthorized openings of accounts or otherwise communicated to USB the findings from that investigation prior to discussions leading to USB's entry into the Consent Order. *Cf. Fifth Third Bancorp*, 2022 WL 1642221, at *21-22 (declining to find scienter in case involving the failure to disclose unauthorized account openings where, *inter alia*, the defendant-company allegedly had "disclosed more than 1,000 unauthorized accounts to the CFPB during a 2015 investigation"). Indeed, the only allegation that sheds any light on what USB and its executives knew about the CFPB's investigation and its focus is the disclosure, starting on May 4, 2021, that the CFPB "is investigating certain of the Company's consumer sales practices." Am. Compl. ¶ 118; *accord id.* ¶ 120. Consumer sales practices is a vast category and the fact that USB knew that this subset of its operations was being investigated reveals little about whether the executives or USB had knowledge that a small number of unauthorized accounts had been opened in the preceding decade. *See Fifth Third Bancorp*, 2022 WL 1642221, at *21-22 ("The only direct link to either Defendant is that the CFPB CIDs were addressed to [the company's President and CEO]. But all [that defendant]'s assumed receipt of the CIDs demonstrates is that he knew of the investigation, not necessarily of the problem itself.").

There also are no allegations to support the inference that executives at USB had been informed that an enforcement action was inevitable or even likely at any point prior to the Consent Order.  At most, certain Defendants had been informed that the CFPB was *considering* an enforcement action as of May 3, 2022. *See* Am. Compl. ¶ 120.  Indeed, the entirety of the concrete allegations in this regard is the existence of the disclosures themselves, causing Lead Plaintiffs' theory of scienter to smack strongly of the impermissible practice of pleading fraud by hindsight. *See Novak*, 216 F.3d at 309 ("[W]e have refused to allow plaintiffs to proceed with allegations of fraud by hindsight.  Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." (internal quotation marks and citations omitted)).  Ultimately, even while drawing all reasonable inferences in their favor, Lead Plaintiffs ask the Court to stack inference upon inference, which the PSLRA prohibits.  The Court accordingly finds that Lead Plaintiffs have failed to adequately plead scienter.

## E.    Loss Causation

Given the above conclusions, the Court does not reach Defendants' loss causation arguments. *See Diehl*, 339 F. Supp. 3d at 170.

## F.    Scheme Liability

In Count I, Lead Plaintiffs reference subsections (a) and (c) of Rule 10b-5, which prohibit, respectively, "employ[ing] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit."  17 C.F.R. § 240.10b-5(a), (c).  Lead Plaintiffs argue that Defendants, by not addressing these subsections in their opening brief, have forfeited any objection to allowing this Count to proceed based on alleged

violations of these two subsections.  Opposition at 34-35.  In response, Defendants argue that they had no obligation to anticipate Lead Plaintiffs' specific arguments and thus were not required to address scheme liability.  Reply at 18 n.18.  And, more substantively, Defendants contend that Lead Plaintiffs have failed to state a scheme liability claim because they have not alleged a "deceptive act" distinct from any alleged omissions.  *Id.* at 17-18.

To state a scheme liability claim, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *Danske Bank A/S*, 11 F.4th at 105.  "Because scheme claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  To maintain a Rule 10b-5(a) or Rule 10b-5(c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  *Id.*  As recently confirmed by the Second Circuit, "misstatements and omissions alone are not enough for scheme liability."  *Rio Tinto plc*, 41 F.4th at 54.

The Court exercises its discretion to overlook Defendants' failure to mention scheme liability in their opening brief given the paucity and plainly deficient pleading of that theory in the Amended Complaint. *See Leo v. Leisure Direct, Inc.*, No. 06 Civ. 13566 (DAB), 2018 WL 4119128, at *2 (S.D.N.Y. Aug. 29, 2018) ("A district court has discretion as to whether to consider an argument raised for the first time in a reply brief.").  First and foremost, Lead Plaintiffs have failed to plead scienter or any actionable misstatements, so their scheme liability claims necessarily fail. *See supra* III.B-D.  In addition, Lead Plaintiffs rely on a small number of scattered cursory references in the Amended Complaint to a fraudulent scheme, none of which detail any scheme separate and apart from their core misstatements theory, as well as conclusory assertions.  *See*

Opposition at 34 (citing Am. Compl. ¶¶ 136-137, 153, 158); *see also* Am. Compl. ¶¶ 175 ("Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of USB securities was a success . . . ."), 176 (conclusory allegation of "dissemination" of false statements), 177 (stating the text of Rule 10b-5).  This pleading is analogous to that in *Danske*, where the plaintiffs did not

> articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it.  Instead, the claim rested upon the incorporation of the previous 140 pages of the pleading paired with the conclusory assertion that "Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to . . . deceive the investing public" and "artificially inflate the market price of Danske Bank ADRs."

11 F.4th at 105 (brackets omitted).  Thus, the Courts additionally finds, as the Second Circuit did in *Danske*, that "[a]bsent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, [Lead Plaintiffs' scheme liability] claim does not comply with the applicable heightened pleading standard and cannot go forward."  *Id.*  Accordingly, Count I is dismissed in its entirety.  But as discussed shortly, *see infra* III.H, the Court grants Lead Plaintiffs leave to amend, in the event they are able to adequately plead scheme liability under Rule 10b-5(a) and/or Rule 10b-5(c).

## G.    Section 20(a)

Because the Court has dismissed Lead Plaintiffs' Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims likewise fail for lack of a primary violation.  *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) (dismissing Section 20(a) control liability claims after dismissing Section 10(b) primary violations).  The Court therefore dismisses Count II of the Amended Complaint.

**H.    Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Lead Plaintiffs have asked the Court for leave to amend their Amended Complaint should the Court rule in Defendants' favor. Opposition at 35 n. 31. Because the Amended Complaint is the first complaint submitted following the appointment of Teamsters Local 710 Pension Fund and Ohio Carpenters Pension Fund as Lead Plaintiffs, the Court grants leave to amend. The Court emphasizes that Lead Plaintiffs should only file a Second Amended Complaint if they are able to remedy the pleading deficiencies identified herein.

## IV.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss and dismisses Plaintiffs' claims without prejudice. If Lead Plaintiffs decide to file a Second Amended Complaint, they must file it within thirty days of this Opinion and Order. Failure to file a Second Amended Complaint by that deadline, and without showing good cause to excuse such failure in advance of the deadline, will result in the dismissal of Plaintiffs' claims with prejudice. The Clerk of Court is respectfully directed to close the motion pending at Docket Number 40.

SO ORDERED.

Dated: March 28, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge

64